# EXHIBIT B

# STOCK PURCHASE AGREEMENT

dated **June 8, 2012**, by and between

## ONEBEACON INSURANCE GROUP LLC

and

## NORTH AMERICAN CASUALTY CO.

# STOCK PURCHASE AGREEMENT

**THIS STOCK PURCHASE AGREEMENT** (this "Agreement") is made and entered into as of **June 8, 2012** (the "Effective Date"), by and between OneBeacon Insurance Group LLC, a Delaware limited liability company (the "Seller") and North American Casualty Co., a Nebraska corporation (the "Buyer"). (The Seller and the Buyer are sometimes referred to individually as a "Party" and, collectively, as the "Parties".) Unless otherwise defined in this Agreement or the context clearly requires otherwise, all initially capitalized terms used in this Agreement are defined in Section 11.13.

## BACKGROUND

**WHEREAS**, the Seller owns all of the issued and outstanding shares of capital stock of Pennsylvania General Insurance Company, a stock insurance company domiciled in the Commonwealth of Pennsylvania (the "Company");

**WHEREAS**, the Seller desires to sell to the Buyer, and the Buyer desires to purchase from the Seller, all of the issued and outstanding shares of capital stock of the Company upon and subject to the terms and conditions set forth herein; and

**WHEREAS**, the Buyer's intent in acquiring such shares of capital stock of the Company is that, as of the Closing, the Company shall be an entity (a) the assets of which consist only of (i) its corporate franchise, (ii) its licenses and authorizations to conduct the business of insurance as specified in such licenses and authorizations and (iii) Deposits which, collectively, have an aggregate Market Value equal to the Capital Amount (as defined herein), and (iv) any Net Cash Surplus (as defined herein).

**NOW, THEREFORE**, the Parties, in consideration of the mutual covenants and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, intending to be legally bound, each do hereby promise and agree as follows:

## ARTICLE I

### Purchase and Sale of Stock

1.1.    Purchase of Stock.  Upon and subject to the terms and conditions set forth in this Agreement, at the Closing, the Seller shall sell, transfer, assign and deliver to the Buyer, and the Buyer shall purchase, acquire and accept from the Seller, 60,000 shares of common stock of the Company, $70.00 par value per share (the "Shares"), which Shares constitute all of the issued and outstanding shares of capital stock of the Company, free and clear of all Encumbrances.

1.2.    Purchase Price; Payment of Purchase Price.

(a)    The purchase price payable by the Buyer for the purchase of the Shares shall be an amount equal to the sum of the following (the "Purchase Price"): (i) the Market Value as of the Closing Date of the Deposits and any remaining Net Cash Surplus (the "Capital Amount") provided that the Capital Amount shall not exceed the sum of Ten Million and no/100 Dollars ($10,000,000.00); and (ii) Four Million Seven Hundred Thousand and no/100 Dollars ($4,700,000.00). In the event that the Capital Amount does exceed the sum of Ten Million and no/100 Dollars ($10,000,000.00) the Seller shall remove such excess amount prior to or concurrent with the Closing as provided in section 1.4.

(b)    At the Closing, the Buyer shall pay the Purchase Price (less the amount of the Earnest Money Deposit, which the Seller shall apply to the Purchase Price at the Closing) to the Seller by wire transfer of immediately available funds to an account designated by the Seller by notice to the Buyer not less than three (3) days prior to the Closing Date.

1.3    Earnest Money Deposit.

(a)    Earnest Money Deposit. At the time of Buyer's execution and delivery of the Agreement, the Buyer shall deliver to the Seller the sum of One Hundred Thousand and no/100 Dollars ($100,000) as earnest money in cash (the "Earnest Money Deposit"). The Earnest Money Deposit shall be held and disbursed in accordance with the provisions of Section 1.3.(b) below:

(b)    Application of Earnest Money Deposit. The Earnest Money Deposit shall be deemed earned by the Seller and shall be non-refundable to the Buyer except that the Earnest Money Deposit shall be applied as follows:

(i)    The Earnest Money Deposit shall be returned to the Buyer in the event that this Agreement is terminated pursuant to the provisions of Section 9.1.(a), Section 9.1(b) or Section 9.1.(c);

(ii)    The Earnest Money shall be applied to the Purchase Price in the event that the Closing occurs as provided in this Agreement;

(iii)    In all other events, if the Agreement is terminated or the Closing does not occur, time being of the essence, the Earnest Money shall be retained by the Seller, in full, including any earnings thereon.

1.4    Removal of Net Cash Surplus. Prior to the Closing, the Seller shall seek to remove as many of the Assets then held by the Company in excess of the Market Value of the Deposits (the "Net Cash Surplus") as possible, subject to obtaining the required permission therefor, if any, from the applicable Governmental Authority regulating such activities.

1.5    Assets at Closing; Closing Value. As of the Closing, the net assets of the Company shall consist of the following: (i) its corporate franchise, (ii) all Governmental Authorizations currently reflected in Schedule 1.5(ii)-A (the "Current Licensed Authority") and

2

Schedule 1.5(ii)-B, (the "Current Certificates of Authority"); (iii) the Deposits reflected on Section 4.1.17(g) of the Disclosure Schedule, and (iv) the assets relating to any remaining Net Cash Surplus. Not more than two (2) Business Days prior to the Closing Date, Seller shall deliver to Buyer a calculation of the aggregate Market Value of the Deposits and the assets relating to any remaining Net Cash Surplus as of the date that is three (3) Business Days prior to the Closing Date (the "Estimated Capital Amount Value"), and such Estimated Capital Amount Value shall be the amount paid to the Seller by the Buyer on the Closing Date as the Capital Amount portion of the Purchase Price  The determination of the aggregate Market Value of the Deposits and Net Cash Surplus shall be made pursuant to the methods set forth in the definition of Market Value in this Agreement. If the Closing does not occur within three (3) days after the Estimated Capital Amount Value is delivered to the Buyer, an Adjusted Capital Amount Value shall be calculated by the Seller and presented to the Buyer within three (3) days after the Closing, to be paid within five (5) business days.

  1.6 Runoff Policies / Reinsurance.  The parties agree that the lawyers' professional liability and managed care errors and omissions policies listed on Schedule 1.6 ("Runoff Policies") shall remain with the Company after the Closing Date. Commencing on the Closing Date and continuing through the last renewal date of the Runoff Policies OneBeacon Insurance Company shall 100 % reinsure the Runoff Polices under a reinsurance agreement ("Reinsurance Agreement"). During the term of the Reinsurance Agreement, the Buyer shall cause the Company to maintain an A.M. Best rating of A or better.

ARTICLE II

Conditions Precedent to the Closing

  2.1. Conditions Precedent to the Buyer's Obligation.  The obligation of the Buyer to consummate the transactions contemplated by this Agreement is subject to the satisfaction, at or prior to the Closing, of each of the following conditions, any of which may be waived in writing exclusively by the Buyer. The conditions precedent  set forth in this Article II are not conditions precedent to the right of the Seller to retain the Earnest Money Deposit as set forth in Section 1.3 of this Agreement :

  (a) Each of the representations and warranties of the Seller made in this Agreement,  and in the exhibits and schedules hereto  and the statements contained in the Disclosure Schedule shall be true and correct,  except to the extent that the failure to be true and correct has not had and would not reasonably be expected to have a Material Adverse Effect, as of the date hereof and on and as of the Closing Date, as though made on and as of the Closing Date (except that any such representation and warranty that is given as of a particular date or period and relates solely to such particular date or period shall be true and correct only as of such date or period); the Seller shall have performed or complied in all material respects with all of the covenants, agreements and obligations of the Seller contained in this Agreement  required to be performed on or prior to the Closing Date; and the Seller shall have delivered to the Buyer a

3

certificate dated as of the Closing Date signed by an authorized officer thereof confirming the foregoing.

(b)    All approvals from the Regulator required to consummate the transactions contemplated hereby shall have been obtained in form and substance reasonably satisfactory to Buyer and shall remain in full force and effect and all statutory waiting periods in respect thereof shall have expired or been terminated.

(c)    The third party consents listed on Schedule 2.1(c) shall have been obtained and shall remain in full force and effect, in form and substance reasonably satisfactory to the Buyer.

(d)    No Proceeding shall be pending or threatened before any Governmental Authority, and no Order shall be in effect, which in any manner challenges or seeks to enjoin, restrain, alter, materially delay or otherwise prevent the consummation of any of the transactions contemplated by this Agreement or which might reasonably be expected to impair or otherwise adversely affect the ability of the Company to conduct the business of insurance in any jurisdiction where it is licensed as of the date of this Agreement, and no Party shall have received from any Governmental Authority required to approve the transactions contemplated hereby, any request (whether written or oral) that the Closing be postponed.

(e)    The Seller shall have delivered to the Buyer the documents, certificates, agreements, instruments and other deliveries required pursuant to Section 3.3.

(f)    Since the Effective Date, there shall not have been any Material Adverse Effect on the business, operations, assets, results of operations, or condition (financial or otherwise) that remains uncured at Closing.

(g)    No Proceeding in which the Company or the Seller shall be a debtor, defendant or party seeking an order for its own relief or reorganization shall have been brought or be pending by or against such Person under any federal, state or foreign bankruptcy or insolvency Law.

(h)    As of the Closing, the Company shall not own or lease any real property.

(i)    The Company shall not lease any tangible personal property or assets, and all owned tangible personal property or assets shall be free and clear of all Encumbrances.

(j)    The assets of the Company shall consist only of the following: (i) its corporate franchise, (ii) all Governmental Authorizations necessary to conduct business as an admitted insurer in each jurisdiction as specifically described in Schedules 1.5(ii)-A and 1.5(ii)-B, (iii) the Deposits reflected on Section 4.1.17(g) of the Disclosure Schedule (iv) the assets relating to any remaining Net Cash Surplus, and (v) reinsurance assets and gross policy related assets.

2.2.    Conditions Precedent to the Seller's Obligation. The obligation of the Seller to consummate the transactions contemplated by this Agreement is subject to the satisfaction, at or

4

prior to the Closing, of each of the following conditions, any of which may be waived in writing exclusively by the Seller:

(a)     Each of the representations and warranties of the Buyer made in this Agreement,  and in the exhibits and schedules hereto  shall be true and correct as of the date hereof and on and as of the Closing Date, (except that any such representation and warranty that is given as of a particular date or period and relates solely to such particular date or period shall be true and correct only as of such date or period) as though made on and as of the Closing Date; the Buyer shall have performed all of the covenants, agreements and obligations of the Buyer contained in this Agreement  required to be performed on or prior to the Closing Date; and the Buyer shall have delivered to the Seller a certificate dated as of the Closing Date signed by an authorized officer of the Buyer confirming the foregoing.

(b)     All approvals from the Regulator required to consummate the transactions contemplated hereby shall have been obtained in form and substance reasonably satisfactory to Seller and shall remain in full force and effect and all statutory waiting periods in respect thereof shall have expired or been terminated.

(c)     The third party consents listed on Schedule 2.1(c) shall have been obtained and shall remain in full force and effect, in form and substance reasonably satisfactory to the Seller.

(d)     No Proceeding shall be pending or threatened before any Governmental Authority, and no Order shall be in effect, which in any manner challenges or seeks to enjoin, restrain, alter, materially delay or otherwise prevent the consummation of any of the transactions contemplated by this Agreement, and no Party shall have received from any Governmental Authority any request (whether written or oral) that the Closing be postponed.

(e)     The Buyer shall have delivered to the Seller the Purchase Price, and the documents, certificates, agreements, instruments and other deliveries required pursuant to Section 3.2 below.

**Schedule 4.1.13**
**Contracts**

(a) (iii)

The Company anticipates it will contract at Closing with OneBeacon Insurance Company to cede as reinsurance all of its liabilities relating to the Runoff Policies at Closing, in the form of agreement that has previously been provided to Buyer.

The Company anticipates it will contract at Closing with OneBeacon Insurance Company to transfer through a transfer and assumption agreement all of its liabilities resulting from policies previously issued by the Company but expired as of Closing.

Purchase Agreement among OneBeacon Insurance Group, Ltd., OneBeacon Insurance Group LLC, OneBeacon America Insurance Company, The Employers' Fire insurance Company, The Camden Fire Insurance Association, Homeland Insurance Company of New York, OneBeacon Insurance Company, OneBeacon Midwest Insurance Company, Pennsylvania General Insurance Company, The Northern Assurance Company of America (collectively "Sellers"), and Tower Group, Inc.

Acquired Business Reinsurance Agreement by and between Pennsylvania General Insurance Company and Tower Insurance Company of New York dated as of July 1, 2010

Acquired Business Administrative Services Agreement by and between Pennsylvania General Insurance Company and Tower Insurance Company of New York effective as of July 1, 2010

Renewal Rights and Asset Purchase Agreement among OneBeacon Insurance Group, Ltd., Atlantic Specialty Insurance Company, Homeland Insurance Company of New York, OneBeacon America Insurance Company, OneBeacon Insurance Company, OneBeacon Midwest insurance Company, Pennsylvania General Insurance Company, The Camden Fire Insurance Association, the Employers' Fire Insurance Company, OneBeacon Insurance Group LLC, (collectively "Sellers"), The Hanover Insurance Company, and the Hanover Insurance Group Inc. dated as of December 3, 2009

Reinsurance Agreement by and among OneBeacon Insurance Group LLC, OneBeacon Insurance Company, all other direct and indirect insurance company subsidiaries of OneBeacon Insurance Group LLC listed on Exhibit A hereto and The Hanover Insurance Company dated December 3, 2009

The Reinsurance Agreement by and Among The Camden Fire Insurance Association (/) Pennsylvania General Insurance Company (Company) and AutoOne Insurance Company (Reinsurer) dated February 22, 2012

The Administrative Services Agreement by and between The Camden Fire Insurance Association (/) Pennsylvania General Insurance Company and AutoOne Insurance Company dated February 22, 2012

Purchase Agreement by and among OneBeacon Insurance Company, The Camden Fire Insurance Association, Pennsylvania General Insurance Company, OneBeacon U.S. Financial Services, Inc. and Interboro Holdings, Inc. dated as of August 30, 2011

Instrument of Transfer and Assumption agreement by and between American Employers Insurance Company and Pennsylvania General Insurance Company dated June 15, 2005 [Note that American Employers Insurance Company is no longer an Affiliate of the Company]

Instrument of Transfer and Assumption agreement by and between American Central Insurance Company and Pennsylvania General Insurance Company dated June 30, 2006

Adverse Development Agreement of Reinsurance between CGU Insurance Company and twenty six of its affiliated insurance entities including Pennsylvania General Insurance Company, on the one hand, and Potomac Insurance Company dated April 13, 2001

Aggregate Loss Portfolio Reinsurance between Potomac Insurance Company (Boston Massachusetts) and National Indemnity Company (Omaha Nebraska) dated March 14, 2001

(a) (iv)
 Trust Agreement by and among Pennsylvania General Insurance Company, Tower Insurance Company of New York and Wells Fargo Bank, N.A. dated as of July 1, 2010. As a result of the sale of OneBeacon's personal lines business effective July 1, 2010, the Company entered a reinsurance transaction with Tower Insurance Company of New York in which Tower reinsured all of the personal lines loss reserves of the Company. A related trust was established by Tower and PGIC is the beneficiary of the trust.

(a) (vi)
 The agreements listed in items (vi)(A) 1 and 2 which follow contain indemnifications from the listed OneBeacon Insurance Group entities including the Company to Tower Group, Inc. and to The Hanover Insurance Group, Inc., respectively.

(a) (vi) (A)

1. Purchase Agreement among OneBeacon Insurance Group, Ltd., OneBeacon Insurance Group LLC, OneBeacon America Insurance Company, The Employers' Fire insurance Company, The Camden Fire Insurance Association, Homeland

Insurance Company of New York, OneBeacon Insurance Company, OneBeacon Midwest Insurance Company, Pennsylvania General Insurance Company, The Northern Assurance Company of America (collectively "Sellers"), and Tower Group, Inc. dated as of February 2, 2010 contains a non-competition, non-solicitation and non-hire provision as follows.

    a.  Sellers may not, directly or indirectly, including through AutoOne Insurance Company and AutoOne Select Insurance Company, as affiliates of OneBeacon, for a period of 3.5 years from July 1, 2010, (i) operate, engage in, manage, own a Restricted Business, including by reinsurance, (ii) induce or persuade or attempt to induce or persuade any policyholder of the personal lines business as of July 1, 2010 to write or renew, or any agent or producer to place or to place the renewal of, any policy transferred to Tower with any company other than a company transferred to Tower, or (iii) induce or persuade or attempt to induce or persuade any policyholder, agent, producer or other person having business dealing with OneBeacon in connection with the Restricted Business to restrict or avoid entering into any business relationship or dealing with Tower or its affiliates. "Restricted Business" means the development, marketing, underwriting, issuance, sale, administration, renewal or servicing of voluntary and involuntary property and casualty insurance policies to individuals and households in their private capacity, including automobile, homeowners', fire, tenant-occupied dwellings, personal umbrella, personal inland marine, watercraft supported by homeowners or package, package, mobile home, landlord protector and fire, except for surplus lines high value property coverages or specialty lines business engaged in by OneBeacon as of July 1, 2010 including AutoOne.

    b.  Sellers may not, directly or indirectly, including through AutoOne Insurance Company and AutoOne Select Insurance Company, as affiliates of OneBeacon, may not for a period of 2 years from July 1, 2010 directly or indirectly employ or solicit to employ any former employee of OneBeacon who went to work for Tower in connection with the transaction in any capacity whatsoever.

(a) (vi) (A)

2.    Renewal Rights and Asset Purchase Agreement among OneBeacon Insurance Group, Ltd., Atlantic Specialty Insurance Company, Homeland Insurance Company of New York, OneBeacon America Insurance Company, OneBeacon Insurance Company, OneBeacon Midwest insurance Company, Pennsylvania General Insurance Company, The Camden Fire Insurance Association, the Employers' Fire Insurance Company, OneBeacon Insurance Group LLC, (collectively "Sellers"), The Hanover Insurance Company, and the Hanover Insurance Group Inc. dated as of December 3, 2009 contains certain non-competition provisions as follows.