UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

)
SPARTA INSURANCE COMPANY            )
(As successor in interest to        )
Sparta Insurance                    )
Holdings, Inc.),                    )  Civil Action
                    Plaintiff       )
vs.                                 )  Number 21-11205-FDS
                                    )
PENNSYLVANIA GENERAL INSURANCE      )
COMPANY (now known as               )
Pennsylvania Insurance              )
Company),                           )
                    Defendant       )
                                    )
                                    )

BEFORE:  CHIEF JUDGE F. DENNIS SAYLOR

MOTION HEARING

John Joseph Moakley United States Courthouse
Courtroom No. 10
1 Courthouse Way
Boston, MA 02210

NOVEMBER 2, 2022
4:00 p.m.

Valerie A. O'Hara
Official Court Reporter
John Joseph Moakley United States Courthouse
1 Courthouse Way
Boston, MA 02210
E-mail: vaohara@gmail.com

APPEARANCES:

For The Plaintiff:

    Skadden, Arps, Slate, Meagher & Flom LLP, by JAMES R. CARROLL, ESQ., CHRISTOPHER G. CLARK, ESQ., and CATHERINE A. FISHER, ATTORNEY, 500 Boylston Street, Boston, Massachusetts 02116;

For The Defendant:

    Boies Schiller Flexner LLP, by SAMUEL CHARLES KAPLAN, ESQ., and VICTORIA SCORDATO, ATTORNEY, 1401 New York Avenue NW, Washington, D.C. 20005;

    Boies Schiller Flexner LLP, by ERIKA NYBORG-BURCH, ATTORNEY, 44 Montgomery Street, 41st Floor
San Francisco, CA 94104

    Cohen Kinne Valicenti & Cook LLP, by JOHN F. DEW, ESQ., 28 North Street, Pittsfield, Massachusetts 01201.

<u>PROCEEDINGS</u>

THE CLERK:  Court is now in session in the matter of Sparta Insurance Company vs. Pennsylvania General Insurance Company, Civil Action Number 21-11205.

Participants are reminded that photographing, recording or rebroadcasting of this hearing is prohibited and may result in sanctions.

Would counsel please identify themselves for the record, starting with the plaintiff.

MR. CARROLL:  Your Honor, James Carroll together with Christopher Clark and Catherine Fisher for plaintiff.

THE COURT:  Good afternoon.

MR. KAPLAN:  Good afternoon, your Honor, Sam Kaplan with my colleagues, Erika Nyborg-Burch, Jack Dew, and Victoria Scordato for the defendant.

THE COURT:  All right.  Good afternoon. Mr. Kaplan, I think you were the one who had asked to move this hearing.  I probably grant 99 percent of those requests, and the only reason I didn't here is I'm about to leave the country for a couple of weeks, and we have Thanksgiving, and I've got a difficult December schedule, and I just needed to make this happen, so I appreciate your patience, what I'm sure is not an ideal circumstance for you.

We have two cross-motions for judgment on the

1   pleadings.  I'm not sure what's logical, but, Mr. Carroll, I

2   think you filed your first, so I'll hear from you first.

3   MR. CARROLL:  Thank you, your Honor, and thank you

4   for properly scheduling this.  And our regrets to

5   Mr. Kaplan, I know it's inconvenient, but I appreciate

6   everyone getting on.

7   The motion, your Honor, is ripe for this time and

8   decision, and putting aside the argument that I think can be

9   quickly dealt with respect to any ambiguity, the heart of

04:03PM 10   the matter, I think, isn't any contention by PGIC that it

11   never assumed the AEIC obligations but, rather, as I

12   understand it, that it off-loaded those obligations and

13   became no longer liable to Sparta as a result of the 2012

14   agreement that it entered, a bilateral agreement with

15   OneBeacon.  And Sparta, of course, was not a party to that

16   agreement.

17   The agreements that we bring the claim under, the

18   2007 and 2005 agreement effectively incorporated therein

19   provided means by which if PGIC wished to get out from under

04:04PM 20   its promises to Sparta that it undertook in 2007, it could

21   seek to do so, and the parties -- and this is a very

22   sophisticated contract entered into by sophisticated parties

23   with counsel in 2007 -- that contract envisions ways you can

24   do that.

25   It envisions that the parties could have an

1    assignment, that PGIC might have an assignment of its

2    obligations to someone else, but if it wanted to do that, it

3    would have required the prior written consent of Sparta,

4    which, of course, it did not obtain.

5            Similarly, the contract provides that if there's

6    going to be an amendment or if there's going to be some sort

7    of waiver under the contract, those are means by which PGIC

8    could escape its promises, but those, too, pursuant to the

9    expressed terms of the agreement require the prior written

04:05PM 10    consent.

11           So, effectively, what it boils down to, I believe,

12    your Honor, is whether there are some sort of affirmative

13    defenses asserted here, and, respectfully, I don't think we

14    ignore them.  What we're arguing is that they do not legally

15    matter that could permit PGIC to get out from under the

16    obligations it undertook in 2007.

17           So what do we have in that regard?  To PGIC's

18    credit, PGIC isn't arguing, nor could it, that, well, we

19    need discovery because we're going to stumble upon some

04:05PM 20    prior written consent.  That certainly isn't what's going on

21    here, nor are they saying, nor would they say, that some

22    human being would raise their hand and swear that there was

23    somehow an oral consent.  If that even mattered, the

24    agreement would say that it does not.

25           Written consent is required, that's what the

parties agreed to.  As I understand it, what the thrust of

the argument is is that somehow by conduct, by conduct

subsequent to 2012, Sparta somehow relinquished its rights

as against PGIC by continuing to do what PGIC argues that it

did before 2012, and that is hand over the claims to

OneBeacon so that they can be administered and paid as they

come in, which, indeed, seems to have been the case

happening since 2007 consistent with the parties'

agreements.

04:06PM        And as I understand the argument, the fact of the

continuing to do so should be interpreted legally as some

sort of implied novation or implied consent or implied

amendments to the contract.

And using the words that Judge Stearns used in the

*HSBC* case, the contract itself eviscerates that notion, just

as it eviscerates the notion that you can have an amendment

without prior written contract, it eviscerates this notion

that the conduct that PGIC points to could possibly suffice

to allow it to escape its obligations, and here's why, your

04:07PM Honor:

The stock purchase agreement, and I emphasize this

because we didn't give it great emphasis in the papers,

Section 11.2C of the stock purchase agreement provides that

the obligations under the agreement were enforceable as

against PGIC or OneBeacon.

1          OneBeacon was a party to that 2007 agreement.

2     They were the guarantor, but under Section 11.2C, OneBeacon

3     was subject to enforcement of all the obligations under that

4     agreement just as PGIC was.

5          So the discovery PGIC says it wants to develop,

6     what would that show?  Well, presumably they hope it will

7     show that Sparta continued to submit those claims to

8     OneBeacon after being on notice in 2012 or whenever that

9     might have been and that something should have been done.

04:08PM 10          That makes no sense under the contract because

11     Sparta was at all times able to and apparently did submit

12     the claims to OneBeacon, and they were paid and paid and

13     paid until 2021.  Nothing changed in that regard from

14     Sparta's point of view.

15          Nothing in that course of conduct could possibly

16     be read to waive any rights about PGIC.  If PGIC wanted out

17     from under, presumably they could have come and bargained

18     for it, I imagine would have had to pay for it and would

19     have had an amendment or agreed upon assignment.  The course

04:09PM 20     of assignment is consistently with the contract as it exists

21     in 2007, and even in PGIC's wildest dreams of what the

22     discovery might say, it doesn't provide a legal basis to get

23     out from under the obligations.

24          So to with respect to arguments about statute of

25     limitations, for example, there's 28 purported affirmative

1    defenses thrown up against the wall.  They don't have legal

2    merit, even if you had all the discovery you would want,

3    statute of limitations, for example.

4         Two levels to that argument, your Honor:

5         The first is the present dispute we have between

6    Sparta and PGIC.  That arose just in 2021, and the record

7    before your Honor is clear.  Sparta all of a sudden is faced

8    with these claims that were previously being handled and

9    paid for.  They're not being paid for, they go to PGIC and

04:09PM 10  said, hey, 2007 agreement, pay them.  That doesn't happen,

11   the suit promptly follows.

12        With respect to arguments that might be made, and

13   there was some filing late this afternoon about statute of

14   limitations with respect to underlying claims, the

15   underlying policyholder claims, well, those obligations

16   belong to PGIC.  In the 2005 agreement incorporating the

17   2007, it is PGIC that undertook to administer those claims,

18   to process those claims, and to pay those claims.

19        If PGIC is of the view that there's some claims

04:10PM 20  there that shouldn't be paid because of statute of

21   limitations issues, it is on PGIC to take that up with the

22   claimant and sort that out as the claims administrator.

23        That certainly isn't a Sparta responsibility.

24   That's what Sparta paid millions and millions of dollars for

25   in 2007.  All of these asserted -- all of these asserted

1   implied-by-conduct purported affirmative defenses can't

2   operate to eviscerate the contract.  It's similar to the

3   ruling that Judge Stearns had that I mentioned, you can't

4   simply say, well, wait a second, I've got an affirmative

5   defense that is foreclosed by the expressed agreed upon

6   terms of the contract, the law that the parties agreed to

7   live by and avoid a judgment of the pleadings.

8           That's effectively the crux of the dispute as we

9   understand it, your Honor.  I don't understand PGIC, perhaps

04:11PM 10   I'll be corrected, to be saying they never had the

11   liabilities.  The question is can we get out from under them

12   and how the contract forecloses simply saying, well, you

13   know, maybe there's some implied by conduct excuse.

14          This is exactly why parties go to the extent of

15   negotiating and paying people to put in place these very

16   elaborate contracts in the first place.  That's the thrust

17   of the motion.  It's decidable as a matter of law on the

18   papers before your Honor, and we would respectfully urge

19   that you do so.

04:11PM 20          THE COURT:  All right.  Mr. Kaplan.

21          MR. KAPLAN:  Thank you, your Honor.  The simplest

22   basis for resolving this motion is that we have 28

23   affirmative defenses.  They filed a motion for judgment on

24   the pleadings, and pleadings is plural, of course, in such a

25   motion.  It's got to address the answer, it's got to address

1   the affirmative defenses, and their motion does not address

2   the affirmative defenses, the substance of them at all, not

3   a substance of a single one.

4   They threw a few arguments in in their reply, and

5   they said, well, we're just responding to you pointing out

6   that you have affirmative defenses.  That's not the way it

7   works, your Honor.  It's like saying we filed a motion for

8   12(b)(6) and because some court somewhere has granted a

9   12(b)(6) motion, that we don't have to address your

04:12PM 10   underlying claims in our 12(b)(6) motion.  So that is one

11   just sort of basic point, your Honor.

12   And now, of course, in the end, if they have good

13   arguments, they're going to be addressed at some point, so

14   the first point is largely a procedural one.

15   And after this argument, if the Court has any

16   doubt as to whether this can be resolved on the pleadings,

17   we would request at a minimum the ability to reply a

18   sur-reply because the bottom line is we've never had a

19   chance to respond to their actual arguments on the

04:13PM 20   affirmative defenses, but, your Honor, I don't think --

21   there's so little basis for their motion, even taking into

22   account the arguments they raise for the first time in reply

23   that I don't know whether that will be -- it's my hope that

24   won't be necessary, and, in any event, this hearing is

25   valuable because your Honor has understandably given the

1    cryptic nature of their complaint, it's very difficult to

2    know what this case is actually about, and I think it is

3    important that the court understand what it's about and that

4    it -- and that it understands the basic foundation of the

5    case.

6         And what Mr. Carroll said at the start, I

7    partially agree with at least where we are at in this case

8    in the sense that my focus and my presentation is going to

9    be on the subsequent conduct and less on the interpretation

04:14PM 10   of the agreements, not because we agree with their

11   interpretation of the agreements, and I'll explain at the

12   end why we do not but because the interpretation of the

13   agreements cannot I don't think resolve the case entirely,

14   and what will ultimately resolve the case entirely is some

15   things related to our affirmative defenses.

16        Would it be permissible, your Honor, if I have one

17   slide that I think -- the relationship between the

18   corporations here is a little complicated, and I think a

19   slide will help orient things.  Would it be permissible for

04:15PM 20   me to share my screen?

21        THE COURT:  Yes.

22        MR. KAPLAN:  Thank you, your Honor.  Mr. Carroll's

23   comment about his own technological ability applies to me as

24   well, so just bear with me just one moment.

25        THE COURT:  You're triggering my PTSD from when I

1   was in private practice and my corporate partners would say

2   well, corporate structure is complex, and then the next

3   thing you're looking at this mass of LLCs and *Liechtenstein,*

4   *Gesellschafts,* and who knows what, and trying to sort it all

5   out, Panamanian corporations.

6          MR. KAPLAN:  Yes.  Hopefully that will have set

7   such a traumatic bar that we will fall well below it, your

8   Honor, and I think we probably will.

9          THE COURT:  As long as it's all rectangles, I can

04:16PM 10   handle it with no triangles and octagons.

11          MR. KAPLAN:  All right.  So we started out -- oh,

12   I'm sorry, I did the wrong thing there.  So we start out

13   with OneBeacon Insurance Group, Pennsylvania General

14   Insurance Company and OneBeacon Insurance Company as

15   subsidiaries of OneBeacon Insurance Group.

16          Now, even before the SPA with the knowledge of

17   Sparta, PGIC had already ceded all of their liabilities to

18   OneBeacon Insurance Company under an intercompany pooling

19   agreement, so this goes to the point, your Honor, that

04:16PM 20   OneBeacon -- that we will be talking about a few times as we

21   proceed through this, that OneBeacon Insurance Company was

22   always the real party in interest here and everybody knew

23   it.

24          The reason that PGIC was involved is that they

25   happened to be the parent of AEIC, but all of these

companies had the same corporate officials signing the

documents.  In fact, these agreements had the same corporate

officials signing the agreements to both parties to these

agreements, or at least some of them.

And here we go, we have AEIC as subsidiary, sorry,

hold on one second, a subsidiary of PGIC.

Now, in with the SPA, 2007, AEIC is sold off, this

is under the -- as a clean shell to Sparta.  OneBeacon

Insurance Company, and, again, this goes to the point that

they were always the real party in interest is made the

guarantor, and PGIC is the seller, and they have -- and they

are a party to the contract, and they have obligations under

the contract.

Now, those obligations, and this is one thing that

was not quite correct that Mr. Carroll said, he's right that

there's no written modification clause to the SPA, but the

obligations that they're asserting here are under the

transfer and assumption agreement from 2005, and the

indemnification that comes in the stock purchase agreement

is premised on alleged breaches of the 2005 agreement, and

that does not have a no written modification clause, so we

proceed from there to the fact that the -- so Sparta now has

AEIC as a clean shell, but part of the issue with the clean

shell is that they still, when there's no novation, and

there was no novation here with the policyholders, the

policyholders still have a direct relationship with Sparta

such that if the person responsible for the liabilities goes

broke, which is the only reason we're here, your Honor, is

because this company, OneBeacon, later Bedivere, when into

liquidation.  That's the only reason anyone is here.

But the AEIC policyholders still have a direct

relation with AEIC.  And then under the stock purchase

agreement, your Honor, it's noteworthy that notices under

the stock purchase agreement were to go only to OneBeacon

and not to PGIC.

There's no provision for notification to PGIC.

Now, of course, it's the same corporate officials, and so

notification to one corporate official is going to be

notification to all corporate officials so long as they are

members of the same corporate family.

But, nonetheless, as an illustration of the fact

that OneBeacon is the real party in interest here, the

notices were supposed to go to them even under the stock

purchase agreement, and they were the guarantor.

So then we go to what happened next in 2012, and

then at that point, the PGIC, all of PGIC's liabilities are

assumed by OneBeacon Insurance Company.  Oh, I apologize

your Honor, one fact that I left out is that I mentioned

early in this that the liabilities, all of PGIC's

liabilities, were ceded under the intercompany pooling

1    agreement to OneBeacon, even prior to transaction with

2    Sparta.

3         That, the one thing I left out is that Sparta knew

4    about that, and the reason we know they knew about that is

5    because of some third-party discovery that we've already

6    conducted or actually I should just say public records

7    request that show that they submitted a filing to get the

8    guarantor agreement approved, and the Massachusetts

9    regulator essentially said, well, this isn't going to change

04:21PM 10   anything because OneBeacon already is responsible for all of

11   PGIC's liabilities.

12        All right.  So then 2012, you have all of those

13   liabilities, PGIC's liabilities were assumed by OneBeacon

14   Insurance Company and PGIC was sold off as a clean shell to

15   North American Casualty Company.  OneBeacon assumed all of

16   PGIC's liabilities.

17        And now PGIC, like AEIC, still had the direct

18   relationship with policyholders, PGIC policyholders, so, for

19   example, PGIC also has -- is left holding the bag to a

04:22PM 20   certain extent by Bedivere's liquidation because they owe to

21   PGIC policyholders potentially, and PGIC policyholders will

22   contact them, and, again, the notices under the North

23   American Casualty Company purchase of PGIC go to OneBeacon

24   Insurance Company.

25        So, again, the point is that OneBeacon Insurance

1   Company is really, is the repository of the liability here.

2   That was always understood to be the case.  Then you have

3   the fact --

4        THE COURT:  Let me ask you, if it was always

5   understood, why wasn't it put in the contract, in other

6   words, if it's an underlying premise?

7        MR. KAPLAN:  Because if your Honor, for example,

8   PGIC had always stayed within the corporate family, the

9   OneBeacon Insurance Group corporate family, then the

04:23PM 10   contract would have provided that if theoretically they

11   wanted to go after PGIC instead of OneBeacon Insurance

12   Company, then, sure, you know, they would have had the right

13   under the contract to do that, but as a practical matter,

14   that was never going to happen because everybody knew.

15        Our point about what happened before, your Honor,

16   is that it informs what happened next that there was never,

17   there was no intent ever that PGIC sold off as a clean shell

18   to a company, who, by the way, your Honor, this is something

19   that defendant said they found, plaintiff said they found

04:24PM 20   puzzling that we say that we had no knowledge of the stock

21   purchase agreement, but that happens to be true because when

22   North American Casualty was sold, PGIC by OneBeacon

23   Insurance Group, they weren't even told about the stock

24   purchase agreement.

25        In fact, we didn't learn -- we didn't even learn

1    of the agreement until we were contacted in 2021.

2         And so then there's the next thing, your Honor,

3    there's the fact that -- so, again, your Honor, back to your

4    Honor's question, the point is that the prior corporate

5    relationships and the fact that OneBeacon was always known

6    to be the true holder of PGIC's liabilities, yes, as a

7    matter of formality, corporate form, PGIC, while they were

8    in the structure of OneBeacon Insurance Group, they also had

9    a relationship, but once they are sold off as a clean shell

04:25PM 10   with Sparta's knowledge that the liabilities were being

11   assumed, that prior -- that prior relationship, that prior

12   understanding of the corporate structure informs what

13   happened next, which is that, and we say appears here, your

14   Honor, because we've been completely out of it.

15        PGIC I don't think was ever really in it, but even

16   assuming they were before 2012, for nine years, at least,

17   OneBeacon Insurance Company has paid the claims as OneBeacon

18   Insurance Company, later renamed Bedivere and later taken, I

19   believe, out of the OneBeacon Insurance Group corporate

04:26PM 20   family, and there have been to our knowledge no

21   communications between PGIC and Sparta from 2012 to 2021.

22        For nine years, this has gone on.  Despite the

23   fact that Sparta knew about the sale of PGIC as a clean

24   shell, we haven't heard a peep from them until Bedivere went

25   belly up, and this has caused great prejudice because this

1  issue could have been resolved, you know, eight years ago,

2  then it could have been addressed with things like

3  reinsurance agreements or whatever, but literally North

4  American Casualty Company and PGIC, clean shell PGIC knew

5  nothing about the stock purchase agreement.  It wasn't even

6  disclosed to them, and there certainly was no attempt to

7  enforce the agreement against them.

8       So then, your Honor, you know, we get to the -- we

9  get to the affirmative defenses, and in order to prevail on

04:27PM 10  a motion for judgment on the pleadings, even if they had

11  actually done what they're supposed to do and actually

12  addressed the substance of the affirmative defenses in their

13  actual motion rather than reserving the arguments to apply,

14  they simply can't establish the demanding standard of a

15  motion for judgment on the pleadings, which requires that

16  they not be able to show any facts that could possibly give

17  rise to liability.

18       So there are all sorts of defenses that we believe

19  bar their claims, including novation.  Novation does not

04:28PM 20  have to be in writing.  Even when there's a no written

21  modification clause, it doesn't have to be in writing.  It

22  can be inferred from facts and circumstances, and those

23  facts and circumstances can include the fact that PGIC was

24  sold off as a clean shell leaving liability in the hands of

25  the company that everyone always knew was the real

1    guarantor, the real repository of these liabilities in the

2    first place, and that is reinforced by the absence of

3    contact, reinforced by the fact that OneBeacon has always

4    been the payor for these claims, and we believe also, your

5    Honor, we talked about this briefly on the scheduling call,

6    your Honor didn't schedule, didn't -- has not yet provided,

7    and I understand why for expert discovery in the case, but

8    we believe industry practice to.

9            From the start, your Honor, this explains why from

04:29PM 10   the start plaintiffs have sort of obscured what this case is

11   about because what they are trying to do, they try to

12   portray it as a standard indemnification type of case, but

13   it is not that.  It is, in fact, as near as we can tell,

14   unprecedented in insurance law for one clean shell company

15   to seek redress against another clean shell insurance

16   company, and so it's simply far more complicated and

17   involved than my friend has portrayed it and as they have

18   portrayed it from the start.

19           This is why in their initial complaint they

04:29PM 20   alleged that we had just been paying constantly.  We have

21   been paying for the claims constantly up until 2021, and

22   then there was this sudden abrupt face, and we told them

23   that wasn't true, and it wasn't true, and so in their

24   amended complaint, they obscured it by just using the

25   passive voice as to who was paying the claims and not

1    identifying who was paying the claims.

2    They know that it was important to establish an

3    uninterrupted practice because this nine-year gap is a

4    problem from them both because it provides support for the

5    novation, it provides support for many of the other

6    defenses, estoppel, unclean hands, and the like, but it also

7    is a statutes of limitations problem for them, and it's also

8    a latches problem, even if you assume the statute of

9    limitations is inapplicable.

04:30PM 10    They don't address latches at all even in their

11    reply, and in the statute of limitations section, they say,

12    well, it couldn't be a statute of limitations problem

13    because PGIC alleges that their first conversations were in

14    2021, and so that's when the controversy started.  That

15    isn't true.

16    I mean, it is true, the first part is true, it is

17    true that we say the only conversations were in 2021, but it

18    isn't true that that doesn't mean they couldn't have known

19    much sooner or didn't know a long time before that there was

04:31PM 20    a controversy because they knew that PGIC was being sold off

21    as a clean shell to somebody else, and they never even

22    bothered to contact them once during that entire period, and

23    so we have every reason to think that we would have had no

24    knowledge about this and that we would not have believed

25    that we were liable under the way that this works, under the

1    entire background of this agreement, under their knowledge

2    of the relationship between the corporate parties and the

3    interpooling agreement and all of that.

4         So I'll briefly address, your Honor, the issues of

5    the interpretation of the contract apart from the

6    affirmative defenses because I do disagree with my friend

7    that there is no dispute there.

8         They, I think, essentially boil down to the

9    following, your Honor:

04:32PM 10    They have never complied.  Even if you assume that

11   these contracts just apply, that none of the other stuff

12   that I talked about that we allege or that even if you

13   assume that it isn't there, just focus on the contracts,

14   they have never -- they can't win under the indemnification

15   provisions because the indemnification provision -- they

16   haven't complied with the indemnification provisions, and

17   they can't win under the duty to administer portion because

18   they haven't established a duty to administer.

19        Their initial complaint, or, actually, I'm sorry,

04:33PM 20   their amended complaint relied on a blatant miscommunication

21   of the transfer and assumption agreement, and then they

22   shifted gears without ever acknowledging it, and they just

23   tried to say that this kind of agreement necessarily

24   includes a duty to administer.

25        But that certainly isn't something that can be

1   established on the face of the contract, particularly when

2   the contract actually talks about a duty to administer with

3   respect to certain claims and doesn't talk about it with

4   respect to the other claims, but also as a matter of law,

5   there are two different types of reinsurance.

6          There's assumption reinsurance, and there's

7   indemnification reinsurance.  And under indemnification

8   reinsurance, there is no duty to administer, it's just a

9   duty to indemnify.  And, again, they haven't complied with

04:34PM 10   the indemnification part of the stock purchase agreement,

11   and they haven't established a duty to administer.

12          Then finally, your Honor, there is the

13   justiciability part.  We still have, under the scheduling

14   order established by the Court, we'll still file a reply to

15   the opposition to the motion -- to the opposition to our

16   motion for partial judgment that was filed today.

17          The gist of our friend's response was essentially

18   that there's nothing new here, nothing new to see here, this

19   is what your Honor already addressed in the original motion.

04:34PM 20   We respectfully disagree with that.

21          What is new is the fact that we have been able to

22   attach communications that they sent to us that reflect the

23   absence of compliance with the indemnification provisions,

24   and we have -- we also today -- oh, and the -- well, we also

25   pointed out that their motion is seeking through or they are

1   now seeking through the back door to try to allege new facts

2   about the claims, and, in addition, the purpose of our

3   notice today I think was not -- didn't have to do with the

4   statute of limitations.  What it had to do with is the fact

5   that if your Honor will look at the RFAs that are being

6   submitted, they demonstrate that it is not true that the

7   plaintiffs are seeking some simple declaratory judgment.

8         There are admissions in there to ask us to admit

9   to liability for or to admit to contract coverage for

04:36PM 10   thousands of claims, underlying claims, and the Declaratory

11   Judgment Act is not supposed to be used for that sort of

12   thing.  It's not supposed to be used as a circumvention for

13   a breach of contract claim.

14         And this reinforces what we've said from the

15   start, that for this to be a ripe dispute, they need to be,

16   at least on the indemnification provisions, they need to put

17   at issue, they need to put it in the context of particular

18   claims because that is how indemnification is sought in

19   insurance, in insurance actions.

04:36PM 20         So, your Honor, I think with that, unless the

21   Court has further questions, I think those are our basic

22   points.

23         THE COURT:  Mr. Carroll, a quick response.

24         MR. CARROLL:  Yes, thank you very much, your

25   Honor.  Let me start where Mr. Kaplan left off.  It doesn't

1    matter if it's indemnity insurance or re-assumption

2    insurance.  PGIC has categorically denied an obligation to

3    pay anything under any circumstances.

4         We believe the contracts clearly require them to

5    do it.  This is a ripe dispute.  We have paid millions and

6    millions of dollars.  They have paid nothing, and they have

7    taken the position that they will pay nothing, which will

8    continue until your Honor clarifies the parties' agreements

9    under the contract.

04:37PM 10         Counsel said, look, everyone knew PGIC's not in

11   it, was never intended to be in it from the beginning, and

12   OneBeacon was the real party in interest.

13         Respectfully, I'm unaware of any legal doctrine

14   that allows you to simply categorize someone as not the real

15   party in interest when it's a legal entity that is agreed to

16   be bound by a contract and the contract provides Sparta with

17   the right to enforce the promises under the contract as

18   against OneBeacon certainly but also and separately as

19   against PGIC.  That's what we're trying to do in this case.

04:38PM 20         You can't rewrite the contract to say, well,

21   PGIC's not in it because we have decided it's not the real

22   party in interest.  By the way, that's nowhere in the

23   contract, and, therefore, you're out from under all the

24   obligations that PGIC undertook.  It's just not a contract

25   document -- a doctrine.

1          Similarly, some of these affirmative defenses,

2     I'll give you just an example.  This is one of the ones that

3     was emphasized.  Asserted as an affirmative defense is the

4     following:  This is Number 22, plaintiff's claims and

5     requested declaratory relief are otherwise barred in whole

6     or part by the transfer and assumption agreement between

7     PGIC and OneBeacon and stock purchase agreement between

8     OneBeacon and North American Casualty, which complies with

9     all applicable statutes and regulations and are approved by

04:39PM 10     governmental authorities, essentially saying that Sparta's

11     rights and obligations somehow get wiped out by some other

12     contract to which they're not a party and approved by

13     regulators.

14          Well, I heard counsel say they didn't even know

15     about the stock purchase agreement, so presumably they

16     didn't provide that to any regulators when they were

17     approving it.  There's no contract doctrine that says if A

18     has a contract with B, B then can go into a contract with C

19     and wipe out A's rights.  It's just not an affirmative

04:39PM 20     defense to a contract action.

21          The suggestion that there's statute of limitations

22     I touched on, this dispute only ripened in 2021, Sparta has

23     moved promptly.  Latches in terms of sleeping on our rights,

24     similarly, there's no latches, there's no conceivable

25     latches argument where we've been being paid until 2021.

1    There was no dispute between the parties.  No one sat on any

2    rights.  We were being fully paid.

3         If we tried to bring an action any earlier than

4    that, we were told it's not judicable because you don't have

5    any damages, you have no claim to complain about, and that

6    would have been right.  It's simply not enough to say, well,

7    I've got a bunch of affirmative defenses and discovery might

8    give me some grounds to get out.

9         The affirmative defenses have to be legally

04:40PM 10   cognizable defenses to a contract action not foreclosed by

11   the terms of the contract itself.

12        THE COURT:  Okay.  Mr. Kaplan, any response to

13   that?

14        MR. KAPLAN:  Yeah, it really didn't address any of

15   the points.  Just in case there's any need for

16   clarification, the real -- as I said, the real party in

17   interest point isn't really about if they had decided say

18   in, you know, 2008 to try to enforce the agreement against

19   PGIC and PGIC said no, we're out, you know, it's not about

04:41PM 20   that, it's about what the combination of what everybody

21   understood to be the case combines with the fact that it was

22   then subsequently sold off as a clean shell combined with

23   the fact that they always sought redress only against

24   OneBeacon and combined with the fact that they never

25   contacted PGIC for nine years.

1          Those are -- it is the combination of those facts

2     that is so significant here, and, again, it's completely

3     unprecedented for them to do what they're trying to do, the

4     statute of limitations.

5          And plainly, your Honor, again, I just emphasize

6     the procedural posture here.  This is a company that didn't

7     even have knowledge of the contract under which it's being

8     sued, and this is a 12(c).  We haven't -- the pleadings

9     don't even or the complaint doesn't even accurately

04:42PM 10     represent all of the relationships, and, you know, not to

11     mention the fact that the small number of arguments that

12     they've actually made about the substance of the affirmative

13     defenses all come under reply when they knew what our

14     affirmative defenses were.

15          And while we, of course, agree with Mr. Carroll

16     that defenses have to be legally cognizable, there is no --

17     *Twombly*, you know, first of all, we feel like we have pled

18     sufficient facts in the affirmative defenses to make all of

19     these points that I've made here today but also the same

04:42PM 20     level of plausibility type analysis doesn't apply to

21     affirmative defenses.

22          I will note, your Honor, that that -- what I just

23     said is not entirely (indiscernible).  I think there are

24     District Courts that agree with it, but there is a case by

25     Judge Gorton in D. Mass, the *Hansen* case, which is

1   287 F.R.D. 119 that concludes that the pleading standard for

2   affirmative defenses is far less for obvious reasons, the

3   fact that the plaintiff has the ability to spend all this

4   time putting together their complaint, and they are in the

5   possession of the facts here.

6        They're the ones who even told us -- there, again,

7   they are the ones that told us about the existence of this

8   contract in the first place, and so there's all sorts of

9   reasons why it would be grossly unfair to deny us discovery

04:43PM 10  given the facts that we've pled.

11       The one case that they cite that denies that, just

12  one case in the contract setting.  It's a case where the

13  contract was just unambiguous and the arguments that were

14  being made could be readily resolved by the contract.  That

15  just isn't the case here.

16       THE COURT:  All right.  Your cross motion, I think

17  you indicated you wanted to file a sur-reply, but I think it

18  may make sense to talk about that as well, and I will permit

19  you to file that sur-reply, so, Mr. Kaplan, do you want to

04:44PM 20  take that up?

21       MR. KAPLAN:  I'm sorry, your Honor, is the

22  question whether -- the cross motion, the reply is still --

23  still has yet to be filed because we just got their

24  opposition today, so we can do within the schedule provided

25  by the Court's rules.

1    THE COURT:  I guess my point is, although it's not

2 completely ripe, the opposition having been filed today, I

3 thought it might be useful to have some argument on it today

4 to be followed by filing of a reply and sur-reply.  I

5 misspoke.

6    MR. KAPLAN:  I fully understand now.

7    THE COURT:  Recognizing it's not fully briefed,

8 but I think it would be useful to do this once rather than

9 twice.

04:45PM 10    MR. KAPLAN:  No, understood.  Yeah, I don't

11 have -- I addressed it briefly in my prior presentation, and

12 I don't know that I have a whole lot to add, but I would say

13 that, again, you know, plaintiffs -- their primary point is

14 that there's nothing new to see here.

15    We think we've established that there is no duty

16 to administer, and, regardless, the primary point is that

17 there's a procedure that they are supposed to follow to seek

18 indemnification, and they haven't done that, and their

19 notion that they are just seeking some, you know,

04:46PM 20 broad-ranging declaratory relief even so should be resolved

21 in the context of a concrete set of facts because that's the

22 way it is typically done, and it can easily be resolved in

23 the context of such claims where they've actually complied

24 with the terms of the indemnification provision.

25    And, finally, their discovery requests that we

1    submitted today, if your Honor looks at them, you'll see

2    that it belies the notion that that's really what they're

3    trying to do here, that all trying to do is this declaratory

4    relief type thing.  They're trying to get in through the

5    back door a bunch of claims or a bunch of discovery about

6    actual claims, which is contradictory to what they say, to

7    what they say they're trying to do.

8         And then, finally, there's the fact that, and your

9    Honor did sort of address what I'm about to say in your

04:47PM 10    original order on the motion to dismiss, but we pointed out

11    that at least as far as the indemnification relief that they

12    seek, the Count One, it truly is framed as an obey the law

13    or obey your contract injunction.

14         It just contracts the contractual language and

15    would not advance the ball, and so they seem to be trying to

16    have it both ways, to seek this sort of general, general

17    declaratory relief or obey your contract relief, which

18    doesn't advance the ball, and then through the back door,

19    they seek to be trying to get all this substantive discovery

04:48PM 20    as to the underlying claims, and so we think that that just

21    reinforces the idea that at least as to the motion for

22    judgment on the pleadings, at least for the indemnification

23    claim, which is all we're seeking affirmative relief on at

24    this moment, that that should -- that that claim isn't ripe,

25    and it needs to be done in compliance with the contractual

1     procedures and a concrete set of facts.

2              THE COURT:  All right.  Mr. Carroll.

3              MR. CARROLL:  Thank you, your Honor.  Just a few

4     points.  First, the record is clear, and there can't be no

5     dispute that Sparta has made millions of dollars.  The

6     record is clear that there can be no dispute that PGIC takes

7     the position that it has no legal obligations to Sparta

8     under these contracts.  That is the legal issue we need to

9     have resolved.

04:48PM 10        It's not at this juncture about this particular

11     claim or that one.  They take the position they are

12     responsible for none of them.  We need that resolution to

13     come to the court seeking that, please.

14              With respect to the last point that we're

15     proceeding with discovery, that's consistent with what your

16     Honor instructed when we had the scheduling conference.  We

17     asked that this hearing be set, and you accommodated us, and

18     we're grateful for that, but the rest of the case isn't

19     stayed, and we're proceeding in parallel, not because we

04:49PM 20     think we should have to but because that's what the schedule

21     permits, and we don't want any delay.

22              There's no inconsistency with that, and so we

23     respectfully submit the issue is a legal one, it's framed

24     appropriately, and the contract itself precludes what are

25     being purported as affirmative defenses, which have been

1  foreclosed by the very detailed agreement that the parties

2  agreed upon, and thank you, your Honor, for your time.

3          MR. KAPLAN:  May I make one point, your Honor, for

4  clarification?

5          THE COURT:  Yes.

6          MR. KAPLAN:  In case I was unclear, the problem

7  isn't that they're proceeding with discovery in the

8  abstract, we certainly agree, and, in fact, that's what we

9  want to do is just get to discovery, and we view this motion

04:50PM 10  as not -- it lacks merit, and that's where we should be

11  focused.

12          The problem is that if you look at, let's see, it

13  is 12 through 19 or 22 maybe of the RFAs that they

14  submitted, they are seeking discovery about specific claims,

15  asking us to admit liability for certain claims using this

16  supposed simple declaratory judgment face of the contract

17  type dispute as a stalking horse for massive discovery about

18  individual claims, and if that is what this is, it

19  cannot -- there is authority to say that a declaratory

04:51PM 20  judgment action cannot be used for that purpose properly,

21  and so that's what we're doing.

22          And they should comply with the contractual

23  indemnification procedures and bring an action that roots it

24  in the facts of particular claims.  So the point again, your

25  Honor, some of these requests are not objectionable, at

1    least on the ground that I just was talking about.  The

2    problem isn't that they're proceeding with discovery, it's

3    particular requests that call into question the bona fides

4    of this supposedly being a simple declaratory judgment

5    action.

6                THE COURT:  All right.  I'm going to take these

7    motions under advisement.  Let us -- I'll give a week for a

8    reply memorandum, that is, to the PGIC's reply to the Sparta

9    opposition, so that will take us to November the 9th and

04:52PM 10   then another week for any sur-reply to November the 16th, at

11   which point I will be back in the country and in a position

12   to read that, read those.

13               MR. KAPLAN:  Sorry, your Honor, just for

14   clarification, is the November 9th for us to file?

15               THE COURT:  Yes, your reply and then if

16   Mr. Carroll wants to do a sur-reply would be another week

17   later.

18               MR. KAPLAN:  Okay.

19               MR. CARROLL:  Thank you, your Honor.

04:52PM 20               MR. KAPLAN:  We would also presumably file our

21   reply to their opposition to our partial motion on that same

22   day?

23               THE COURT:  Well, hold on.  Let me make sure I

24   have this straight.  Your motion for judgment on the

25   pleadings, which is Number 64 on the docket, Mr. Carroll

1    filed his opposition today.  I'm going to let you reply to

2    that and you have a week until November 9th.

3              MR. KAPLAN:  Yes.

4              THE COURT:  Mr. Carroll has a week after that for

5    any sur-reply until the 16th.  I thought that the other

6    motion, the original motion from Sparta was fully briefed.

7    Am I wrong about that?

8              MR. KAPLAN:  Yes, it is, in the sense this was the

9    point, we sought leave to file a sur-reply, and this is the

04:53PM 10   point I made at the beginning, your Honor.  This is single

11   to the extent that they have any arguments against the

12   substantive defenses, they only made them on reply, so we've

13   had no chance to reply to them.  And, again we think they

14   lacked merit.  I tried to show that.

15             THE COURT:  If you want to file a sur-reply, you

16   may do so by the 9th as well.

17             MR. KAPLAN:  Okay.  Thank you, your Honor.

18             THE COURT:  All right.  Thank you, gentlemen, I

19   will take this under advisement.  Thank you.

04:54PM 20            MR. CARROLL:  Thank you very much.

21             (Whereupon, the hearing was adjourned at 4:53 p.m.)

22

23

24

25

C E R T I F I C A T E

UNITED STATES DISTRICT COURT )

DISTRICT OF MASSACHUSETTS ) ss.

CITY OF BOSTON )


         I do hereby certify that the foregoing transcript,

Pages 1 through 35 inclusive, was recorded by me

stenographically at the time and place aforesaid in Civil

Action No. 21-11205-FDS, SPARTA INSURANCE COMPANY

(As successor in interest to Sparta Insurance

Holdings, Inc.) vs. PENNSYLVANIA GENERAL INSURANCE

COMPANY (now known as Pennsylvania Insurance Company), and

thereafter by me reduced to typewriting and is a true and

accurate record of the proceedings.

         Dated November 6, 2022.


                    s/s Valerie A. O'Hara


                    _____

                    VALERIE A. O'HARA

                    OFFICIAL COURT REPORTER