*Exhibit 2*

*2007 Stock Purchase Agreement
by and between PGIC, OneBeacon
Insurance Company, and SPARTA*

## STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT (together with the Schedules and Exhibits attached hereto and incorporated herein by reference, being hereinafter referred to as this "Agreement") is made and entered into as of the twelfth (12th) day of March, 2007, by and among Pennsylvania General Insurance Company, a Pennsylvania corporation (hereinafter referred to as the "Seller" unless otherwise stated expressly), OneBeacon Insurance Company, a Pennsylvania corporation (the "Guarantor"), and SPARTA Insurance Holdings, Inc., a Delaware corporation ("Purchaser").

## WITNESETH:

WHEREAS, Seller owns of record and beneficially 45,000 shares of the voting common stock, $100 par value per share, of American Employers' Insurance Company, a Massachusetts corporation ("Company"), representing 100% of the capital stock of the Company (such shares being hereinafter referred to as the "Shares"); and

WHEREAS, the Company was previously engaged in the business of insurance and all activities customarily engaged in by insurance companies, including but not limited to the conduct of investment and administrative activities (collectively, the "Business"); and

WHEREAS, Seller desires to sell to Purchaser, and Purchaser desires to purchase from Seller, all of the Shares, all on the terms and conditions hereinafter set forth;

NOW THEREFORE, in consideration of the premises set forth above, and subject to the terms and conditions stated herein, the parties hereto agree as follows:

1

PGIC 30(b)(6)

EX 0002

T.A. 10.25.23

PGIC_0004097

# ARTICLE 1

## The Purchase and Sale Transaction

**Section 1.1    Purchase and Sale of the Shares; Deposit Amount.**

(a)    Purchaser agrees to purchase from Seller, and Seller agrees to sell, assign, transfer and deliver to Purchaser, on the Closing Date (as defined in Section 1.4), the Shares for the consideration specified in Section 1.2 and on all of the terms and conditions provided for herein.

(b)    Immediately following the execution of this Agreement, Purchaser shall pay to Seller an amount equal to the sum of $250,000.00 (the "Initial Deposit").

(c)    In the event that Purchaser has not elected to terminate this Agreement pursuant to Section 10.3(a)(v), Purchaser shall pay an additional $250,000.00 (together with the Initial Deposit, the "Deposit Amount") to Seller on March 16, 2007.

**Section 1.2    Purchase Price.**

(a)    Purchaser agrees to pay to Seller, and Seller agrees to accept from Purchaser, as consideration for the Shares an amount ("Purchase Price"), payable in immediately available funds at the Closing (as defined in Section 1.4), determined as follows:

(i)    the amount of the Company's paid-in capital and surplus as of the business day prior to the Closing Date determined in accordance with MA SAP (as defined below in paragraph (c) of this Section 1.2);

**plus:**

(ii)    the amount of $12 million;

**plus (or minus)**

2

NYI 1074421v12

PGIC_0004098

(iii)    the amount by which the Fair Market Value (as defined below) of the securities held by the Company as of the business day prior to the Closing Date exceeds (or is less than) the book value of such securities as of such date determined in accordance with MA SAP.  At least thirty (30) days prior to the Closing, Seller shall provide to Purchaser Schedule 1.2(a), which shall be a list of all admitted assets, including securities on deposit in certain jurisdictions as a condition of maintaining the Licenses (the "Statutory Deposits"), to be owned by Company as of the Closing (the "Closing Admitted Assets").  The Closing Admitted Assets shall include only the Statutory Deposits (all of which shall be marketable securities), cash and cash equivalents.

(b)  The term "Fair Market Value" shall mean, in the case of securities listed on a national securities exchange, the closing price on such exchange, and in the case of other securities, the average of the bid and asked prices for such securities, in each case on the last business day preceding the Closing Date on which such securities were traded.  The term "Fair Market Value" shall also include interest accrued on such securities through the business day next preceding the Closing Date.

(c)  The term "MA SAP" shall mean the accounting treatment prescribed or permitted by the Office of Consumer Affairs and Business Regulation—Division of Insurance of the Commonwealth of Massachusetts (the "Division").

(d)  The Purchase Price less the Deposit Amount shall be paid by direct wire transfer payable on the Closing Date in immediately available funds to such United States account or accounts as shall have been designated in writing to Purchaser by Seller at least five (5) business days prior to the Closing Date.

3

NYI 1074421v12

PGIC_0004099

### Section 1.3    Adjustments to Purchase Price.

(a)  In the event that the adjustment to the Purchase Price provided for in Section 1.2(a)(iii) is determined to be incorrect or is not available at the Closing, the Purchase Price shall be adjusted not later than 15 days after the Closing.  The adjustment shall be paid by the party from which any payment pursuant to this clause (a) is due.

(b)  The Purchase Price shall be subject to adjustment with respect to the Licenses:

(i)      at the Closing, in the event that any License has been and continues to be rescinded, terminated, revoked, nonrenewed, suspended or otherwise materially restricted or impaired (a "Rescinded Insurance License") as of the Closing Date, and neither Seller nor Purchaser has been notified in writing by the applicable regulatory authority that such rescission, termination, revocation, nonrenewal, suspension, restriction or impairment is attributable to the Purchaser's identity, management or business plan, by decreasing the Purchase Price in an amount equal to $300,000.00 with respect to each Rescinded License in the States of California, Illinois, New York and Texas (the "Key States"), if any, and by decreasing the Purchase Price in an amount equal to $175,000.00 with respect to each other Rescinded Insurance License, if any (it is hereby acknowledged by the parties hereto that certain states renew Licenses on an annual basis and, accordingly, that a certificate representing a renewed License may not be issued until the term of the previous License has expired and that, therefore, original certificates representing all in-force Licenses may not be delivered at the Closing for this reason); and

4

PGIC_0004100

(ii) on the date that is the six month anniversary of the Closing Date (the "Adjustment Date"), in the event that (1) any Rescinded Insurance License, with respect to which an adjustment to the Purchase Price was made pursuant to Section 1.3(b)(i), is restored in full to its status on the date hereof, by increasing the Purchase Price in an amount equal to the amount by which the Purchase Price was decreased with respect to such Rescinded Insurance License pursuant to Section 1.3(b)(i), or (2) any License has become, following the Closing Date, and continues to be, a Rescinded Insurance License as of the Adjustment Date as a proximate result of the actions or omissions of Seller or any affiliate thereof (including Company) which occurred or failed to occur, as the case may be, prior to the Closing Date, by decreasing the Purchase Price in an amount equal to $300,000.00 with respect to each Rescinded License in any Key State and by decreasing the Purchase Price in an amount equal to $175,000.00 with respect to each other Rescinded Insurance License, if any. For purposes of this Section 1.3(b)(i) or (ii), the loss of a License due to the failure of Company and/or Purchaser to satisfy the post-Closing requirement of any state or territorial insurance department that the Company comply with a re-licensing statute (such as Section 405(1) of the Insurance Code of the State of Michigan) shall not cause a License to be considered a Rescinded Insurance License. Any such adjustment made pursuant to (1) or (2) above shall be paid by the party from which any payment pursuant to this Section 1.3(b)(ii) is due. Following the adjustment to the Purchase Price, if any, provided for in this Section 1.3(b)(ii), there shall be no further adjustments to the Purchase Price for a License becoming a Rescinded Insurance License. Seller and Purchaser each acknowledge and agree that the actual damages that would result from a License becoming a Rescinded Insurance License would be impossible to determine, and thus any such adjustment

5

NYI 1074421v12

PGIC_0004101

pursuant to Section 1.3(b)(i) or (ii) shall constitute liquidated damages and not a penalty, and Seller shall not be required to compensate or reimburse Purchaser for the value of any License which becomes a Rescinded Insurance License after the Adjustment Date or for any lost opportunity costs or other consequential damages incurred as a result of such License becoming a Rescinded Insurance License; provided, however, that Seller shall pay or reimburse Company for any fines associated with any License becoming a Rescinded Insurance License prior to the Adjustment Date.

(c) In the event that a License has become and continues to be a Rescinded Insurance License pursuant to Section 1.3(b)(i) or (ii), each of Seller and Purchaser shall confer with the other, and, in the event of Section 1.3(b)(i), Seller shall cause Company to, or, in the event of Section 1.3(b)(ii), Purchaser shall cause Company to, use commercially reasonable best efforts to have any such Rescinded Insurance License reinstated in full to its status on the date hereof, such commercially reasonable best efforts to include, but not be limited to, having appropriate officials of each such entity meet in person or telephonically with the applicable regulatory authorities, making all requisite filings and paying all fees, Taxes and assessments due and owing and Seller shall reimburse Company for its reasonable legal expenses in connection with such efforts up to a maximum of $50,000.00 for any such Rescinded Insurance License.

Section 1.4   Closing.   The Closing of the purchase and sale of the Shares (the "Closing") shall take place at the offices of OneBeacon Insurance Company, One Beacon Lane, Canton, Massachusetts at 10:00 a.m., New York time, on the fifth business day after all closing conditions under Articles 6 and 7 hereunder, including, without limitation, receipt of approval of Purchaser's acquisition of the Shares by the Commissioner of Insurance of the Division (the

6

PGIC_0004102

"Commissioner"), have been satisfied (other than the conditions that, by their nature, are to be satisfied on the Closing Date), or such later time and date as the parties hereto may agree in writing (the "Closing Date"), subject to satisfaction or waiver of the terms and conditions provided for herein.

The Closing Date and location may be changed by written agreement of the Purchaser and Seller. Neither party shall have the obligation to Close if all regulatory approvals have not been obtained by July 31, 2007.

The Purchaser and the Seller shall use their reasonable best efforts to obtain all regulatory approvals required for the purchase of the Shares.

At the Closing, subject to Purchaser's payment of the Purchase Price to Seller, Seller shall deliver to Purchaser all of the Shares duly assigned to Purchaser duly endorsed in blank for transfer or accompanied by stock powers duly executed, so as to vest fully in Purchaser all right, title and interest in and to the Shares, free and clear of all liens, encumbrances, mortgages, pledges, charges, claims, debts, liabilities, obligations, arguments, rights, options, warrants, restrictions and security interests of any kind or nature whatsoever, whether legal or equitable, or any claim by any person or entity to any of the foregoing ("Encumbrances"). All such certificates and stock powers shall be in form and substance reasonably satisfactory to Purchaser and Purchaser's counsel. The obligations of the parties to make such transfers are conditioned upon the satisfaction, as of the Closing Date, of all of the terms and conditions set forth herein.

NYI 1074421v12

PGIC_0004103

## ARTICLE 2

### Warranties and Representations by Seller

To induce Purchaser to enter into this Agreement and (i) to proceed as required herein in anticipation of the Closing on the Closing Date and (ii) to cause the transactions provided for in this Agreement to be consummated on the Closing Date, Seller warrants and represents to Purchaser as follows:

Section 2.1    Organization and Qualification of Seller.    The Seller is a corporation, duly organized, validly existing and in good standing under the laws of the state of its incorporation and has its principal office in Canton, Massachusetts. The Seller has all requisite corporate power and authority to carry on all of its business as the same is being conducted on the date hereof and to own or otherwise possess all of the assets and properties (whether tangible, intangible or mixed) it owns or otherwise possesses on the date hereof.

Section 2.2    Authority Relating to this Agreement.    Seller has full corporate power and authority to execute and deliver this Agreement and to take the actions required to be taken by it pursuant to this Agreement. The execution, delivery and performance by Seller of this Agreement, and the consummation of the transactions contemplated herein, have been duly authorized and approved by all required corporate actions.

Section 2.3    Organization and Qualification of the Company.    The Company is a stock insurer, duly organized, validly existing and in good standing under the laws of the Commonwealth of Massachusetts. The Company is duly qualified and licensed to do Business as a domestic property and casualty insurance company in the Commonwealth of Massachusetts and is duly qualified and licensed to do Business as a foreign property and casualty insurance

8

PGIC_0004104

company in each jurisdiction listed on Schedule 2.3 attached hereto, which are the only jurisdictions in which the conduct of its Business has required that it be so licensed (collectively, the "Licenses"). Company is in good standing in each such jurisdiction with no restrictions on such Licenses other than those noted on Schedule 2.3 and is qualified to write those lines of Business in each such state as are indicated on the License in each such jurisdiction. Company is not required to be qualified to do Business as a foreign corporation in any other jurisdiction as a result of its ownership or leasing of assets or the conduct of any Business other than the insurance Business. Company has not been found in any administrative hearing to have violated any such License and has conducted its Business so as to comply in all material respects with all Licenses held by it and all applicable Federal, state, local and foreign statutes and regulations.

Except as set forth in Schedule 2.3 with respect to North Carolina, since January 1, 2005, Company has not had any License revoked, restricted (other than as originally issued) or suspended, has not had correspondence with any regulator concerning the lack of activity of Company in any state and has not had any "cease and desist" order issued with regard to any License or with regard to any of the business or operations of Company. Since January 1, 2005, Company has not been involved in any proceeding to revoke, restrict or suspend any License or been subject to any "cease or desist" order, nor is any proceeding pending or, to Seller's knowledge, threatened which could have that effect. Seller is not aware of any event, condition or circumstance which has had or threatens to have an adverse effect on Company's ability to maintain the continued effectiveness of or renew each of the Licenses.

Section 2.4 **Authority Relating to the Reinsurance Agreement.** As of the date of execution and delivery of the Instrument of Transfer and Assumption between the Seller and

9

PGIC_0004105

the Company attached hereto as Exhibit A ( the "Reinsurance Agreement" ), each of Seller and the Company had full corporate power and authority to execute and deliver the Reinsurance Agreement and to take the actions required to be taken by Seller or the Company, as the case may be, pursuant to the Reinsurance Agreement and the transactions provided for therein. The execution, delivery and performance of the Reinsurance Agreement by each of Seller and the Company, and the consummation of the transactions contemplated therein, have been duly authorized and approved by all required corporate action on the part of Seller and the Company, respectively, and such corporate actions have not been and will not have been rescinded and remain in full force and effect.

No authorization, consent or approval or other order of any governmental or regulatory body or authority, or any consent from any third party, was required for the execution and delivery of the Reinsurance Agreement or the consummation by each of the Seller and Company of the transactions provided for therein, other than such consents, approvals or other orders as were received by each of the Seller and Company. Company has provided prompt written notice, in the form of Exhibit A to the Reinsurance Agreement, to all holders of policies as to which Company had unearned premiums recorded as of June 30, 2005, pursuant to Section 7 of the Reinsurance Agreement (other than holders of the policies constituting the Retained Business (as defined in the Reinsurance Agreement)). Neither Seller nor Company has received any objections to the terms of the Reinsurance Agreement from any such policyholder, and, to the best of Seller's knowledge, no policyholder has threatened any such objection. Notwithstanding the provisions of this Section 2.4 or any other provisions of this Agreement, it is acknowledged

NYI 1074421v12

PGIC_0004106

and agreed that Seller makes no representation that the Reinsurance Agreement constitutes a novation or that policyholders did not have any right of consent with respect thereto.

Section 2.5    No Subsidiaries of the Company.  The Company does not own, either directly or indirectly, any voting securities or other equity of any corporation, partnership or other business entity and is not a participant in any joint venture with any other person.

Section 2.6    Capitalization of the Company.  The authorized capital stock of the Company consists of 60,000 duly authorized shares of common stock, $100 par value per share, 45,000 of which shares have been and are now validly issued and outstanding, fully paid and nonassessable.  The Shares constitute all of the issued and outstanding capital stock of the Company.  Seller is the lawful record and beneficial owner of the Shares, free and clear of all Encumbrances of every kind.  There are no outstanding options, warrants or, except for this Agreement, other agreements or rights to purchase or otherwise acquire, or securities convertible into, any of the Shares or any other shares of common stock or any other securities of the Company.  Neither Seller nor the Company has made any commitment to issue or to sell any of the Shares or any other shares of common stock or preferred stock or any other securities of the Company, or any options, warrants, rights or convertible securities or evidences of indebtedness of the Company.  Upon the transfer of the Shares to Purchaser in accordance with this Agreement, good and marketable title in and to the Shares will have been transferred to Purchaser, free and clear of all Encumbrances whatsoever.

Section 2.7    Articles of Organization and Bylaws.  Seller has delivered to Purchaser a true, correct and complete copy of the Articles of Organization and the Bylaws, reflecting all amendments and restatements thereto, of the Company.  Such Articles of Organization and

11

PGIC_0004107

Bylaws will not be amended, and the Board of Directors and the shareholder of Company will not take any action for the purpose of effecting any amendment or modification of such Articles of Organization or Bylaws.

Section 2.8    Validity.

(a)   This Agreement constitutes the legal, valid and binding obligation of each of Seller and the Guarantor, enforceable against each of Seller and the Guarantor in accordance with its terms, except only as limited by applicable bankruptcy, reorganization, insolvency, moratorium and other similar laws presently or hereafter in force affecting the enforcement of creditors' rights generally and subject to general equitable principles limiting the right to obtain specific performance or other equitable relief.

(b)   The Reinsurance Agreement does, and will, at Closing, constitute a legal, valid and binding obligation of each of Seller and the Company, enforceable against each of Seller and the Company, respectively, in accordance with its terms.

Section 2.9    Governmental Approvals.    To the best of Seller's knowledge, except for the approval or non-disapproval, as the case may be, of the Insurance Commissioner of the Pennsylvania Department of Insurance (the "Pennsylvania Department") with respect to the guarantee provided by the Guarantor herein and the approval of the Commissioner pursuant to the laws of the Commonwealth of Massachusetts, including, without limitation, the Massachusetts Insurance Code and the regulations thereunder (as interpreted and applied by the Commissioner), with respect to this Agreement, no authorization, consent or approval (or non-disapprovals, as the case may be) or other order of a governmental or regulatory body or authority is required for (i) the execution and delivery of this Agreement by each of Seller and

12

PGIC_0004108

the Guarantor, (ii) the consummation by each of Seller and the Guarantor of the transactions provided for herein, or (iii) the transfer on the records of the Company of the Shares to Purchaser on the Closing Date.

Section 2.10  **Third Party Approvals.**  To the best of the knowledge of Seller and the Guarantor, no authorization, consent or approval from any third party is required for (i) the execution and delivery of this Agreement by each of Seller and the Guarantor, (ii) the consummation by each of Seller and the Guarantor of the transactions provided for herein, or (iii) the transfer on the records of Company of the Shares to Purchaser on the Closing Date.

Section 2.11  **Conflict With Other Instruments.**  Except as disclosed on Schedule 2.11, the execution, delivery and performance of this Agreement by each of Seller and the Guarantor and the consummation of the transactions contemplated hereby do not and will not (i) conflict with or result in the breach of any of the terms or conditions of, or constitute a default under, the Articles of Organization or Bylaws or other organizational documents, as the case may be, of any of Seller, the Guarantor or the Company; (ii) conflict with or result in the breach of any of the terms or conditions of or constitute a default under any mortgage, note, bond, indenture, agreement, license or other instrument or obligation to which any of Seller, the Guarantor or the Company is a party or by which any of them is bound; or (iii) violate any law or regulation, or order, writ, judgment, injunction or decree of any court, administrative agency or governmental body applicable to any of Seller, the Guarantor or the Company in effect on the date hereof or on the Closing Date.

NY1 1074421v12

PGIC_0004109

### Section 2.12  Financial Statements.

(a) (i) The unaudited financial statements of the Company for the years ended December 31, 2004, 2005 and 2006, accompanied by the balance sheet, statements of operations, policyholders' surplus and changes in financial position, together with the schedules and footnotes thereto, filed with the Division (collectively, the "Company Statements"), have been prepared in accordance with MA SAP, applied on a consistent basis; and (ii) the Company Statements fairly present the financial condition, the statements of operations, changes in policyholders' surplus and changes in financial position of the Company as of and for the respective dates and periods indicated therein, in accordance with MA SAP, applied on a consistent basis.  Company has not prepared, and was not required to prepare, any audited financial statements with respect to Company on a stand-alone basis for the years ended December 31, 2004, 2005 or 2006, and no audited financial statements have been prepared on Company's behalf for any such periods on a stand-alone basis.  The only audited financial statements required to be prepared and/or filed with respect to Company are the Guarantor Audited Statements (as defined in Section 2.12(c)), which statements have been prepared and filed, or with respect to the year ended December 31, 2006, will be prepared and filed, by the Guarantor on a consolidated basis with each of its subsidiaries and affiliates.  All books of account of the Company fully and fairly disclose all of the transactions, properties, assets, liabilities and obligations of the Company, are in the possession of the Company and, together with all information contained in the Company Statements, the Guarantor Audited Statements and the Guarantor Unaudited Statements (as defined in Section 2.12(c)), are true, correct and

NY1 1074421v12

PGIC_0004110

complete in all material respects. The investments of the Company comply with the requirements of the Division as well as those of any other applicable jurisdiction.

(b)    (i) The unaudited financial statements of the Seller for the years ended December 31, 2004, 2005 and 2006, accompanied by the balance sheet, statements of operations, policyholders' surplus and changes in financial position, together with the schedules and footnotes thereto, filed with the Pennsylvania Department (collectively, the "Seller Statements") have been prepared in accordance with statutory accounting principles prescribed or permitted by the Pennsylvania Department ("Pennsylvania SAP"), applied on a consistent basis; and (ii) the Seller Statements fairly present the financial condition, the statements of operations, changes in policyholders' surplus and changes in financial position of the Seller as of and for the respective dates and periods indicated therein, in accordance with Pennsylvania SAP, applied on a consistent basis. Seller has not prepared, and was not required to prepare, any audited financial statements with respect to Seller on a stand-alone basis for the years ended December 31, 2004, 2005 or 2006, and no audited financial statements have been prepared on Seller's behalf for any such periods on a stand-alone basis. The only audited financial statements required to be prepared and/or filed with respect to Seller are the Guarantor Audited Statements.

(c)    (i) The audited financial statements of the Guarantor for the years ended December 31, 2004, 2005 and 2006, accompanied by the balance sheet, statements of operations, policyholders' surplus and changes in financial position, together with the schedules and footnotes thereto (the "Guarantor Audited Statements"), and the unaudited financial statements of the Guarantor for the years ended December 31, 2004, 2005 and 2006, accompanied by the balance sheet, statements of operations, policyholders' surplus and changes in financial position,

15

PGIC_0004111

together with the schedules and footnotes thereto (the "Guarantor Unaudited Statements"), each as filed, or with respect to the Guarantor Audited Statements for the year ended December 31, 2006, as will be filed, with each required regulatory authority, have been prepared by the Guarantor in accordance with Pennsylvania SAP, applied on a consistent basis; and (ii) the Guarantor Audited Statements and the Guarantor Unaudited Statements fairly present the financial condition, the statements of operations, changes in policyholders' surplus and changes in financial position of the Guarantor and each of its subsidiaries and affiliates on a consolidated basis, as of and for the respective dates and periods indicated therein, in accordance with Pennsylvania SAP, applied on a consistent basis.

Section 2.13 **No Adverse Change.** Except for the Reinsurance Agreement, the Company has not engaged in any activity or entered into or carried out any transaction, or experienced any occurrence or circumstance since June 30, 2005 which has had or might reasonably be expected to have a materially adverse effect on its financial condition, properties or assets.

Section 2.14 **Taxes.**

(a) All Tax Returns required to have been filed by or with respect to the Company or the Business have been timely filed (taking into account any extension of time to file granted or obtained), all such Tax Returns were true, correct and complete in all material respects and all Taxes shown to be payable on such Tax Returns have been paid.

(b) The Company has timely paid, withheld, collected and remitted all Taxes that are required to be paid, withheld, collected or remitted by it.

16

PGIC_0004112

(c) No deficiency for any amount of Tax has been proposed, asserted or assessed by a governmental authority in writing against the Company that has not been satisfied by payment, settled or withdrawn.

(d) Except as disclosed on Schedule 2.14(d), there is no tax audit, examination, suit or other tax proceeding now in progress, pending or, to the knowledge of Seller, threatened against or with respect to the Company nor are there any matters under discussion between the Company, on the one hand, and any governmental authority, on the other hand, with respect to Taxes.

(e) Except as disclosed on Schedule 2.14(e), there are no outstanding waivers extending the statutory period of limitations on assessment or payment of Taxes due from the Company.

(f) The Company is a U.S. domestic corporation, and the Company has not been a United States real property holding corporation within the meaning of Section 897(c)(2) of the Internal Revenue Code of 1986, as amended (the "Code") during the applicable period specified in Section 897(c)(1)(A)(ii) of the Code.

(g) The Company has not (i) entered into a closing agreement pursuant to Section 7121 of the Code (or any similar provision of state, local or foreign law) with any governmental authority or (ii) received or sought, or participated in a request for, a ruling (or other determination or form of advice) from any governmental authority pertaining to the treatment of any item for Tax purposes.

(h) True and complete copies of all federal, state, local and foreign Tax Returns of or including the Company or any predecessor thereto that remain subject to examination

17

PGIC_0004113

and/or adjustment by any governmental authority and true and complete copies of all examination reports and statements of deficiencies assessed against or agreed to by (or affecting) the Company have been provided to the Purchaser prior to the date hereof.

(i) The Company has not engaged in any "listed transaction" as defined in Section 1.6011-4 of the Regulations.

(j) (i) The Seller and the Company are members of an "affiliated group" within the meaning of Section 1504 of the Code and Fund American Financial Services, Inc. ("Fund American") is the "common parent" of such affiliated group, (ii) Fund American has filed, or will file, a consolidated U.S. federal income Tax Return with Seller and Company as members of a consolidated group for the taxable year ended on December 31, 2006 and for the Taxable Period that includes the sale of the Shares hereunder, and (iii) the Seller is eligible to make a Section 338(h)(10) Election (as defined below) with respect to the Company.

(k) The Company has no deferred income reportable for Tax purposes for a period ending after the Closing Date but that is attributable to a transaction, contract entered into or occurring in, or resulting from a change of accounting method for, a period ending on or prior to the Closing Date.

Section 2.15 **Litigation.** Except as disclosed on Schedule 2.15, other than proceedings with respect to claims under insurance policies issued by Company which have arisen in the ordinary course of Business and which have been assumed and administered by Seller under the Reinsurance Agreement, there are no actions, suits or claims pending or, to the knowledge of Seller, threatened before or by any governmental body, nor any legal, administrative or arbitration proceedings pending or, to the knowledge of Seller, threatened, nor is there any

18

PGIC_0004114

outstanding order, writ, injunction or decree of any court, governmental agency or arbitration tribunal, in each case against or affecting the Company which would restrain, enjoin, prohibit or in any way impair any of the transactions contemplated herein or in the Reinsurance Agreement or which would have a material adverse effect on the financial condition, properties or assets of the Company or the conduct of the Business or the status of the Licenses. No circumstance, occurrence or event or series of events has occurred, to the knowledge of Seller or the Guarantor, which will or might give rise to the assertion of any suit, proceeding or other of the foregoing types of procedures against the Company.

Section 2.16 <u>Collective Bargaining Agreements; Employees.</u>

(a)  Since January 1, 2005, Company has not had, and as of the date hereof, Company does not have, any employees.

(b)  As of the effective date of the Reinsurance Agreement there were no, and, as of the date hereof, there are no, written or oral employment or consulting agreements, severance pay plans, pension, retirement, profit sharing, employee relations policies, practices and arrangements, agreements with respect to leased or temporary employees, executive compensation plans, incentive compensation plans or arrangements, vacation pay plans or arrangements, sick pay plans, deferred compensation and bonus plans, incentive stock option, stock ownership and stock purchase plans, or any other employee benefit programs, arrangements, agreements or understandings, including medical, vision, dental or other health plans, insurance and disability plans, including, without limitation, "any employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), in each case to which the Company contributes or is a party or is bound or under

19

PGIC_0004115

which it may have liability and under which former employees of Company (or their dependents or beneficiaries) are eligible to participate or derive a benefit (the "Employee Benefit Plans"), other than those assumed pursuant to the Reinsurance Agreement.

(c) With respect to each Employee Benefit Plan (or similar plan of Seller, if applicable) in which former employees of Company participated or to which contributions were made by such former employees or by Company, Seller or the Guarantor on such employees' behalf, (i) each Employee Benefit Plan is in compliance and has been administered in accordance with the requirements prescribed by statutes, orders and governmental rules or regulations applicable to such Employee Benefit Plans, including, but not limited to, ERISA and the Internal Revenue Code, in all material respects, (ii) no "employee pension benefit plan" (as defined in Section 3(2) of ERISA) of Company or any affiliate which is subject to Section 412 of the Code has incurred any "accumulated funding deficiency" (as defined in Section 412 of the Code), whether or not waived, (iii) there has been no "reportable event" within the meaning of Section 403(b) of ERISA and (iv) none of Seller, Company or any affiliate thereof has any unpaid liability to the Pension Benefit Guarantee Corporation or to any other person under Title IV of ERISA.

(d) None of the employees or former employees of Company has been covered by a "multi-employer plan", subject to ERISA within the meaning of Section 3(37) of ERISA to which Seller, Company or any affiliate thereof has been a party.

(e) The Company is not a party to or bound by any collective bargaining agreement or other labor agreement with any bargaining agent (exclusive or otherwise) or any of its employees.

20

PGIC_0004116

Section 2.17  **Powers of Attorney**.  No person holds a power of attorney from the Company except those statutory agents for service of process identified on Schedule 2.17.

Section 2.18  **Environmental Matters**.

(a)  Except for claims in the normal course of Business, all of which have been or will be prior to Closing assumed by Seller pursuant to the Reinsurance Agreement, no litigation, suits, claims, proceedings or investigations or private or governmental enforcement actions or orders are pending or, to the knowledge of Seller or the Guarantor, threatened against Company with respect to any Hazardous Material or applicable Environmental Law (each as defined below).

(b)  Neither the Seller nor Company has received any notice from any governmental authority or other person of any claims or potential violations by Company of, or liability under, any Environmental Law.

(c)  Neither Seller nor the Guarantor knows of (i) any activity on any properties presently or formerly owned or operated by Company which was conducted, or is being conducted, in violation of any Environmental Law, or (ii) any actual or threatened release (including, without limitation, any spill, discharge, leak, emission, ejection, escape or dumping) or improper or inadequate storage of, or contamination caused by, any Hazardous Material on or under any properties of Company, which in any of such cases would or could reasonably be expected to have a material adverse effect upon the assets, liabilities (whether absolute, accrued, contingent or otherwise), condition (financial or otherwise), results of operations, business or prospects of Company.

21

PGIC_0004117

(d) For purposes of this Section 2.18, "Environmental Law" means any applicable law relating to pollution or protection of the environment, health, safety, or natural resources or to the use, handling, transportation, treatment, storage, disposal, release or discharge of Hazardous Materials; and "Hazardous Material" means any material, substance, waste, pollutant, contaminant, chemical or other matter that is defined as a hazardous material, hazardous substance, hazardous waste, toxic material, toxic substance or other term having a similar meaning under applicable law or is otherwise subject to elimination, abatement, removal, remediation or cleanup under applicable law.

**Section 2.19    Assets and Property; No Liabilities.**

(a) The Company has good and marketable title to all of its assets and properties, free of any Encumbrances, except for Statutory Deposits made in the ordinary course of Business and Encumbrances arising from claims made in the ordinary course of Business under any insurance policies issued by the Company. As of the Closing Date, the Company will have no assets, except (i) its Articles of Organization, Bylaws, minute books, regulatory records and filings, stock ledgers, and valid and enforceable Licenses referred to in Section 2.3, (ii) the Statutory Deposits, (iii) cash or cash equivalents and (iv) the minimum amount of assets, if any, required by the Division to maintain its Articles of Organization in Massachusetts and its Licenses in the states referenced in Schedule 2.3, such assets to consist only of cash or cash equivalents.

(b) All liabilities of the Company that have arisen or could arise, under any insurance contract or any reinsurance treaty or otherwise, have been and will be assumed by Seller pursuant to the Reinsurance Agreement. The Company has, and will at Closing have, no

22

PGIC_0004118

liabilities of any nature, whether absolute, accrued, contingent or otherwise or whether due or to become due, other than those assumed by Seller pursuant to the Reinsurance Agreement.

(c)  Schedule 2.19(c) contains a list of all deposits which have been made with the insurance departments of jurisdictions where Company currently holds Licenses and the location of such deposits as of the date hereof.

(d)  Schedule 2.19(d) contains a complete and correct listing of each bank account or safe deposit box maintained by Company. There are no credit cards issued to any person under which Company may be liable for charges or payments.

(e)  Company has paid all guaranty fund assessments that are due or claimed or asserted by any insurance regulatory authority to be due from Company.

Section 2.20  **Corporate Records**.

(a)  Each of the corporate minute books and stock record books of the Company is current and complete and contains, respectively, a true and correct record of all of the corporate actions and stock records of the Company through the date hereof.

(b)  Company has made available to Purchaser originals or complete and correct copies of its corporate minute books and stock records. Such materials contain a complete and correct record of all proceedings and actions taken at all meetings of, and all actions taken by written consent of, the holders of its capital stock and its board of directors, and all original issuances, subsequent transfers and any repurchases of its capital stock.

Section 2.21  **Business of the Company**.  Seller has delivered to Purchaser prior to the execution and delivery of this Agreement complete, correct and legible copies of each of the Company Statements, the Seller Statements, the Guarantor Audited Statements and the

23

PGIC_0004119

Guarantor Unaudited Statements, other than Guarantor Audited Statement for the year ended December 31, 2006, correct, complete and legible copies of which will be delivered to Purchaser promptly after such statement is filed with the applicable regulatory authorities.

Section 2.22  **Compliance.**  The Company is not to the best of Seller's knowledge in violation of any applicable law, rule, regulation, ordinance, order, judgment, injunction or decree, or any other requirement of any court or Federal, state, municipal or other governmental department, regulatory authority, commission, board or instrumentality.  Company is not a party to or subject to any agreement, judgment, order, writ, injunction or decree of or with any court or governmental body or other regulatory authority that could reasonably be expected to prevent in any material manner the rendering of, or the right to render, the services of Company as a property and casualty insurance company after the Closing or Company's full use of the Licenses to conduct the Business permitted under such Licenses as listed on Schedule 2.3 hereof.  Except as disclosed on Schedule 2.22, during the past five fiscal years Company has not been the subject of any governmental proceedings or investigations, including without limitation any insurance department proceedings or investigations, which were adversely determined and resulted in Company being bound or held to be in violation or contravention of any material law relating to its Business, Business practices or employment practices.

Section 2.23  **Brokers or Finders.**  There is no broker or finder involved on behalf of Seller in connection with the transactions contemplated hereby other than Merger & Acquisition Services, Inc., the fees and expenses of which shall be paid in their entirety by the Seller.

Section 2.24  **Contracts.**  As of the date of this Agreement, Company:

24

PGIC_0004120

(a) is not a party to any agreement, commitment or instrument evidencing indebtedness of Company whether directly or indirectly, by way of purchase money obligations, conditional sale, lease purchase, guaranty or otherwise;

(b) is not a party to any contract containing covenants limiting the freedom of Company to compete in any line of Business or with any person;

(c) is not a party to or obligated under any agreement, contract or other instrument to pay any fees, bonus or other amount upon or following any threatened or actual change in control, or change in the nature of the Business of Company;

(d) is not a party to any contract or agreement, not of the type covered by any other subsections of this Section 2.24 which by its terms does not terminate or is not terminable by and without penalty or cost to Company within 30 business days which is not indemnifiable in this Agreement or assumed under the Reinsurance Agreement;

(e) is not a party to any contract with any governmental entity or third party containing any provision or covenant (i) restricting, restraining or impairing the ability of Company to engage in any line of Business, to compete with any person, to do business with any person or in any location or to employ any person, or (ii) restricting, restraining or impairing the ability of any person to obtain products or services from the Company;

(f) is not a party to any in-force agreement with any agent, broker, producer or other intermediary that is or was a distributor of products of Company pursuant to which any such agent, broker, producer or other intermediary currently has authority to bind Company to insurance policies or other obligations;

25

PGIC_0004121

(g) is not a party to any contract with any third-party administrator with respect to the Business other than any third-party administration arrangements arising under the Aggregate Loss Portfolio Reinsurance Agreement between Potomac Insurance Company and National Indemnity Company dated as of March 15, 2001;

(h) is not a party to any forward foreign-exchange contract or substantially-identical instrument; and

(i) is not in default under any agreement, lease, license or other arrangement otherwise material to its Business.

Section 2.25  **Absence of Certain Changes or Events.**

(a) Other than as disclosed on Schedule 2.25, since December 31, 2005, the Company has not:

(i) incurred any material adverse change in its condition (financial or otherwise);

(ii) redeemed, purchased or otherwise acquired any of its capital stock or other securities;

(iii) granted any option to purchase or other right to acquire any of the Shares or any capital stock of Company, or any stock appreciation rights, or issued any capital stock (whether treasury shares or otherwise);

(iv) incurred any indebtedness for borrowed money or commitment to borrow money;

(v) mortgaged, pledged or subjected to any Encumbrance any of its assets or properties;

26

NYI 1074421v12

PGIC_0004122

(vi)     entered into any transaction or agreement, whether for insurance or otherwise;

(vii)    made any change in its accounting methods or practices, or made any change in depreciation or amortization policies or rates adopted by it;

(viii)   changed any method of accounting with respect to Taxes, revoked, changed or made any Tax elections, or compromised or entered into any settlements in respect of Taxes;

(ix)     amended its Articles of Organization or Bylaws;

(x)      declared, made, set aside or paid any dividend, distribution or payment on any Shares or any other shares of its capital stock;

(xi)     written up, written down or written off the value of any material amount of assets; or

(xii)    entered into any oral or written agreement or understanding to do any of the acts or things described in this Section 2.25(a).

(b)  No amount is presently due and payable from Company in respect of any guaranties or similar instruments issued by Company guaranteeing loans advanced to its agents by any financial institution under any agent loan program or similar type program.

Section 2.26  <u>Status as of the Closing.</u>  All of the warranties and representations made by Seller in this Agreement will also be true and correct as of the Closing.

NYI 107442lvl2

PGIC_0004123

# ARTICLE 3

## Warranties and Representations by Purchaser

To induce Seller to enter into this Agreement and (i) to proceed as required herein in anticipation of the Closing on the Closing Date and (ii) to cause the transactions provided for in this Agreement to be consummated on the Closing Date, Purchaser warrants and represents to Seller as follows:

Section 3.1  **Corporate Existence, Power and Authority.**  Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to enter into this Agreement and to consummate the transactions contemplated herein.

Section 3.2  **Corporate Action.**  The execution and delivery of this Agreement by Purchaser, and the consummation by Purchaser of the transactions contemplated herein, have been authorized by all requisite corporate action on the part of Purchaser, including the approval by the Board of Directors of Purchaser.

Section 3.3  **Validity.**  This Agreement constitutes the valid and binding obligation of Purchaser enforceable in accordance with its terms, except only as limited by applicable bankruptcy, reorganization, insolvency, moratorium and other similar laws now or hereafter in force affecting the enforcement of creditors' rights generally and subject to general equitable principles limiting the right to obtain specific performance or other equitable relief.

Section 3.4  **Conflict with Other Instruments.**  Neither the execution and delivery of this Agreement by Purchaser nor the consummation of the transactions contemplated herein conflict with, result in a breach of the terms, conditions or provisions of, or constitute a default

28

NY1 1074421v12

PGIC_0004124

(or an event which with notice or passage of time or both would become a default) under, the Certificate of Incorporation or Bylaws of Purchaser or any indenture, mortgage, lease, agreement, contract, note or other instrument or obligation to which Purchaser is a party or by which it or its properties may be bound or affected, or result in the creation of a lien or encumbrance on any of the properties of Purchaser or (subject to compliance with the requirements of the General Corporation Act of the State of Delaware) violate any law or regulation to which Purchaser is subject or by which it or its properties are bound.

Section 3.5 **Brokers or Finders.** No finder or broker has acted on behalf of Purchaser in connection with the negotiation or consummation of this Agreement or of any of the transactions contemplated hereby.

Section 3.6 **Governmental Approvals.** Except for approval of the Commissioner, no authorization, consent or approval or other order or action of or filing with any court, administrative agency or other governmental or regulatory body or authority is required for the execution and delivery by Purchaser of this Agreement or Purchaser's consummation of the transactions contemplated herein.

Section 3.7 **Litigation.** There is no action, suit, proceeding or investigation of Purchaser which is pending, or, to the knowledge of Purchaser, threatened which questions the validity or propriety of this Agreement or any action taken by Purchaser in connection herewith.

Section 3.8 **No Securities Acts Violation.** Purchaser acknowledges that the Shares to be delivered to Purchaser have not been registered under the Securities Act of 1933 or the securities laws of any state (the "Acts"). On the Closing Date, Purchaser will acquire the Shares for its own account for investment, with no present intention of reselling or otherwise disposing

29

PGIC_0004125

of all or any portion of the Shares in a manner which would constitute a violation of the Acts, subject nevertheless to the requirement of applicable law that the disposition of its assets be at all times within its control.

Section 3.9    Status as of the Closing Date.    All of the warranties and representations made by the Purchaser contained in this Agreement will also be true and correct on the date made and as of the Closing.

## ARTICLE 4

### Covenants of Seller

Section 4.1    Preservation of Licenses.    Seller covenants and agrees that from and after the date of the execution and delivery of this Agreement through and including the Closing Date, Seller will cause the Company to use commercially reasonable efforts to preserve the Licenses. Such efforts shall include, but not be limited to, making all requisite filings and paying all fees, Taxes and assessments due and owing. In addition, Seller shall, and shall cause Company to, deliver to Purchaser promptly upon receipt copies of all communications with state regulatory authorities with respect to the Licenses.

Section 4.2    Dividends and Other Distributions.    Seller covenants and agrees that between the date of execution of this Agreement and the Closing Date, inclusive, Seller will not cause to be made, and will not permit the Company to make or agree to, any distribution of cash or of properties or other assets by way of dividends, distributions, redemptions or otherwise, whether or not in respect of the Shares.

Section 4.3    Access to Records.

30

PGIC_0004126

(a)  Seller agrees that (i) between the date of execution of this Agreement and the Closing Date, inclusive, Seller will cause the Company to make available to Purchaser and its authorized representatives (with the right to copy) at reasonable times and under reasonable circumstances all Company records, minute books, stock books, seals, examination reports, annual statements, financial statements, Tax Returns, contracts and any other documents of the Company reasonably requested by Purchaser and (ii) after the Closing Date, Seller will provide Purchaser with any information which Purchaser reasonably may request in order to prepare financial statements, respond to litigation or comply with regulatory requirements and requests. In addition, both before and after the Closing Date, Seller shall instruct its officers, employees, counsel, actuaries and accountants to be available for a reasonable period of time during normal business hours for, and to respond to, any questions of Purchaser and its authorized representatives.  Purchaser recognizes the proprietary nature of all of these documents and information and agrees not to reveal their contents to any third party except as otherwise required by law or governmental authority.

(b)  Without in any way limiting clause (a) above, Seller shall prepare the quarterly statutory financial statements of Company for the period ending June 30, 2007 (subject, in the event that Closing has occurred on or before June 30, 2007, to Purchaser's assistance pursuant to Section 5.2 hereof).  For any statutory financial statements of Company required to be filed for periods ending on or after July 1, 2007, in the event that Closing has occurred prior to the end of any such period, Seller shall provide Purchaser and/or Company with any information which Purchaser and/or Company may reasonably request in order that Purchaser and/or Company may prepare such statutory financial statements, and Seller shall instruct its

31

PGIC_0004127

officers, employees, counsel, actuaries and accountants to be available for a reasonable period of time during normal business hours for, and to respond to, any questions of Purchaser and its authorized representatives in connection therewith.

Section 4.4 <u>Notification of Changes and Default</u>. Seller covenants and agrees that between the date of execution of this Agreement and the Closing Date, inclusive, Seller will promptly give notice, or will cause the Company to give prompt notice, to Purchaser of (a) the occurrence of any event or circumstance or the discovery of any inaccuracy, omission or mistake, which, in any way, would cause any warranty or representation made by Seller in ARTICLE 2, or any of the information or documents heretofore provided to Purchaser to be changed, modified, misleading, inaccurate or otherwise not true and correct in any material respect, whether as of the date of execution of this Agreement or any time subsequent thereto and prior to the Closing Date; or (b) the occurrence of any events or circumstances that would result in a violation or breach by Seller of any of the terms and provisions of this Agreement. No such notice shall avoid compliance by Seller with the requirements of Section 4.6. Seller shall report promptly to Purchaser any fact, circumstance or occurrence which in the reasonable business judgment of management of Seller or Company may result in an adverse change in the status of the Licenses. Providing notice pursuant to this Section 4.4 shall not relieve Seller of any liability under this Agreement with respect to matters identified in such notice.

Section 4.5 <u>Compliance with Regulatory Filings</u>. Seller and the Guarantor shall (a) prior to or promptly after, and in any case within ten (10) business days following, the date of execution of this Agreement, make all filings disclosed in Section 2.9 with all applicable governmental or regulatory bodies or authorities, and shall promptly thereafter provide Purchaser

32

PGIC_0004128

with copies of all such filings, (b) cooperate with Purchaser in connection with Purchaser's preparation and filing of the Acquisition Statement (as defined in Section 5.1) and (c) use their respective best efforts to facilitate approval of the transactions contemplated by this Agreement.

Section 4.6    **Prohibited Conduct.** Except as permitted or required by this Agreement, between the date hereof and the Closing Date, inclusive, unless Purchaser has given its prior written consent or such action is required by this Agreement, Seller shall not cause or permit the Company to:

(a) authorize the issuance of, nor issue or acquire any stock or security of Company of whatsoever kind, nor grant any option to purchase, or other right to acquire, any stock or securities of Company;

(b) introduce any new method of accounting or any changes in any current accounting method for financial reporting or Tax purposes unless required by applicable law;

(c) take any action with respect to Taxes that will result in a material adverse effect to the Purchaser or Company after the Closing Date; including (i) making, revoking or changing any election in respect of Taxes; (ii) filing any amended Tax Return; (iii) entering into any closing agreement; (iv) settling any claim or assessment in respect of Taxes, (v) surrendering any right to claim a refund of Taxes; and (vi) consenting to any extension or waiver of any statute of limitation applicable to any claim or assessment in respect of Taxes;

(d) reclassify or change the rights of any capital stock or other securities of Company;

33

PGIC_0004129

(e) incur, suffer or permit any Encumbrance upon the Shares, nor shall Seller transfer or dispose of any Shares nor grant any rights or options with respect thereto except in accordance with this Agreement;

(f) fail to operate Company other than in substantially the same manner consistent with practices followed since September 30, 2005;

(g) mortgage, pledge or subject to lien, encumbrance, charge or equity any of its properties, assets or rights;

(h) make any loan commitment;

(i) enter into any merger, acquisition or other business combination in any form or transaction;

(j) transact any Business which will have an adverse effect on the property, assets or condition of the Company;

(k) amend its Articles of Organization or Bylaws;

(l) fail to comply in any material respect with any applicable laws, statutes, orders and regulations, including, but not limited to, making all filings with Tax and regulatory authorities;

(m) enter into any agreement that would cause Company to become subject to any indemnification obligations; or

(n) make any offer or commitment or incur any obligation to enter into any contract, arrangement or transaction of a type described in this Section 4.6.

NYI 1074421v12

PGIC_0004130

**Section 4.7** **Deposits.** The deposits listed on Schedule 2.19(c) shall be maintained through the Closing Date and will constitute a portion of the assets to be retained in the Company to constitute its capital and surplus.

**Section 4.8** **Intercompany Contracts and Indebtedness.** On the Closing Date, there shall be no outstanding indebtedness or other liability of Seller or any of its affiliates to Company, or of Company to any of its affiliates, other than the Reinsurance Agreement. On or prior to the Closing Date, Seller shall cause Company to terminate (i) the Investment Management Agreement, effective as of November 14, 2006, between the Company and White Mountains Advisors LLC (the "Investment Management Agreement"), and (ii) (with respect to the Company) the Tax Allocation Agreement by and among Fund American, the Company, and the several subsidiaries listed therein (the "Tax Allocation Agreement").

**Section 4.9** **No Negotiations, etc.** Between the date hereof and the Closing Date inclusive, Seller shall not, and shall cause its affiliates (including Company) not to, directly or indirectly: (a) initiate, solicit or seek any inquiries or the making or implementation of any proposal or offer with respect to a merger, acquisition, consolidation or similar business combination transaction involving, or any purchase of any equity securities of Company (any such proposal or offer being hereinafter referred to as an "Acquisition Proposal"); (b) engage in any negotiations concerning, or provide any confidential information, data or other non-public information to, or have any substantive discussions with, any person or entity relating to an Acquisition Proposal; or (c) otherwise cooperate in any effort or attempt to make, implement or accept an Acquisition Proposal. Seller for itself and on behalf of Company acknowledges that Purchaser has no adequate remedy at law or in equity (other than as described below) for a

35

PGIC_0004131

breach of this Section 4.9 by Seller, and therefore Seller agrees that in the event of a breach of this Section 4.9 by Seller, Purchaser shall be entitled to seek equitable relief, including, without limitation, injunctions, restraining orders and specific performance, and Seller will not, and will cause the Company not to, oppose the granting of these remedies on the basis that Purchaser should not be entitled to such relief because Purchaser has an adequate remedy at law or otherwise in equity.

Section 4.10   Reserved.

Section 4.11   Delivery of Financial Statements, Regulatory Filings, etc.   No later than the tenth day after filing with the applicable regulatory authorities, (a) Seller shall deliver to Purchaser true, complete and correct copies of the Company Statements, and all related schedules thereto as of and for the year ended December 31, 2006 (as prepared in accordance with MA SAP, applied on a consistent basis); (b) each of Seller and the Guarantor shall deliver to Purchaser true, complete and correct copies of the Seller Statements and Guarantor Audited Statements, respectively, and all schedules related to each of the Seller Statements and the Guarantor Audited Statements, respectively, as of and for the year ended December 31, 2006, each as prepared in accordance with Pennsylvania SAP, applied on a consistent basis; and (c) Seller shall cause Company to deliver true, correct and complete copies of any material filings made by Company with any such regulatory authority.

Section 4.12   Termination of Agents, Brokers, Etc.   No later than the sixtieth day after the date of this Agreement, Seller or Guarantor shall, or Seller shall cause Company to, as appropriate, send written notification to any and all agents, brokers, producers or other intermediaries that were or are distributors of products of Company notifying such persons of the

36

NYI 1074421v12

PGIC_0004132

entry by each of Seller and Guarantor into this Agreement and of the transactions contemplated herein, and notifying such agents, brokers, producers or intermediaries that their appointments to such role or roles with respect to Company are terminated effective upon receipt of such notification.

Section 4.13 **Termination of Signing Powers.** At least five (5) business days prior to the Closing Date, Seller or Guarantor shall, or Seller shall cause Company to, deliver written notification to any bank which maintains, on behalf of Company, any account or safe deposit box listed on Schedule 2.19(d) notifying any such bank of the entry into this Agreement by Seller and Guarantor, and notifying any and all such banks that the check signing or withdrawal powers or other authority of all persons with respect to the accounts or safe deposit boxes of Company maintained therein are revoked immediately upon receipt by any such bank of such notice.

## ARTICLE 5

### Covenants of Purchaser

Section 5.1 **Acquisition Statement and Compliance with Massachusetts Insurance Code.** Prior to or promptly after, and in any case within ten (10) business days following, the date of execution of this Agreement, Purchaser shall file the statement, and all related materials, in connection with Purchaser's acquisition of the Shares pursuant to the requirements of the Massachusetts Insurance Code (the "Acquisition Statement"). Purchaser shall use commercially reasonable best efforts to take all other actions in connection with such filing required by the Massachusetts Insurance Code in order to permit Purchaser to be authorized (subject to the terms and conditions of this Agreement) to consummate the

37

PGIC_0004133

transactions contemplated by this Agreement, including, without limitation, the filing of any amendment to the Acquisition Statement.

Section 5.2  **Post-Closing Access/Responsibilities.**  After the Closing, Purchaser shall, and shall cause the Company to, afford to Seller, its agents and representatives reasonable access to the properties, books, records and employees of the Company to the extent reasonably necessary or desirable, and shall provide to Seller all reasonably requested information, including, without limitation, the names of directors and officers of Company and the National Association of Insurance Commissioners Company Code of Company, in order to (a) allow Seller to prepare the statutory financial statements for the period ended June 30, 2007 (in the event that Closing has occurred prior to such period end), and (b) permit Seller to determine or investigate any matter relating to its rights and obligations with respect to any period ending on or before the Closing Date.  Purchaser shall be responsible for causing Company to prepare any and all statutory financial statements of Company for periods ending on or after July 1, 2007 in the event that Closing has occurred prior to the end of any such period.  Purchaser shall be responsible for causing Company to execute and file any and all statutory statements and state premium Tax Returns for the Company which become due after the Closing and shall cause Company to pay any filing fees and third-party printing costs in connection therewith.  The Seller and Purchaser shall meet and confer concerning the exchange of information necessary for each of Seller and Company to prepare its respective statutory statements for any period prior to and after the Closing.

Section 5.3  **Financing.**  Purchaser shall utilize commercially reasonable best efforts to receive sufficient commitments for funds from potential investors such that, as of the Closing

38

PGIC_0004134

Date, the Purchaser shall have sufficient funds to pay the Purchase Price and all other amounts payable pursuant to this Agreement or otherwise necessary to consummate the transactions contemplated hereby and to pay any fees and expenses in connection with the transactions contemplated hereby.

## ARTICLE 6

## Conditions Precedent to Obligation of Purchaser to Close

The obligation of Purchaser under this Agreement to purchase the Shares on the Closing Date shall be subject to delivery by Seller of the Shares, free and clear of all Encumbrances whatsoever, to Purchaser and to the satisfaction of the following conditions precedent:

Section 6.1    Proceedings Satisfactory.    Seller shall have delivered to Purchaser on the Closing Date such documents and other evidence as Purchaser may reasonably request in order to establish the consummation of the transactions provided for in this Agreement, the taking of all corporate and other proceedings in connection herewith and the compliance by each of Seller and the Guarantor with the conditions set forth in this ARTICLE 6.

Section 6.2    Warranties and Representations of Seller and the Guarantor.    Each of the warranties, representations and disclosures of and made by each of Seller and the Guarantor in this Agreement (without regard to any notice of any change given by Seller pursuant to the requirement of Section 4.4) shall be true and correct in all respects on and as of the Closing Date as though each of such warranties, representations and disclosures had been made at and as of the time of the Closing on the Closing Date.

Section 6.3    Compliance with Covenants.    Each of Seller and the Guarantor shall have complied with and performed to the reasonable satisfaction of Purchaser, all covenants and

39

NY1 1074421v12

PGIC_0004135

agreements required to be performed by each of Seller and the Guarantor herein on or before the Closing Date.

Section 6.4    **No Proceedings Pending.**   No injunction or restraining order shall prohibit or limit the right of Purchaser to consummate the transactions provided for in this Agreement, and no action, suit, proceeding or investigation by or before any court, administrative agency or other governmental authority of any kind shall have been instituted or threatened which may materially and adversely affect the ability of the Company to conduct the Business or which may result in restraining, prohibiting or invalidating, or seeking monetary damages by reason of consummation of, the transactions provided for in this Agreement.   No request of or investigation by any governmental or administrative agency or other authority of any kind for deferral of the Closing Date shall be pending or threatened which would subject Purchaser, Company (after Closing) or the directors or officers of any of them (including any directors or officers of Company after the Closing) to any material liability, fine, forfeiture or penalty on the ground that the transactions contemplated herein, or any of them, are unlawful in any respect, or that any applicable law, rule or regulation has been breached or violated, or that the transactions contemplated herein or any of them will breach or violate by the consummation hereof any applicable law, rule or regulation, or that Company otherwise would have acted improperly or in breach of any duty in connection with this Agreement or the transactions contemplated herein.

Section 6.5    **Directors and Officers.**  Seller shall have obtained the resignations of all of the officers and directors of the Company effective as of the Closing Date.

NYI 1074421v12

PGIC_0004136

**Section 6.6  Regulatory Approvals.**  Purchaser shall have obtained approval of the Acquisition Statement from the Division without conditions reasonably found objectionable to Purchaser.  Each of Purchaser, Seller and the Guarantor shall have obtained all reasonably necessary and appropriate approvals of all regulatory agencies required to lawfully permit Purchaser to purchase the Shares and acquire control of the Company, Seller to sell the Shares to Purchaser and the Guarantor to perform its obligations as guarantor hereunder.

**Section 6.7  Delivery of Certificates for the Shares.**  Seller shall have delivered to Purchaser, against receipt of the Purchase Price, the certificates evidencing ownership of the Shares, endorsed in blank or accompanied by separate stock powers duly executed in blank with all appropriate stock transfer tax stamps affixed.

**Section 6.8  Intercompany Balances; Assumed Reinsurance.**  All intercompany balances between the Company and Seller or any affiliate of Seller shall have been repaid in full notwithstanding the expressed terms of payment thereof.

**Section 6.9  Delivery of Closing Documents.**  Each of Seller and the Guarantor shall have delivered to Purchaser the following documents, each in form and substance reasonably satisfactory to Purchaser and its counsel:

(a)  Certificate of the President, Treasurer or any Senior Vice President of Seller, dated as of the Closing Date, to the effect that the representations and warranties made by Seller are true in all material respects, the conditions set forth in this Agreement have been satisfied and all obligations required to be performed herein have been performed;

(b)  Copies of the resolutions of the Board of Directors of Seller, certified by the Secretary or Assistant Secretary of Seller, authorizing and approving the execution and delivery

41

NYI 1074421v12

PGIC_0004137

of this Agreement and the taking of all other action required by applicable law for the lawful consummation of this Agreement and any and all transactions prescribed herein, including but not limited to the Reinsurance Agreement, certifying that the adopting resolutions have not been rescinded or amended and are in full force and effect, and such other incumbency certificates and other certificates of Seller as Purchaser shall reasonably request;

(c) The Articles of Organization, Bylaws, minute books, stock books, corporate seal and other corporate records of Company in the possession of Seller, including the Licenses currently in effect for each state in which Company is licensed;

(d) Certificates as to the good standing or authority of the Company in the Commonwealth of Massachusetts, dated as of a date no earlier than fifteen days prior to the Closing Date, together with a copy of the Articles of Organization of the Company certified by the Secretary of State of the Commonwealth of Massachusetts;

(e) A receipt, duly executed by a senior officer of Seller, evidencing receipt by Seller of the Purchase Price; and

(f) All additional documents as Purchaser may reasonably request to assure Purchaser and its counsel that the provisions of and conditions specified in this Agreement to be performed or satisfied by each of Seller and the Guarantor have been performed or satisfied.

Section 6.10   **Capital and Surplus.** The capital and surplus of Company, as provided in Section 1.2, shall not be less than $30 million and not more than $47 million, and the Closing Admitted Assets shall consist of cash, cash equivalents and those assets specified on Schedule 1.2(a).

NY1 1074421v12

PGIC_0004138

Section 6.11 **Financing.** Purchaser shall have received sufficient commitments for funds and, as of the Closing Date, the Purchaser shall have sufficient funds to pay the Purchase Price and all other amounts payable pursuant to this Agreement or otherwise necessary to consummate the transactions contemplated hereby and to pay any fees and expenses in connection with the transactions contemplated hereby.

Section 6.12 **Reinsurance Agreement.** The Reinsurance Agreement shall be in full force and effect.

Section 6.13 **Termination of Agents, Brokers, Etc.** All appointments of any agent, broker, producer or other intermediary with respect to the Company, active on the date hereof, shall have been terminated with respect to the Company and no new appointments shall have been made with respect to the Company.

Section 6.14 **Termination of Account Powers.** All persons holding check signing or withdrawal powers or other authority over any bank account or safe deposit box listed on Schedule 2.19(d) shall have had such power or authority revoked.

Section 6.15 **Termination of Agreements.** Seller shall have caused Company to terminate (i) the Tax Allocation Agreement (with respect to Company) and (ii) the Investment Management Agreement.

## ARTICLE 7

### Conditions Precedent to Obligation of Seller to Close

The obligation of Seller under this Agreement to sell the Shares on the Closing Date shall be subject to the satisfaction of the following conditions precedent:

43

PGIC_0004139

**Section 7.1** <u>Proceedings Satisfactory.</u> Purchaser shall have delivered to Seller on the Closing Date such documents and other evidence as Seller may reasonably request in order to establish the consummation of the transactions provided for in this Agreement, the taking of all corporate and other proceedings in connection herewith and the compliance by Purchaser with the conditions set forth in this ARTICLE 7.

**Section 7.2** <u>Warranties and Representations.</u> Each of the warranties, representations and disclosures of and made by Purchaser in ARTICLE 3 shall be true and correct in all material respects on and as of the Closing Date as though each of such warranties and representations had been made at and as of the time of Closing on the Closing Date.

**Section 7.3** <u>Compliance with Covenants.</u> Purchaser shall have complied with and performed to the reasonable satisfaction of Seller all covenants and agreements required to be performed by Purchaser herein, on or before the Closing Date.

**Section 7.4** <u>No Proceedings Pending.</u> No injunction or restraining order shall prohibit or limit the right of Seller to consummate the transactions provided for in this Agreement, and no action, suit, proceeding or investigation by or before any court, administrative agency or other governmental authority of any kind shall have been instituted or threatened which may result in restraining, prohibiting or invalidating, or seeking monetary damages by reason of, consummation of the transactions provided for in this Agreement. No request of any governmental or administrative agency or other authority of any kind for deferral of the Closing Date shall be pending or threatened which would subject Seller, Company (prior to Closing) or the directors or officers of either of them to any material liability, fine, forfeiture or penalty on the ground that the transactions contemplated herein, or any of them, are unlawful

44

NY1 1074421v12

PGIC_0004140

in any respect, or that any applicable law, rule or regulation has been breached or violated, or that the transactions contemplated herein or any of them will breach or violate by the consummation hereof any applicable law, rule or regulation, or that Seller otherwise would have acted improperly or in breach of any duty in connection with this Agreement or the transactions contemplated herein.

Section 7.5    **Regulatory Approvals.**  The approval of the acquisition of the Shares and of the control of the Company by Purchaser shall have been obtained from the Division without conditions imposed on Seller and reasonably found objectionable to Seller.  Each of Purchaser, Seller and the Guarantor shall have obtained all reasonably necessary and appropriate approvals of all regulatory agencies required to lawfully permit Purchaser to purchase the Shares and acquire control of the Company, Seller to sell the Shares to Purchaser and the Guarantor to perform its obligations as guarantor hereunder.

Section 7.6    **Payment of Purchase Price.**  The Purchase Price shall have been paid to Seller in accordance with Section 1.2.

Section 7.7    **Cross-Receipt.**  Purchaser shall have delivered a receipt, duly executed by a senior officer of Purchaser, evidencing receipt by Purchaser of the Shares.

Section 7.8    **Delivery of Closing Documents.**  Purchaser shall have delivered to Seller the following documents, each in form and substance reasonably satisfactory to Seller:

(a)  Certificate of the President, any Senior Vice President or executive officer of Purchaser, dated as of the Closing Date, to the effect that the representations and warranties made by Purchaser are true in all material respects, the conditions set forth in this Agreement

NY1 1074421v12

PGIC_0004141

with respect to Purchaser have been satisfied and all of Purchaser's obligations required to be performed herein have been performed;

(b) Copies of the resolutions of the Board of Directors of Purchaser, certified by the Secretary or Assistant Secretary of Purchaser, authorizing and approving the execution and delivery of this Agreement and the taking of all other action required by applicable law for the lawful consummation of this Agreement and any and all transactions prescribed herein, certifying that the adopting resolutions have not been rescinded or amended and are in full force and effect, and such other incumbency certificates and other certificates of Purchaser as Seller shall reasonably request; and

(c) All additional documents as Seller may reasonably request to assure Seller and its counsel that the provisions of and conditions specified in this Agreement to be performed or satisfied by Purchaser have been performed or satisfied.

## ARTICLE 8

### Indemnification

**Section 8.1    Indemnity by Seller.**  Seller agrees to indemnify and hold Purchaser harmless of and from any loss, cost, expense, claim, interest, fine, penalty, deficiency, obligation, liability or damage, including, without limitation, reasonable attorneys' fees, accountants' fees and other investigatory fees and out-of-pocket expenses, actually expended or incurred by Purchaser or the Company (collectively, "Losses"), arising out of or resulting from (i) any breach of representation or warranty (including any misrepresentation in, or omission from, any certificate or other document furnished or to be furnished by the Seller to Purchaser hereunder), or nonfulfillment of any covenant or agreement on the part of Seller under this Agreement; (ii)

46

PGIC_0004142

the failure by the Seller to perform any of its obligations under the Reinsurance Agreement; (iii) any Loss arising out of or resulting from the existence of Company prior to the Closing or the conduct of the Business or other operations by or of Company prior to the Closing; (iv) all filing fees and administrative assessments for insurance guaranty funds and/or insurance department expenses and all other assessments, levies or liabilities of any kind arising out of and/or associated with the conduct of the Business of the Company prior to the Closing; (v) any matter relating to any employee benefit plan or arrangement in effect prior to the Closing; and (vi) all actions, suits, proceedings, demands, assessments, judgments, costs and expenses incident to any of the foregoing (any and all of which are hereafter referred to as a "Claim").

Purchaser shall give Seller written notice by certified or registered mail or overnight courier of any Claim with respect to which Purchaser seeks indemnification. Seller shall have ten business days from the date of receipt of such notice to notify Purchaser that Seller will assume the entire control of the defense, compromise or settlement (any and all of which are hereinafter referred to as "Defense") of such Claim through its own attorneys, which attorneys must be reasonably acceptable to Purchaser, and at its own expense. If Seller shall assume such Defense, it shall promptly advise Purchaser of its activities and efforts in connection therewith and of the ultimate resolution of such Claim. Seller shall have the right to settle, compromise or adjust any such Claim, provided that (x) Purchaser's rights in and to any of the assets of the Company or the Shares and Company's rights to its assets and ability to do Business are not infringed thereby, (y) such settlement includes an unconditional release of Purchaser and Company from all liability arising out of such action or Claim, except for settlements with respect to Claims arising in the ordinary course of Business pursuant to insurance policies issued

47

PGIC_0004143

by Company prior to Closing, in which case any such settlement need only include the unconditional release of Company with respect to such Claim, and (z) such settlement does not include a statement as to, or an admission of fault, culpability or failure to act, by or on behalf of the Purchaser or Company. In connection with any Defense, Purchaser shall be entitled, at its own cost and expense, to have its counsel monitor the progress and status thereof and, in such event, Seller and its counsel agree to afford all reasonable cooperation to Purchaser and its counsel in order to permit counsel to Purchaser effectively to monitor the progress and status from time to time of any such Claim. If Seller fails to notify Purchaser that it has assumed the Defense or does not in fact assume the Defense, Purchaser may, but shall not be required to, pay, compromise or settle such Claim, or take such action to settle such Claim, provided that Purchaser shall notify Seller of such action. In such event, Purchaser shall be fully entitled to indemnification hereunder.

Section 8.2 **Indemnity by Purchaser.** Purchaser agrees to indemnify and hold Seller harmless from any Loss arising out of or resulting from (i) any breach of representation or warranty (including any misrepresentation in, or omission from, any certificate or other document furnished or to be furnished by it to Seller hereunder), or nonfulfillment of any covenant or agreement on the part of Purchaser under this Agreement; (ii) arising out of or associated with the conduct of the Business or other operations of the Company after the Closing; and (iii) all actions, suits, proceedings, demands, assessments, judgments, costs and expenses incident to any of the foregoing. The same notice and payment provisions contained in Section 8.1 of this Agreement with regard to indemnification claims by Purchaser against Seller

48

NYI 1074421v12

PGIC_0004144

shall apply with regard to indemnification claims by Seller against Purchaser pursuant to this Section 8.2.

Section 8.3    **Valuation of Claims**.  After the indemnified party has determined the dollar amount of any Claim, such indemnified party shall provide written notice to indemnifying party of the amount of such Claim, which notice shall include in reasonable detail information explaining calculation of the amount of such Claim.  Unless, within thirty (30) business days after the receipt of such notice by the indemnifying party, the indemnified party receives written notice that indemnifying party does not concur with the indemnified party's determination of the amount of the Claim, the amount of such Claim provided in such written notice shall conclusively be deemed to have been accepted by the indemnifying party and to be the agreed amount which the indemnified party and, in the event that Purchaser is the indemnified party, Company are entitled to receive by way of indemnification from the indemnifying party (the "Indemnification Loss").  If the indemnified party within such thirty (30) business day period receives written notice that the indemnifying party disagrees with the amount of the Claim, the parties shall endeavor forthwith, and within ten (10) business days after receipt of such notice of disagreement by the indemnified party, to negotiate in good faith to resolve the issue or issues which form the basis of their disagreement.  If no resolution with respect to such disagreement has been reached by the parties within such ten (10) business day period, either the indemnified party (on behalf of itself or, in the event Purchaser is the indemnified party, the Company) or the indemnifying party may commence litigation with respect to such disagreement in a court of competent jurisdiction in the Commonwealth of Massachusetts.  In any such action, suit or other proceeding, each of the parties hereto irrevocably and unconditionally waives and agrees not to

49

NYI 1074421v12

PGIC_0004145

assert by way of motion, as a defense or otherwise any claims that it is not subject to the jurisdiction of the above court, that such action is brought in an inconvenient forum or that the venue of such action, suit or other proceeding is improper. Each of the parties hereto also agrees that any final and unappealable judgment against a party hereto in connection with any action, suit or other proceeding shall be conclusive and binding on such party and that such award or judgment may be enforced in any court of competent jurisdiction, either within or outside the United States. A certified or exemplified copy of such award or judgment shall be conclusive evidence of the fact and amount of such award or judgment. Without limiting the foregoing, each party agrees that service of process on such party as provided in Section 12.9 shall be deemed effective service of process on such party.

Section 8.4    **Payment of Indemnification Loss.** Any indemnification amount payable by any indemnifying party pursuant to Sections 8.1 or 8.2 hereunder shall be promptly remitted by such indemnifying party to a bank account of the indemnified party (or, if Purchaser is the indemnified party and so directs the Seller, the Company), as designated in writing by the indemnified party, within five business days after the determination of the amount of such indemnification amount.

Section 8.5    **Tax Matters.** Anything in this Article 8 to the contrary notwithstanding, with the exception of Section 8.2, the rights and obligations of the parties with respect to indemnification for any and all Tax matters (except as specifically provided elsewhere in this Agreement) shall be solely governed by Article 9 and shall not be subject to the provisions of this Article 8.

NY1 1074421v12

PGIC_0004146

## ARTICLE 9
## Tax Matters

Section 9.1    Tax Indemnities.

(a)  Seller shall indemnify, defend and hold harmless Purchaser, its affiliates, the Company and their respective officers, directors, employees and agents (each, a "Tax Indemnitee") from and against, and shall reimburse each Tax Indemnitee for, any and all Taxes (including, without limitation, reasonable expenses of investigation and reasonable attorneys' and accountants' fees and expenses in connection with any action, suit or proceeding) actually incurred, accrued or suffered at any time by any Tax Indemnitee arising out of or attributable to (i) any misrepresentation, inaccuracy or breach of any representation, warranty, covenant, agreement or promise related to Taxes by Seller and/or the Company contained in this Agreement (or in any certificate, document, list or schedule delivered to Purchaser by Seller or Company hereunder), (ii) any and all unpaid Taxes for any Taxable Period, or portion thereof, ending on or before the Closing Date except to the extent that such Taxes are specifically set forth in the Tax reserve accrued on the Company Financial Statements for the period ended December 31, 2006, or (iii) any and all unpaid Taxes, whether determined on a separate, consolidated, combined, group or unitary basis, including any penalties and interest in respect thereof, of the Company (A) pursuant to Treas. Reg. §1.1502-6 or any comparable provision of state, local, or foreign law with respect to any Taxable Period beginning before the Closing Date and (B) pursuant to any guaranty, indemnification, Tax sharing, or similar agreement made on or before the Closing Date relating to the sharing of liability for, or payment of, Taxes.

(b)  In the case of Taxes that are payable with respect to any Taxable Period beginning on or before the Closing Date and ending after the Closing Date (a "Straddle Period"),

51

PGIC_0004147

the portion of any such Tax that is allocable to the portion of such Straddle Period ending on the Closing Date shall be:

(i)     in the case of taxes that are either (A) based upon or related to income or receipts or (B) imposed in connection with any sale or other transfer or assignment of property (real or personal, tangible or intangible) (other than conveyances pursuant to this Agreement, as provided in Section 9.4), deemed equal to the amount which would be payable (after giving effect to amounts which may be deducted from or offset against such Taxes) if the Taxable Period ended on the Closing Date and the parties hereto shall elect to do so if permitted by applicable law; and

(ii)     in the case of Taxes imposed on a periodic basis with respect to the assets of the Company, or otherwise measured by the level of any item, deemed to be the amount of such Taxes for the entire Straddle Period (after giving effect to amounts which may be deducted from or offset against such Taxes) (or, in the case of such Taxes determined on an arrears basis, the amount of such Taxes for the immediately preceding period), multiplied by a fraction the numerator of which is the number of days in the Straddle Period ending on the Closing Date and the denominator of which is the number of days in the entire Straddle Period.

(c)     Any credit or refund resulting from an overpayment of Taxes (and associated interest) for a Straddle Period shall be attributed to the portion of the Straddle Period ending on the Closing Date and/or the portion of the Straddle Period beginning after the Closing Date based upon the method employed in Section 9.1(b) taking into account the type of Tax to which the credit or refund relates. In the case of any Tax paid based upon or measured by capital (including net worth or long-term debt) or intangibles, any amount thereof required to be

52

PGIC_0004148

apportioned under Section 9.1(b) shall be computed by reference to the level of such items on the Closing Date.

(d)  In the event of an indemnity claim by a Tax Indemnitee pursuant to Section 9.1 hereof, payment by Seller of any amount payable under this Section 9.1 that can be satisfied by a remittal of Tax to a governmental authority shall be made within 10 days (or such shorter period of time as shall constitute timely payment) following written notice by the Tax Indemnitee or the relevant governmental authority, as the case may be, that payment of such amounts to the appropriate Taxing Authority is due; provided that Seller shall not be required to make any payment earlier than five days before it is due to the appropriate Taxing Authority.  In all other cases, payment shall be made within 10 days following written demand therefor.  In the case of a Tax that is contested in accordance with the provisions of Section 9.5, payment of the Tax to the appropriate Taxing Authority will be considered to be due no earlier than the date a final determination to such effect is made by the appropriate Taxing Authority or court.

(e)  If a Tax Indemnitee receives a refund or credit or other reimbursement with respect to Taxes for which it would be indemnified under this Agreement, the Tax Indemnitee shall pay over such refund or credit or other reimbursement to Seller that would indemnify it for such Tax.

Section 9.2   Preparation of Tax Returns, etc.

(a)  Seller shall prepare and timely file or cause the Company to prepare and timely file in a manner consistent with past practice all Tax Returns (whether separate or consolidated, combined, group or unitary Tax Returns that include the Company or any of its Subsidiaries) with respect to Company for any Tax Period that ends on or before the Closing

53

NYI 1074421v12

PGIC_0004149

Date. The Seller shall pay or cause the Company to pay all Taxes shown as due, or required to be shown as due, on such Tax Returns.

(b) The parties hereto acknowledge and agree that Purchaser shall control the preparation and filing of all Tax Returns of the Company for any Tax Period that ends after the Closing Date (the "Post-Closing Returns"). Seller shall cooperate with Purchaser and the Company and its affiliates in the preparation of Post-Closing Returns and shall provide assistance as reasonably requested by Purchaser. At least ten (10) Business Days prior to the due date of any payment required to be made with respect to any Post-Closing Return, Seller shall pay to Purchaser (in accordance with Section 9.1) the amount of Taxes attributable to any Taxable Period (or portion thereof) ending on or before the Closing Date. With respect to any Tax Return with respect to a Straddle Period or as to which Taxes are otherwise the obligation of the Seller under Section 9.1, the Purchaser shall provide the Seller and its authorized representative with a copy of such completed Tax Return and a statement (with which the Purchaser will make available supporting schedules and information) certifying the amount of Tax shown on such Tax Return for which the Seller is responsible pursuant to Section 9.1 at least 30 days prior to the due date (including any extension thereof) for filing of such Tax Return, and the Seller and its authorized representative shall have the right to review and comment on such Tax Return and statement prior to the filing of such Tax Return. If the Seller, within 15 days after delivery of such Tax Return and statement, notifies the Purchaser in writing that it objects to any items therein, the Purchaser and the Seller shall proceed to attempt in good faith to resolve the disputed items and, if they are unable to do so within five days, the disputed items shall be submitted to and resolved by an independent accounting firm prior to the due date for filing such

54

NY1 1074421v12

PGIC_0004150

Tax Return. Upon resolution of all disputed items, the relevant Tax Return and statement shall be adjusted to reflect the resolution and shall be binding upon the parties (including the Company) without further adjustment. If the independent accounting firm resolves all disputes presented to it entirely in the manner proposed by the Seller or the Purchaser, as the case may be, the fees and expenses of the independent accounting firm relating to the resolution of such dispute shall be paid by the other party. In all other events, the fees and expenses of the independent accounting firm shall be shared based on the difference between the Seller's position, on the one hand, and the Purchaser's position, on the other hand, initially presented to the independent accounting firm (based on the aggregate of all differences taken as a whole) and the final resolution as determined by the independent accounting firm in proportion to the total difference between the Seller's and the Purchaser's initial positions.

Section 9.3 **Tax Cooperation and Exchange of Information.** Seller and Purchaser shall, (i) after the Closing, assist (and cause their respective affiliates to assist) each other in preparing and filing any Tax Returns that either party is responsible for preparing and filing with respect to the Company, (ii) after the Closing, cooperate fully in preparing for any audits of, or disputes or other proceedings with any Taxing Authority or with respect to any matters with respect to Taxes of or relating to the Company and (iii) make available to each other and to any Taxing Authority as reasonably requested all information, records and documents relating to Tax matters (including Tax Returns) of or relating to the Company relating to any Taxable Period that begins on or before the Closing Date. Seller and Purchaser shall keep any information obtained under this Section 9.3 confidential except (x) as may be necessary in connection with

55

NYI 1074421v12

PGIC_0004151

the filing of Tax Returns or claims for refund or the conduct of any audit, litigation or other proceeding with respect to Taxes or (y) with the consent of the disclosing party.

Section 9.4    Conveyance Taxes.    All transfer, documentary, sales, use, registration and other such Taxes (including, without limitation, all applicable real estate transfer or gains Taxes and stock transfer Taxes), any penalties, interest and additions to Tax and fees incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by Seller. Each party hereto shall cooperate in the timely making of all filings, returns, reports and forms as may be required in connection therewith.

Section 9.5    Contests.

(a)    After the Closing Date, Purchaser shall notify Seller in writing of the proposed assessment or the commencement of any Tax audit or administrative or judicial proceeding or of any demand or claim on Purchaser and its affiliates or the Company which, if determined adversely to the taxpayer after the lapse of time, could be grounds for indemnification by Seller under Section 9.1. Such notice shall contain factual information (to the extent known to Purchaser and its affiliates or the Company) describing the asserted Tax liability in reasonable detail and shall include copies of any notice or other document received from any Taxing Authority in respect of any such asserted Tax liability.

(b)    In the case of a Tax audit or administrative or judicial proceeding (a "Contest") that relates to Taxable Periods ending on or prior to the Closing Date, the Seller shall have the sole right, at its expense, to control the conduct of such Contest. In the event that any such proceeding would result in an adjustment to Tax that would have an adverse effect on Purchaser or any of its affiliates for a period ending after the Closing Date, Seller (i) shall permit

56

PGIC_0004152

Purchaser to participate in the proceeding to the extent the adjustment may affect the Tax liability of the Purchaser or any of its affiliates for a period ending after the Closing Date and (ii) shall not settle or otherwise compromise such proceeding without the prior written consent of Purchaser, which shall not be unreasonably withheld.

(c) With respect to Taxes for any Straddle Period, Seller may elect to participate in any Contest involving any asserted Tax liability with respect to which indemnity may be sought from Seller pursuant to Section 9.1.

Section 9.6     **Tax Covenants.**

(a) Neither Purchaser nor any affiliate of Purchaser shall amend, refile or otherwise modify, or cause or permit the Company to amend, refile or otherwise modify, any Tax election or Tax Return with respect to any Taxable Period (or portion of any Taxable Period), ending on or prior to the Closing without the prior written notice to Seller.

(b) Seller shall deliver to Purchaser a non-foreign affidavit dated as of the Closing Date which shall conform to the model certification set forth in Treasury Regulations Section 1.1445-2(b)(2)(iii)(B).

(c) For purposes of apportioning a Tax to any Straddle Period, the parties hereto shall treat the Closing Date as the last day of such Period (i.e., the parties hereto shall "close the books" on such date) and shall elect to do so if permitted by applicable law.

(d) All contracts, agreements or arrangements under which the Company may at any time have an obligation to indemnify for or share the payment of or liability for any portion of a Tax (or any amount calculated with reference to any portion of a Tax) shall be terminated with respect to the Company as of the Closing Date, and the Company shall thereafter be

NYI 1074421v12

PGIC_0004153

released from any liability thereunder. After the Closing, this Agreement shall be the sole Tax sharing agreement relating to the Company.

(e) On or before the Closing Date, Purchaser and Seller shall cooperate to jointly file IRS Form 8023 (or any such successor form) in connection with the sale of the Shares contemplated hereby.

Section 9.7   <u>Tax Record Retention.</u>   For a period of seven (7) years after the Closing Date, Seller and its representatives shall have reasonable access to the books and records (including the right to make extracts thereof) of the Company to the extent that such books and records relate to Taxes and to the extent that such access may reasonably be required by Seller in connection with matters relating to or affected by the operation of the Company prior to the Closing Date. Such access shall be afforded by Purchaser upon receipt of reasonable advance notice and during normal business hours. If Purchaser shall desire to dispose of any such books and records prior to the expiration of such seven-year period, Purchaser shall, prior to such disposition, give Seller a reasonable opportunity, at Seller's expense, to segregate and remove such books and records as Seller may select.

Section 9.8   <u>Miscellaneous.</u>

(a) For Tax purposes, unless otherwise required by law, the parties agree to treat all payments made under this Article 9 and under any other indemnity provisions contained in this Agreement, and any payments in respect of any breaches of representations, warranties, covenants or agreements hereunder, as adjustments to the Purchase Price.

(b) Except as provided in Section 8.5 and otherwise in this Agreement, this Article 9 shall be the sole provision governing indemnities for Taxes under this Agreement.

NY1 1074421v12

PGIC_0004154

(c)  For purposes of this Article 9, all references to Purchaser, Seller, affiliates or the Company include successors.

(d)  Notwithstanding any provision in this Agreement to the contrary, all representations, warranties, covenants and agreements of the parties hereto relating to Taxes contained in this Agreement shall survive until one-hundred and twenty (120) days beyond the lapse of the applicable statute of limitations (including any extension thereof).

(e)  Payments by Seller under this Article 9 shall be limited to the amount of any liability or damage that remains after deducting therefrom any indemnity, contribution or other similar payment recoverable by Purchaser or the Company or any affiliates of Purchaser from any third party with respect thereto.

Section 9.9   Section 338(h)(10) Election.   In connection with the sale of the Shares contemplated hereby, the parties hereto shall jointly cause an express election pursuant to Section 338(h)(10) of the Code to be made for the Company and shall cause similar elections to be made where eligible to do so for state and local Tax purposes (collectively, the "Section 338(h)(10) Election").   Seller and Purchaser shall comply fully with all filing and other requirements necessary to effectuate the foregoing on a timely basis and agree to cooperate in good faith with each other in the preparation and timely filing of any Tax Returns required to be filed in connection with the making of any Section 338(h)(10) Election, including the exchange of information and the joint preparation and filing of all required Tax elections and Tax forms and schedules.   The Seller and Purchaser shall endeavor in good faith to agree upon the allocation of the Purchase Price and liabilities of the Company (and other amounts constituting consideration) among the assets of the Company and any other relevant items (the "Allocation")

59

NYI 1074421v12

PGIC_0004155

for purposes of Section 338(h)(10) of the Code and other applicable Tax purposes within 120 days after the Closing Date. The Allocation shall be prepared in a manner consistent with Code Sections 338 and 1060 and the Regulations thereunder. If Seller and Purchaser cannot agree on the proper Allocation, then Seller and Purchaser shall submit the items in dispute for resolution to Ernst & Young, LLP (or, if such firm shall decline or be unable to act, or is not, at the time of such submission, independent of Purchaser and Seller, then to another independent valuation or accounting firm of international reputation mutually acceptable to Seller and Purchaser), which shall, as soon as practicable after such submission and in all events within 30 days following submission, determine and report to Seller and Purchaser its resolution of such disputed items. The report of such firm shall be final and binding upon the parties hereto. If such firm resolves all disputes presented to it entirely in the manner proposed by Seller or Purchaser, as the case may be, the fees and expenses of such firm relating to the resolution of such dispute shall be paid by the other party. In all other events, the fees and expenses of such firm shall be shared based on the difference between Seller's position, on the one hand, and Purchaser's position, on the other hand, initially presented to the firm (based on the aggregate of all differences taken as a whole) and the final resolution as determined by the firm in proportion to the total difference between Seller's and Purchaser's initial positions. Seller and Purchaser shall cooperate with each other and such in connection with the matters contemplated by this Section 9.8, including by furnishing such books and records, personnel and properties as may be reasonably requested. Each of the parties hereto agrees to (a) prepare and timely file (or cause there to be prepared and timely filed) all applicable Tax Returns, including Form 8023 and Form 8883 (and all supplements thereto), in a manner consistent with the Allocation as finalized and (b) act in

60

PGIC_0004156

accordance with the Allocation for all applicable Tax purposes, unless otherwise required by law, and neither party (nor any of their affiliates) shall take or concede to a position with a Tax authority, that is inconsistent with the Allocation unless otherwise required by law; provided that if a party proposes a settlement or other final disposition of a contest with a Taxing Authority inconsistent, in whole or in part, with such Allocation, such party may proceed with such settlement or other disposition unless the other party requests that such party (x) contest the matter further and (y) agrees to bear the cost and expense of such further contest. Seller and Purchaser hereby agree to revise the Allocation to reflect any adjustment made to the Purchase Price pursuant to Section 1.2 and the parties shall follow the procedures outlined above with respect to preparation of such revised Allocation and resolution of any dispute with respect thereto.

Section 9.10 **Certain Definitions Relating to Taxes.** For purposes of this Agreement:

(a) "Taxable Period" shall mean any taxable year or any other period that is treated as a taxable year (or other period, or portion thereof, in the case of a Tax imposed with respect to such other period; e.g., a quarter) respect to which any Tax may be imposed under any applicable statute, rule, or regulation;

(b) "Tax Return" shall mean any and all returns, reports and forms (including elections, declarations, amendments, schedules, information returns or attachments thereto) required to be filed with a governmental authority with respect to Taxes.

(c) "Taxes" shall mean any and all federal, state, local and foreign taxes, assessments and other governmental charges, duties, impositions, levies and liabilities, including taxes that are or are based upon or measured by gross receipts, income, profits, sales, use and

NY1 1074421v12

PGIC_0004157

occupation, and value added, ad valorem, transfer, gains, franchise, withholding, payroll, recapture, employment, workers' compensation, excise, unemployment, insurance, social security, business license, occupation, fuel, custom, duty, goods and services, excess profits, business organization, stamp, environmental (including taxes under section 9A of the Code) and property taxes, together with all interest, penalties and additions imposed with respect to such amounts. For purposes of this Agreement, "Taxes" also includes any obligations under any agreements or arrangements with any Person with respect to the liability for, or sharing of, Taxes (including pursuant to Treasury Regulations § 1.1502-6 or comparable provisions of state, local or foreign Tax law) and including any liability for Taxes as a transferee or successor, by Contract or otherwise.

(d) "Taxing Authority" shall mean any federal, national, provincial, state, local or foreign government, or any subdivision, agency, commission or authority thereof exercising tax regulatory, enforcement, collection or other authority.

## ARTICLE 10
### Modification, Waivers and Termination

**Section 10.1  Modification.** Purchaser and Seller may, by mutual consent of their duly and properly authorized representatives, amend, modify or supplement this Agreement in such manner as may be agreed upon by them in writing at any time.

**Section 10.2  Waivers.** Each of Purchaser and Seller may, pursuant to action by its duly and properly authorized representatives and by an instrument in writing, extend the time for or waive the performance of any of the obligations of the other or waive compliance by the other with any of the covenants or conditions contained herein.

62

NYI 1074421v12

PGIC_0004158

**Section 10.3  Termination.**  This Agreement may be terminated, and the transactions contemplated hereby abandoned, prior to Closing:

(a)  (i) by Purchaser if there has been a material misrepresentation on the part of Seller or the Guarantor in any representation or warranty contained herein or in any certificate or other instrument delivered or furnished to Purchaser, or pursuant hereto, or if there has been any failure on the part of either Seller or the Guarantor to comply with or perform any of its agreements, covenants or obligations hereunder in any material respect, and such misrepresentation, noncompliance or nonperformance shall not have been (1) cured or eliminated by Seller within fifteen (15) business days following receipt of written notice thereof from Purchaser or (2) waived by Purchaser on or before the Closing Date;

(ii)  by Seller if there has been a material misrepresentation on the part of Purchaser in any representation or warranty of Purchaser contained herein or in any certificate or other instrument delivered or furnished to Seller pursuant hereto, or if there has been any failure on the part of Purchaser to comply with or perform any of its agreements, covenants or obligations hereunder in any material respect and such misrepresentation, non-compliance or nonperformance shall not have been (1) cured or eliminated by Purchaser within fifteen (15) business days from receipt by Purchaser of written notice thereof from Seller or (2) waived by Seller on or before the Closing Date;

(iii)  by Seller or Purchaser if the Division shall have disapproved of the Purchaser's acquisition of the Shares;

(iv)  at the election of either party hereto on or after July 31, 2007, if the Closing shall not have occurred on or prior to such date, unless such date is extended by the

63

NY1 1074421v12

PGIC_0004159

mutual written consent of the parties hereto; provided, however, that the right to terminate this Agreement pursuant to this subclause (iv) shall not be available to a party whose failure or whose affiliate's failure to perform or observe in any material respect any of its obligations under this Agreement shall either have been the principal cause of or resulted in the failure to consummate the Closing on or before such date;

        (v)     by Purchaser, on or prior to March 16, 2007, for any reason whatsoever; or

        (vi)     by mutual agreement of the parties hereto.

    (b) In the event of a termination pursuant to Section 10.3(a)(v), Seller shall return the Initial Deposit without interest to Purchaser no later than the third business day following such termination. Any such returned amount shall be paid by direct wire transfer in immediately available funds to the Purchaser pursuant to the wiring instructions given by Purchaser to Seller for such payment. In the event of a termination pursuant to any provision of this Section 10.3 other than clause (a)(v), the Deposit Amount shall not be refundable.

## ARTICLE 11

### Guarantee

**Section 11.1  Guaranteed Obligations.**

    (a) The Guarantor hereby absolutely and unconditionally guarantees to Purchaser, Company, and their respective successors and permitted assigns, the accuracy of Seller's representations and warranties herein, and the performance by Seller of all of its covenants, agreements and obligations, including, but not limited to, the prompt and complete payment by Seller and its successors and permitted assigns, as and when due and payable, of all

64

PGIC_0004160

amounts payable by Seller to Purchaser and Company, arising under, out of or in any way related to this Agreement or the Reinsurance Agreement (the "Guaranteed Obligations"). The guarantee provided in this Section 11.1 is a guarantee of performance and payment and not of collectibility and is in no way conditioned upon any attempt to collect from or enforce performance by Seller.

(b)   If for any reason whatsoever Seller shall fail or be unable to fully pay or perform the Guaranteed Obligations, as and when due and payable, the Guarantor shall forthwith, upon written demand of Purchaser or Company, and without Purchaser having to seek any recourse against Seller or to satisfy any other requirements as a condition to recourse against the Guarantor, as provided for by law or otherwise, pay or perform or cause to be paid or performed such Guaranteed Obligations in accordance with the instructions of Purchaser or Company (or their respective successors or assigns), together with interest on any amounts due and owing from Seller.   The Guarantor, promptly after demand, will reimburse Purchaser, Company, its successors and assigns for all reasonable costs and expenses of collecting such amounts from the Guarantor or otherwise enforcing this Agreement, including, without limitation, the reasonable fees and expenses of counsel.

Section 11.2   Warranties and Representations of the Guarantor.

(a)   Organization and Qualification.   The Guarantor is a corporation, duly organized, validly existing and in good standing under the laws of the state of its incorporation and has its principal office in Canton, Massachusetts.

(b)   Authority Relating to this Agreement.   The Guarantor has full corporate power and authority to execute and deliver this Agreement and to take the actions required to be taken by it pursuant to this Agreement.   The execution, delivery and performance by the

65

NYI 1074421v12

PGIC_0004161

Guarantor of this Agreement, and the consummation of the transactions contemplated herein, have been duly authorized and approved by all required corporate actions.

(c) Validity. This Agreement constitutes the legal, valid and binding obligation of each of the Seller and the Guarantor, enforceable against each of Seller and the Guarantor in accordance with its terms, except only as limited by applicable bankruptcy, reorganization, insolvency, moratorium and other similar laws presently or hereafter in force affecting the enforcement of creditors' rights generally and subject to general equitable principles limiting the right to obtain specific performance or other equitable relief.

(d) Warranties and Representation of the Seller. Each of the warranties, representations and disclosures of and made by the Seller in this Agreement is true and correct on and as of the date hereof, and will be true and correct on and as of the Closing Date as though each of such warranties, representations and disclosures had been made at and as of the time of the Closing on the Closing Date.

(e) Governmental Approvals. Except as disclosed in Section 2.9, no authorization, consent or approvals (or non-disapprovals, as the case may be) or other order of a governmental or regulatory body or authority is required for (i) the execution and delivery of this Agreement by the Guarantor or (ii) the consummation by Guarantor of the transactions provided herein.

## ARTICLE 12

### Miscellaneous Provisions

Section 12.1 Expenses. Each party shall pay its own expenses, including, but not limited to, all legal and accounting fees, incurred by it in connection with this Agreement.

66

PGIC_0004162

Section 12.2  **Exhibits and Schedules.**  The Exhibits and Schedules attached hereto are incorporated herein and made a part hereof for all purposes.  As used herein, the expression "this Agreement" means the body of this Agreement and such Exhibits and Schedules, and the expression "herein," "hereof," and "hereunder" and other words of similar import refer to this Agreement and such Exhibits and Schedules as a whole and not to any particular part or subdivision thereof.

Section 12.3  **Survival of Obligations.**  The respective warranties, representations, covenants and agreements of the parties to this Agreement shall survive consummation of the transactions contemplated by this Agreement and shall continue in full force and effect after the Closing Date.

Section 12.4  **Amendments and Waivers.**  Except as otherwise specifically stated herein, no provision of this Agreement may be amended except by, and only by, a written instrument executed by the parties hereto or their respective successors in interest.

Section 12.5  **Other Instruments to be Executed.**  From and after the Closing Date, assuming consummation of the transactions provided for in this Agreement on such date, Seller shall, from time to time, at the request of Purchaser and without further consideration (but at the expense of Purchaser) do, execute, acknowledge and deliver all such further acts, deeds, assignments, transfers, conveyances, powers of attorney and assurances as may be reasonably required by Purchaser more effectively to transfer, assign and set over, or to confirm the sale of, the Shares on the Closing Date to Purchaser.

Section 12.6  **Public Statements: Confidentiality.**  None of Seller, the Guarantor or Purchaser shall issue (nor shall Seller, prior to the Closing Date, permit the Company to issue)

67

PGIC_0004163

any press release or other public statement concerning the transactions contemplated by this Agreement prior to Closing without first providing the other with a written copy of the text of such release or statement and obtaining the consent of the other respecting such release or statement (which consent shall not be unreasonably delayed or withheld). Purchaser, Seller and the Guarantor shall keep this Agreement, the terms hereof, and all documents and information relating hereto, or furnished pursuant to or in connection with, this Agreement or the transactions contemplated hereby, confidential, except as may be required by law or, in the case of Purchaser, as may be necessary in the ordinary conduct of the Business by the Company after the Closing Date, or in the case of Seller or Seller's affiliates, in their respective public filings.

Section 12.7 **Parties Bound.** This Agreement shall apply to, inure to the benefit of and be binding upon and enforceable against the parties hereto and their respective successors and permitted assigns.

Section 12.8 **Governing Law.** This Agreement, and the rights and obligations of the parties hereto, shall be enforced by and construed in accordance with the laws of the Commonwealth of Massachusetts other than the insurance laws thereof; provided, that to the extent that any insurance laws or regulations are applicable to matters under this Agreement, such matters shall be governed by the insurance laws or regulations of the applicable jurisdiction involved.

Section 12.9 **Notices.** Any notice, demand, approval, consent, request, waiver or other communication which may be or is required to be given pursuant to this Agreement shall be in writing and shall be deemed given on the day actually received and shall be addressed to a party at the address set forth after its respective name below, or at such different address as such party

68

PGIC_0004164

shall have theretofore advised the other party in writing, with copies sent to the persons indicated:

>

>>>
>>> If to Seller or Guarantor:
>>>
>>> OneBeacon Insurance Company
>>> One Beacon Lane
>>> Canton, Massachusetts 02021
>>> Attention: Treasurer
>>>
>>> Copy to:
>>>
>>> OneBeacon Insurance Company
>>> One Beacon Lane
>>> Canton, Massachusetts 02021
>>> Attention: General Counsel
>>>
>>> If to Purchaser:
>>>
>>> SPARTA Insurance Holdings, Inc.
>>> 15 Quail Ridge Road
>>> Farmington, Connecticut 06032
>>> Attention: Chief Financial Officer
>>>
>>> Copy to:
>>>
>>> Dewey Ballantine LLP
>>> 1301 Avenue of the Americas
>>> New York, New York 10019
>>> Attention: James A. FitzPatrick, Jr.

**Section 12.10 Number and Gender of Words.** Whenever herein the singular is used, the same shall include the plural, where appropriate, and whenever herein the plural is used, the same shall include the singular, where appropriate, and words of any gender shall include each other gender, where appropriate.

NY1 1074421v12

PGIC_0004165

Section 12.11    Invalid Provisions.   In the event any provision of this Agreement is deemed to be in violation of law, such provision shall not be deemed to impair the validity of any other provision hereof.

Section 12.12    Accounting Terms.   Unless otherwise specified, all accounting terms used in this Agreement shall be interpreted in accordance with MA SAP or Pennsylvania SAP, as applicable, each as in effect on the Closing Date, applied on a consistent basis.

Section 12.13    Entirety of Agreement.   This Agreement contains the entire agreement between the parties and supersedes any and all prior agreements, arrangements or understandings between the parties relating to the subject matter hereto.  No representation, inducement, promise or agreement, oral or otherwise, which is not embodied or referred to herein is or shall be of any force or effect.

Section 12.14    Multiple Counterparts: Effectiveness.   This Agreement may be executed in multiple counterparts, each of which shall be deemed an original for all purposes and all of which shall be deemed, collectively, one and the same Agreement.  This Agreement shall become effective when executed and delivered by the parties hereto.

Section 12.15    Assignment.   This Agreement shall not be assignable by any party without the prior written consent of the other parties and any attempt to assign this Agreement without such consent shall be void; provided, however, that Purchaser may assign all or any portion of this Agreement to any affiliate of Purchaser, if such affiliate assumes the obligations of Purchaser hereunder.   Notwithstanding any permitted assignment by Purchaser, Purchaser shall not be released from its obligations and responsibilities hereunder.  All the terms and

NYI 1074421v12

PGIC_0004166

provisions of this Agreement shall be binding upon and inure to the benefit of the permitted transferees, successors and assigns of any party.

Section 12.16    Post-Closing Covenants.

(a)    Within thirty (30) days after the Closing Date, Purchaser shall, at its expense, file any applications and related documents with applicable regulatory authorities to change the name of Company to another name selected by Purchaser that does not include the words "American Employers' ". Purchaser shall thereafter use its reasonable best efforts to diligently pursue the process.

(b)    At all times during the term of the Reinsurance Agreement, Seller shall employ a sufficient number of trained, experienced personnel and/or retain one or more third party administrators capable of providing the administrative services to Seller necessary for Seller to perform its obligations under the Reinsurance Agreement.

Section 12.17    Headings.    The headings contained in this Agreement are for convenience of reference only and shall not affect the interpretation or meaning of this Agreement.

Section 12.18    Third Party Beneficiaries.    Except as otherwise provided herein, nothing herein, express or implied, is intended, or shall be construed, to confer upon or give to any person other than the signatories hereto and their successors any rights or remedies under or by reason of this Agreement.

Section 12.19    Other Remedies.    Regardless of whether any party hereto shall otherwise have pursued or be pursuing any other rights or remedies, such party may proceed to protect and enforce its rights under this Agreement by exercising such remedies as are available

71

NY1 1074421v12

PGIC_0004167

to such party in respect thereof under applicable law, either by suit in equity or by action at law, or both, whether for specific performance of any agreement contained in this Agreement or in aid of the exercise of any power granted in this Agreement.

*The remainder of this page is intentionally left blank; signature page follows.*

NYI 1074421v12

PGIC_0004168

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date

first above written.

Pennsylvania General Insurance Company      SPARTA Insurance Holdings, Inc.

By: _T. M. Miller_ _____      By:_____
     Name: T. Michael Miller                      Name:
     Title:   Chief Executive Officer            Title:


OneBeacon Insurance Company

By: _T. M. Miller_ _____
     Name: T. Michael Miller
     Title:   Chief Executive Officer

PGIC_0004169

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

Pennsylvania General Insurance Company

By:_____
    Name:
    Title:

SPARTA Insurance Holdings, Inc.

By:_____
    Name: G. L. Estes III
    Title: Chair. + CEO.

OneBeacon Insurance Company

By:_____
    Name:
    Title:

PGIC_0004170

**EXHIBITS AND SCHEDULES:**

Exhibit A - Transfer and Assumption Agreement

Schedule 1.2(a) - Closing Admitted Assets/Statutory Deposits

Schedule 2.3 - List of Licenses

Schedule 2.11 - No Conflicts

Schedule 2.14(d) - Tax Audits

Schedule 2.14(e) - Tax Waivers

Schedule 2.15 – Litigation

Schedule 2.17 - Statutory Agents

Schedule 2.19(c) - List of Statutory Deposits

Schedule 2.19(d) – List of Bank Accounts

Schedule 2.22 - Governmental Proceedings

Schedule 2.25 - Changes or Events

NY1 1074421v12

PGIC_0004171

# EXHIBIT A

PGIC_0004172

This INSTRUMENT OF TRANSFER AND ASSUMPTION (this "Instrument"), made this 15th day of June, 2005, is by and between Pennsylvania General Insurance Company, a stock insurance company duly organized and existing under the laws of the Commonwealth of Pennsylvania ("Pennsylvania General"), and American Employers' Insurance Company, a stock insurance company duly organized and existing under the laws of the Commonwealth of Massachusetts ("American", and, together with Pennsylvania General, the "Parties" and each, individually, a "Party").

## W I T N E S S E T H:

WHEREAS, Pennsylvania General is the record holder of 100% of the issued and outstanding stock of American;

WHEREAS, Pennsylvania General has decided to offer for sale (the "Sale") 100% of the issued and outstanding shares of American to an unrelated party; and

WHEREAS, to facilitate the Sale, it is deemed desirable to transfer any and all of American's liabilities to, and have them assumed by, Pennsylvania General (the "Transfer and Assumption").

NOW, THEREFORE, in consideration of the premises and of the mutual agreements and covenants hereinafter set forth, the Parties hereby agree as follows:

1.      This Instrument shall become binding and non-cancelable upon the approval hereof by the Massachusetts Division of Insurance and the Pennsylvania Insurance Department; provided, that the Transfer and Assumption shall be effective June 30, 2005 at 11:59:59 P.M. Boston, Massachusetts Time (such date and time, the "Effective Date and Time").

2.      By this Instrument, the liabilities and assets of American shall be transferred to Pennsylvania General and Pennsylvania General shall thereby succeed to the liabilities and assets of American.

3.      Immediately as of the Effective Date and Time, all the rights, franchises, and interests of American in and to every species of property (whether real, personal, or mixed) and choses in action thereunto belonging, shall be deemed as transferred to and vested in Pennsylvania General and simultaneously therewith Pennsylvania General shall be deemed to have assumed any and all of the liabilities and assets of American; provided, that not less than eleven million dollars ($11,000,000.00) in assets, which shall include or consist of any and all statutory deposits ("Policyholders' Surplus"), shall remain in American, together with the

PGIC_0004173

corporate charter, minute books and the licenses of, and regulatory records and filings concerning, American (together with the Policyholders' Surplus, the "Retained Assets").

4. With the exception of the Retained Assets, the assets of American as of the Effective Date and Time shall include any and all of American's assets of every nature and description of whatever kind and wheresoever situated including, without limitation, the following:

a. any and all business, including, without limitation, any and all underwriting contracts, including direct insurance policies and endorsements in respect thereto, reinsurance contracts, facultative contracts, retrocession agreements and any and all other underwriting contracts of every kind and description;

b. any and all cash, securities, choses in action and other property of every nature and description, including real property, leaseholds and other interests therein;

c. any and all securities or other property on deposit with supervisory insurance officials, other insurance officials and any and all other governmental officials;

d. any and all monies owing by others to American, including agents, brokers and other underwriting representatives and reinsurers;

e. any and all loans; and

f. any and all rights, title and interest in any and all contracts, leases and agreements, including employment obligations or contracts and agency contracts, whether or not in writing.

5. With the exception of the Retained Assets, the liabilities of American as of the Effective Date and Time shall include any and all of American's liabilities or contractual commitments of every nature and description, whether absolute, accrued, contingent or otherwise or whether due now or in the future, including, without limitation, the following:

a. any and all unpaid losses and loss adjustment expenses and any and all liabilities existing or arising in the future under Section 4.a. or 4.b.;

2

PGIC_0004174

b.     any and all unpaid expenses, including contingent commissions, underwriting and investment expenses, taxes, (including, without limitation, United States Federal and State and foreign taxes, license fees and other fees and any and all other similar obligations);

c.     any and all unearned premiums;

d.     any and all monies withheld or retained for the account of others and any and all monies owing by American to others, including agents, brokers and other underwriting representatives and reinsurers;

e.     any and all monies or other obligations due under reinsurance contracts;

f.     any and all liabilities under leaseholds and other contracts covering real estate or interests therein;

g.     any and all liabilities under any and all contracts, leases and agreements, including employment obligations or contracts and agency contracts, whether or not in writing; and

h.     any and all subsequent actions, proceedings or liabilities arising from any of the foregoing liabilities or the assets of American.

6.     Pennsylvania General shall assume as 100% reinsurance, as opposed to a complete Transfer and Assumption, the following insurance business which is in force as of the Effective Date and Time: (a) the historical bond insurance business of American (the "Retained Bonding Business") and (b) the historical insurance business of American in those states in which such business has unearned premium or unpaid loss and in which Pennsylvania General does not have an insurance license (the "Retained Non-Bonding Business", and together with the Retained Bonding Business, the "Retained Business"): provided, that such reinsurance for the Retained Non-Bonding Business shall continue only until such time as Pennsylvania General receives the insurance license(s), if necessary, to permit a complete Transfer and Assumption of the Retained Non-Bonding Business into Pennsylvania General or one of its affiliates or there ceases to be unearned premium or unpaid loss on such business. Pennsylvania General shall, at its sole expense, perform any and all administrative functions for such Retained Business, including without limitation claims handling, underwriting and regulatory functions, and shall

3

PGIC_0004175

reimburse American for any and all out of pocket expenses related thereto. Pennsylvania General shall 100% reinsure American with respect to, and American shall cede to Pennsylvania General, all premiums, losses and expenses relating to such Retained Business as of the Effective Date and Time and as renewed by American thereafter pending regulatory approvals. Pennsylvania General shall diligently seek to obtain regulatory approval to undertake a complete Transfer and Assumption of the Retained Non-Bonding Business within one year following the Effective Date and Time. Pennsylvania General shall provide all accounting data related to the Retained Business within twenty (20) business days of the end of each quarter as may be necessary for American to account in its Statutory Statements for the Retained Business so reinsured. The Retained Business shall include only the Retained Business in force as of the Effective Date and Time. In the event of the insolvency of American, the reinsurance provided by Pennsylvania General with respect to the Retained Business pursuant to this Section 6 shall be payable directly to American or to American's liquidator, receiver, conservator, or statutory successor on the basis of the liability of American without diminution because of the insolvency of American or because the liquidator, receiver, conservator or statutory successor of American has failed to pay all or a portion of any applicable claim.

7.     American shall provide notice, substantially in the form of Exhibit A, attached hereto and made part hereof, to all policyholders of in-force premium other than Retained Business policyholders.

8.     No actions or proceedings pending on the Effective Date and Time, or any subsequent actions or proceedings arising from the liabilities and assets of American prior to the Effective Date and Time, to which American may be a party shall be abated or discontinued by reason of the Transfer and Assumption, but the same may be prosecuted to final judgment in the same manner as if the Transfer and Assumption had not taken place, or Pennsylvania General may be substituted in place of American by order of the court in which the action or proceeding may be pending. Including as provided in Section 6, all liabilities of every nature and description of American at the time of the Transfer and Assumption shall attach to and be assumed by Pennsylvania General and may be enforced against Pennsylvania General to the same extent as if such liabilities had been originally incurred or contracted by Pennsylvania General.

9.     Pennsylvania General agrees that the failure of American to exercise any right hereunder shall not be deemed a waiver of any right inferred hereunder.

10.     The Parties hereto covenant and agree to take such additional steps, to perform such additional acts, and to furnish such additional documents and other agreements and instruments, as may at any time be necessary or appropriate to carry out the transactions

4

PGIC_0004176

contemplated by this Instrument. To this end, American does hereby irrevocably authorize and empower all of its duly authorized officers, or any one of them, to take such additional steps, to perform such additional acts and to execute such additional documents and other agreements and instruments on behalf of American in furtherance hereof, and such acts when taken, such acts when performed and such documents and other agreements and instruments when executed shall have full effect and be as if taken, performed or executed by American under its corporate seal.

11.    The terms and conditions contained in this Instrument shall inure to the benefit of, and be binding upon, the Parties and their respective successors and permitted assigns.

12.    This Instrument constitutes the entire agreement between the Parties relating to the subject matter hereof and supersedes all prior and contemporaneous agreements, understandings, negotiations and discussions, whether oral or written, of the Parties, and there are no general or specific warranties, representations or other agreements by or between the Parties in connection with the entering into of this Agreement or the subject matter hereof except as specifically set forth herein.

13.    This Instrument may be executed by the Parties in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute one and the same instrument. Each counterpart may be delivered by facsimile transmission, which transmission shall be deemed delivery of an originally executed document.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK, SIGNATURE PAGE FOLLOWS]

PGIC_0004177

IN WITNESS WHEREOF, Pennsylvania General and American have caused this instrument to be duly executed as of the date first written above.

PENNSYLVANIA GENERAL INSURANCE COMPANY

AMERICAN EMPLOYERS' INSURANCE COMPANY

By: _Roger M. Singer_

Name: Roger M. Singer
Title:  Senior Vice President

[SEAL]

By: _Roger M. Singer_

Name: Roger M. Singer
Title:  Senior Vice President

[SEAL]

6

PGIC_0004178

## Exhibit A to Instrument of Transfer and Assumption

### NOTICE AND CERTIFICATION OF ASSUMPTION
### BY
### PENNSYLVANIA GENERAL INSURANCE COMPANY

Pursuant to the terms of an Instrument of Transfer and Assumption, all liabilities and obligations of American Employers' Insurance Company, a stock insurance company duly organized and existing under the laws of the Commonwealth of Massachusetts ("American") under all policies of insurance and any amendment or modifications thereto (each a "Policy", and collectively, the "Policies") heretofore written by American will be assumed by Pennsylvania General Insurance Company, a stock insurance company duly organized and existing under the laws of the Commonwealth of Pennsylvania and the parent company of American ("Pennsylvania General").

This change is effective as of [Date].

All terms and conditions of your policy with us, referenced in the attached policy declarations page, remain unchanged, except that Pennsylvania General shall be substituted as your insurer. All payments, notices, claims and suits or actions on your Policy shall hereafter be made to Pennsylvania General as though it were your original insurer.

UNLESS YOU OBJECT IN WRITING WITHIN THIRTY (30) DAYS OF YOUR RECEIPT OF THIS NOTICE, YOU WILL BE PRESUMED TO HAVE CONSENTED TO A CHANGE IN YOUR INSURER UNDER THE POLICY REFERENCED IN THE ATTACHED POLICY DECLARATIONS PAGE BY THE SUBSTITUTION OF PENNSYLVANIA GENERAL FOR AMERICAN. OBJECTIONS MUST BE MAILED TO:

    American Employers' Insurance Company
    One Beacon Street
    Boston, Massachusetts 02108-3100
    Attn.: [Name]
    Telephone: [        ]
    Telecopier: [       ]

IN WITNESS WHEREOF, American has caused its corporate seal to be affixed hereto and this Notice and Certification of Assumption to be executed by its duly authorized officers.

AMERICAN EMPLOYERS' INSURANCE COMPANY

By:_____
    [  ], Senior Vice President
By:_____      [SEAL]
    [  ], Secretary

7

PGIC_0004179

## Schedule 1.2(a) - Closing Admitted Assets/Statutory Deposits

To be provided at least 30 days prior to Closing

NY1 1082397v1

PGIC_0004180

## Schedule 2.3 - Licenses

The Company is licensed in all fifty states, the District of Columbia and the U.S. Virgin Islands, and by the Department of the Treasury of the United States of America.

With respect to the State of Florida, in 2001 and 2002 the Company withdrew from writing certain lines of insurance in the state, and its Certificate of Authority was amended to delete the lines of Homeowners Multi Peril, Private Passenger Auto Liability and Private Passenger Auto Physical Damage.

With respect to the State of North Carolina, in a letter dated October 24, 2006 the North Carolina Department of Insurance stated that since the Company was not writing any new business in North Carolina, it intended to restrict the Company's North Carolina license to "no new business". North Carolina counsel retained by the Company responded to the Department by letter dated December 8, 2006, asserting that it would be inappropriate for the Department to impose such a restriction, and requesting a conference to discuss the matter. To date, the Company has not received any further communication from the Department and the restriction referred to above has not been imposed on this North Carolina license.

With respect to the State of Texas, in 2001 and 2002 the Company withdrew from writing certain lines of insurance in the state, and is not permitted to write business in Texas prior to April 30, 2008 without making certain filings and receiving the approval of the Insurance Commissioner.

PGIC_0004181

## Schedule 2.11 - No Conflicts

No exceptions

## Schedule 2.14(d) - Tax Audits

### List of Income Tax Examinations as of Closing Date

- Federal Income Tax for the periods ended December 31, 2000, June 1, 2001, December 31, 2001 and December 31, 2002.

- Federal Income Tax for the periods ended December 31, 2003 and December 31, 2004.

PGIC_0004183

## Schedule 2.14(e) - Tax Waivers

### List of Waivers extending Statute of Limitations for Taxes

- Federal Income Tax for the periods ended December 31, 2000, June 1, 2001, December 31, 2001 and December 31, 2002; Statute of Limitations extended until June 30, 2007.

NYI 1082397v1

PGIC_0004184

## Schedule 2.15 – Litigation

No exceptions.

NY1 1082397v1

PGIC_0004185

## Schedule 2.17 - Statutory Agents

See attached

NY1 1082397v1

PGIC_0004186

## Schedule 2.17

## AMERICAN EMPLOYERS' INSURANCE COMPANY

## AGENTS FOR SERVICE OF PROCESS

**AL**   Commissioner of Insurance – Resident Agent –   The Corporation Company
2000 Interstate Park Dr.
Montgomery, AL 36109

**AK**   Director of Insurance

**AZ**   Director of Insurance

**AR**   Commissioner of Insurance – Resident Agent –   The Corporation Company
417 Spring Street
Little Rock, AR 72201

**CA**   Resident Agent –   Jere Keprios
CT Corporation System
818 West Seventh Street
Los Angeles, CA 90017

**CO**   Commissioner of Insurance – Resident Agent –   The Corporation Company
1675 Broadway
Denver, CO 86202

**CT**   Commissioner of Insurance

**DE**   Commissioner of Insurance & Securities

**DC**   Commissioner of Insurance & Securities or Local Agent –   Mark A. Schaefer
1614 Twentieth St.
Washington, D.C. 20009

**FL**   Commissioner of Insurance

**GA**   Commissioner of Insurance and Safety Fire – Resident Agent -   Joe Gallagher
OneBeacon Ins. Co.
4501 Circle 75 Parkway
Suite C3220
Atlanta, GA 30339
678-255-7606

**HI**   Commissioner of Insurance – Resident Agent –   AON Risk Services of Hawaii, Inc.
201 Merchant St., Suite 2400
Honolulu, HI 96813

PGIC_0004187

| **ID** | Commissioner of Insurance |
| **IL** | Director of Insurance |
| **IN** | Resident Agent - | CT Corporation System<br>36 S. Pennsylvania St., Suite 700<br>Indianapolis, IN 46204 |
| **IA** | Commissioner of Insurance |
| **KS** | Commissioner of Insurance – Med James Inc.<br>Doing Business as m.e.d. #1<br>8595 College Boulevard<br>Overland Park, KS 66210 |
| **KY** | Secretary of State |
| **LA** | Secretary of State |
| **MD** | Insurance Commissioner |
| **MA** | Service may be made on the corporate address or Corporations Division of the Secretary of Commonwealth |
| **ME** | Resident Agent - | Thomas G. Mundhenk<br>707 Sable Oaks Drive<br>South Portland, ME 04106 |
| **MI** | Commissioner of Insurance - CT Corporation System<br>30600 Telegraph Road<br>Bingham Farms, MI 48025 |
| **MN** | Commissioner of Insurance |
| **MO** | Director of Insurance will forward to Roger M. Singer |
| **MS** | Commissioner of Insurance – Resident Agent - | Roy A. Smith, Jr.<br>Daniel, Coker, Horton & Bell<br>4400 Old Canton Road<br>Suite 400<br>Jackson, MS 39211 |
| **MT** | Commissioner of Insurance |
| **NE** | Officer of Company or Resident Agent - | CT Corporation System<br>301 South 13th Street, Suite 500<br>Lincoln, NE 68508 |

2

PGIC_0004188

| | | |
|---|---|---|
| **NH** | Commissioner of Insurance | |
| **NV** | Commissioner of Insurance – Incorp Services, Inc. | 6075 S. Eastern Ave., Suite 1<br>Las Vegas, NV 89119 |
| **NJ** | Commissioner of Banking & Insurance / Resident Agent – | Steven D. Cannon<br>OneBeacon Insurance<br>44 Whippany Road<br>Morristown, NJ 07960 |
| **NM** | Superintendent of Insurance | |
| **NY** | Superintendent of Insurance | |
| **NC** | Commissioner of Insurance | |
| **ND** | Commissioner of Insurance | |
| **OH** | Resident Agent – | CT Corporation System<br>1300 East 9th Street<br>Cleveland, OH 44114 |
| **OR** | Resident Agent – | CT Corporation System<br>388 State Street, Suite 420<br>Salem, OR 97301 |
| **OK** | Commissioner of Insurance | |
| **PA** | Service may be sent to the registered address of the entity. | |
| **PR** | Commissioner of Insurance | |
| **RI** | Superintendent of Insurance | |
| **SC** | Superintendent of Insurance | |
| **SD** | Director of Insurance | |
| **TN** | Commissioner of Insurance | |
| **TX** | Resident Agent – | CT Corporation System<br>350 North St. Paul Street<br>Dallas, TX 75201 |

3

PGIC_0004189

| | | |
|---|---|---|
| **UT** | Resident Agent - | CT Corporation System<br>50 West Broadway<br>Salt Lake City, UT 84111 |
| **VT** | Secretary of State | Thomas M. Dowling, Esq.<br>98 Merchants Row<br>Rutland, VT 05701 |
| **VA** | Resident Agent | Commonwealth Legal Services Corp.<br>4701 Cox Rd., Suite 301<br>Glen Allen, VA 23060 |
| **VI** | Lieutenant Governor/Commissioner | |
| **WA** | Insurance Commissioner | |
| **WV** | Secretary of State | |
| **WI** | Resident Agent | CT Corporation System<br>44 East Mifflin Street<br>Madison, WI 53717 |
| **WY** | Commissioner of Insurance | |

Service served on the Commissioner of Insurance or Secretary of State is forwarded to Thomas Forsyth, One Beacon St., Boston, MA 02108 unless otherwise indicated.

4

PGIC_0004190

## Schedule 2.19(c) - List of Statutory Deposits

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| AZ | AEIC | 912828AF7 | 110,000 | 07/15/12 | 3.000 | 1,650.00 | US Bank | RSD for WC |
| CA | AEIC | 912828AF7 | 110,000 | 07/15/12 | 3.000 | 1,650.00 | Bank of New York | RSD for WC |
| CT | AEIC | 912828AF7 | 20,000 | 07/15/12 | 3.000 | 300.00 | Bank of America | RSD for WC |
| CT | AEIC | 9128274Y5 | 50,000 | 01/15/09 | 3.875 | 968.75 | Bank of America | RSD for WC |
| DE | AEIC | 912828AF7 | 106,000 | 07/15/12 | 3.000 | 1,590.00 | Wilmington Trust | RSD for WC |
| GA | AEIC | 9128274Y5 | 95,000 | 01/15/09 | 3.875 | 1,840.63 | US Bank | RSD for the protection of GA policyholders |
| ID | AEIC | 912828AF7 | 257,000 | 07/15/12 | 3.000 | 3,855.00 | Wells Fargo Bank Northwest | RSD for WC |
| IL | AEIC | 912828AF7 | 50,000 | 07/15/12 | 3.000 | 750.00 | Illinois National Bank | RSD for WC |
| IN | AEIC | 9128274Y5 | 25,000 | 01/15/09 | 3.875 | 484.38 | JP Morgan Chase | RSD by Ins Code Statute 27-01-20-12 |
| KS | AEIC | 9128274Y5 | 60,000 | 01/15/09 | 3.875 | 1,162.50 | UMB National Bank | RSD for WC |
| LA | AEIC | 9128274Y5 | 70,000 | 01/15/09 | 3.875 | 1,356.25 | JP Morgan Chase | RSD for Fidelity & Surety |
| MA | AEIC | 912828AF7 | 3,010,000 | 07/15/12 | 3.000 | 45,150.00 | State Street Bank | RSD for the Protection of all Policyholders |
| MD | AEIC | 912828AF7 | 50,000 | 07/15/12 | 3.000 | 750.00 | M & T Bank | RSD for WC |
| NC | AEIC | 9128274Y5 | 80,000 | 01/15/09 | 3.875 | 1,550.00 | US Bank | RSD |
| NC | AEIC | 912828AF7 | 180,000 | 07/15/12 | 3.000 | 2,700.00 | US Bank | RSD |
| NH | AEIC | 912828AF7 | 50,000 | 07/15/12 | 3.000 | 750.00 | Bank of America | RSD for WC |
| NM | AEIC | 912828AF7 | 333,000 | 07/15/12 | 3.000 | 4,995.00 | Century Trust | RSD for the protection of NM policyholders and creditors |
| NV | AEIC | 9128274Y5 | 100,000 | 01/15/09 | 3.875 | 1,937.50 | Mellon Bank-regular custody | RSD for WC |
| NY | AEIC | 912828AF7 | 50,000 | 07/15/12 | 3.000 | 750.00 | JP Morgan Chase | RSD for WC |
| OR | AEIC | 912828AF7 | 370,000 | 07/15/12 | 3.000 | 5,550.00 | US Bank | RSD for Surety ($260,000) WC ($110,000) (Minimum 110,000) |
| TX | AEIC | 912828AF7 | 75,000 | 07/15/12 | 3.000 | 1,125.00 | Texas Ins Dept. - Physical | RSD for Fidelity & Surety |
| VA | AEIC | 9128274Y5 | 200,000 | 01/15/09 | 3.875 | 3,875.00 | Sun Trust/Crestar | RSD for Ins Code Statute 382-1945 |
| VT | AEIC | 9128274Y5 | 60,000 | 01/15/09 | 3.875 | 1,162.50 | Chittenden Bank | RSD for WC |

NY1 1082397v1

PGIC_0004191

## Schedule 2.19(d) - List of Bank Accounts

### List of Company Bank Accounts

Citizens Bank, Operating Account # 1304762618

Mellon Bank, Custody Account #GAIF-120-1002

NY1 1082397v1

PGIC_0004192

## Schedule 2.22 - Governmental Proceedings

Final Judgment by Consent in a matter entitled Commonwealth of Massachusetts v. OneBeacon Insurance Company, et. al., Suffolk County, Massachusetts, Superior Court Civil Action No. 06-5151, in which the Company was one of the defendants.

PGIC_0004193

## Schedule 2.25 - Changes or Events

With respect to Section 2.25(a)(vi), the Company entered into a new Investment Management Agreement with White Mountains Advisors LLC effective November 14, 2006; this agreement will be terminated on or prior to the Closing Date.

With respect to Section 2.25(a)(x), on June 30, 2006, the Company paid a dividend of $3,300,000 to its sole stockholder, Pennsylvania General Insurance Company.

PGIC_0004194