*Exhibit 14*

*2014 Services Agreement Between
OneBeaon Insurance Company, Armour
Risk Services (Bermuda) Limited, and others*

## SERVICES AGREEMENT

This SERVICES AGREEMENT, dated as of December 23, 2014 is made and entered into by OneBeacon Insurance Company, a Pennsylvania domiciled stock insurance company ("OBIC"), Potomac Insurance Company, a Pennsylvania domiciled stock insurance company ("Potomac"), OneBeacon America Insurance Company, a Pennsylvania domiciled stock insurance company ("OBAIC") and The Employers' Fire Insurance Company, a Pennsylvania domiciled stock insurance company ("EFIC" and collectively the "Companies" and each a "Company" with respect to the services to be provided to it hereunder) and Armour Risk Services (Bermuda) Limited, a company incorporated in Bermuda ("ARS") and Armour Risk Management Inc., a Pennsylvania corporation ("ARM" and collectively with ARS, "Service Provider").

### WHEREAS:

On the Effective Date, Trebuchet US Holdings, Inc., a corporation incorporated under the laws of the State of Delaware purchased all of the issued shares in the capital of OBIC and Potomac, and indirectly OBIC's subsidiaries, OBAIC and EFIC (the "Acquisition") from OneBeacon Insurance Group LLC, a limited liability company organized under the laws of the State of Delaware ("OBIG").

Prior to the Effective Date, Company obtained certain administrative and insurance related services from entities which were affiliates of OBIG and thus does not currently have the facilities or people to provide these services internally.

As a result of the Acquisition, Company will no longer have access to certain of the services provided by OBIG and it wishes to retain a new service provider to provide those services.

Company wishes to appoint Service Provider to provide the services set out in this Agreement in accordance with the terms and conditions contained herein. ARM and ARI are each an Affiliate of Trebuchet US Holdings, Inc., and post-Acquisition an Affiliate of Company.

NOW, THEREFORE, in consideration of the mutual promises and covenants contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties hereby agree as follows:

## ARTICLE 1
## DEFINED TERMS

Whenever used in this Agreement, unless there is something in the subject matter or context inconsistent therewith, the following words and terms shall have the respective meanings ascribed to them as follows:

LEGAL\21024036\4


Silver
Exhibit No. 97
Date: 12-5-23
T. Alfaro

1.1 Affiliate – "Affiliate" means in relation to any Person any other Person that directly or through one or more intermediaries controls, is controlled by or is under common control with such Person;

1.2 Agreement - "Agreement" means this agreement as the same may be amended from time to time in accordance with the terms hereof and all instruments supplemental hereto or in amendment or confirmation hereof; and the expressions "herein", "hereof", "hereto", "above", "below" and similar expressions used in any paragraph, subparagraph, section or article of this Agreement refer to this Agreement in its entirety and not to that paragraph, subparagraph, section or article only, unless otherwise expressly provided;

1.3 Books and Records – "Books and Records" has the meaning ascribed thereto in Section 5.1;

1.4 Business Day - "Business Day" means a day other than a Saturday, Sunday or any other day on which the principle commercial banks in New York, New York, are not open for business during normal banking hours;

1.5 Charges - "Charges" has the meaning ascribed thereto in Article 6;

1.6 Effective Date - "Effective Date" means that day on which this Agreement becomes effective, as set out in Article 9;

1.7 Person - "Person" means any individual, corporation, partnership, trustee, trust, limited liability company, unincorporated association or any other entity; and pronouns have a similarly extended meaning;

1.8 Services - "Services" means those services described in Article 2 hereof.

## ARTICLE 2
## APPOINTMENT OF SERVICE PROVIDER

2.1 Company appoints and authorizes Service Provider, directly or through its Affiliates, from the Effective Date to act as Company's service provider and agent to provide the Services:

    2.1.1 Upon the terms contained in this Agreement;

    2.1.2 In accordance with all applicable laws, rules and regulations;

    2.1.3 Subject to the overall policy and supervision of Company's board of directors ("Board") and the run-off strategy adopted by the Board;

    2.1.4 Until this Agreement is terminated as provided in this Agreement.

Service Provider hereby accepts such appointment and agrees to assume the obligations set out in this Agreement.

**2.2** Service Provider agrees that in performing or providing the Services hereunder, it shall use that degree of ordinary care and reasonable diligence that an experienced and qualified provider of similar services would use acting in like circumstances and experience in such matters and in accordance with the standards, practices and procedures established by Service Provider for its own business. Service Provider agrees to maintain sufficient facilities and trained personnel of the kind necessary to perform the Services under this Agreement.

**2.3** Without prejudice to the generality of the foregoing, Service Provider shall at all times comply, so far as lies within its power, with any restrictions or requirements notified to it and imposed upon Company by any Federal or State authority with jurisdiction over Company and with any general writtten instructions that may from time to time be given to it by Company in connection with the conduct of Company's business.

**2.4** Service Provider shall provide (or cause its Affiliates or third party service providers to provide) on behalf of, in the name of Company the Services as set forth in Schedule I hereof.

**2.5** Service Provider shall maintain Errors and Omissions insurance coverage of not less than US$2,000,000 during the period that it is providing the Services hereunder. On request, Company may require that the documentation evidencing compliance under this section be made available for its review.

## ARTICLE 3
## SERVICES NOT PROVIDED

**3.1** Under no circumstance shall Service Provider perform, or be obligated to perform, or be authorized by Company to perform, any of the following functions for Company, each of which shall be a retained responsibility of Company:

**3.1.1** The investment of assets of Company requiring any specific regulatory investment management authorizations, it being acknowledged that any services in this area is restricted to coordination of legally authorized providers;

**3.1.2** Tax or accounting services requiring any specific regulatory or professional membership or certification, it being acknowledged that any services in this area is restricted to coordination of legally authorized providers;

**3.1.3** Legal services requiring any specific regulatory or professional membership, license or certification, it being acknowledged that any services in this area is restricted to coordination of legally authorized providers.

LEGAL\21024036\4
BEDIVERE_000111

## ARTICLE 4
## PERFORMANCE OF SERVICES AND JOINT USE OF SERVICES

4.1 Other Arrangements. If Service Provider determines that for any reason, including its own needs, it is or will be unable to perform any Service under this Agreement, it shall promptly notify Company so that Company can make other arrangements for such Service.

4.2 Responsibility for Personnel. The personnel utilized by Service Provider to perform Services for Company pursuant to this Agreement shall at no time be deemed employees of Company by virtue of the transactions contemplated under this Agreement. Company shall have no liability to such personnel for their compensation, employee benefits, and taxes (including withholding) attributable to the terms of this Agreement.

4.3 Exercise of Judgment in Rendering Services. In providing any services hereunder which require the exercise of judgment by Service Provider, Service Provider will endeavor to perform such services in accordance with any reasonable and appropriate standards and guidelines Company develops and communicates in writing to Service Provider. In performing any services hereunder, Service Provider shall at all times act in a manner reasonably calculated to be in or not opposed to the best interests of Company.

4.4 Control. The performance or receipt of Services pursuant to this Agreement shall in no way impair the absolute right and responsibility to supervise, direct and oversee the business and operations of each of the parties by its own board of directors and officers. Company shall maintain oversight of all Services provided by Service Provider and Company shall monitor the Services annually for quality assurance.

## ARTICLE 5
## UNDERTAKINGS OF SERVICE PROVIDER

5.1 Books and Records. All records, books, and files developed, established or maintained by Service Provider by reason of its performance of the Services under this Agreement, which absent this Agreement would have been held by Company (the "Books and Records"), shall be deemed the exclusive property of Company, held by Service Provider for Company's benefit and subject to Company's control, and shall be maintained in accordance with applicable law. The Books and Records shall be available, during normal business hours, for inspection by Company, anyone authorized by Company, and any governmental agency that has regulatory authority over Company's business activities. Copies of the Books and Records shall be delivered to Company on demand. The Books and Records shall be promptly transferred to Company by Service Provider upon termination of this Agreement.

5.2 Service Provider shall be responsible for the safe and secure storage of all records of Company delivered into its possession or which are subsequently created by Service Provider. Physical records will be maintained in the United States and Service Provider will protect these and all records from unauthorized access and will take all reasonable steps to ensure that once in its possession Company's data will be kept free from all computer viruses, corruption and inaccuracies.

5.3 Claims Processing. Final claim decisions will be based upon guidelines and procedures established and approved by Company from time to time and communicated in writing to Service Provider by Company, and Company retains final approval authority on all claim payments. Payment of claims shall be made using Company checks. In performing claim services for Company pursuant to this Agreement Service Provider shall obtain and maintain all necessary licenses and permits required in order to comply with applicable laws, including an administrator's or independent adjuster's license as may be required.

5.4 Contact With Policyholders. In providing the Services with respect to this Agreement, Service Provider agrees that any and all personal contact or communication, both oral and written, with the Company's policyholders will be done in the name of and on behalf of the Company. Service Provider agrees to use Company's letterhead for all such written communications.

5.5 Receipt of Funds. Other than funds received as remuneration pursuant to Article 6, Service Provider shall act in a fiduciary capacity with respect to receipt of all funds due to or from Company, hold such payments for the benefit of Company, and after the required processing of such payments, will immediately deposit such payments in one or more bank accounts established in the name of Company and subject to the control of officers of Company.

5.6 Accounting Services. All records shall be maintained in accordance with the requirements of the Pennsylvania Insurance Department and applicable laws. In addition to the foregoing, a computer terminal, which is linked to the electronic system that generates the electronic records that constitute Company's books of account, shall be kept and maintained at Company's principal office. During all normal business hours, there shall be ready availability and easy access through such terminal (either directly by Pennsylvania Insurance Department personnel or indirectly with the aid of Company employees) to the electronic media used to maintain the records comprising Company's books of account. The electronic records shall be in a readable form. Service Provider shall maintain format integrity and compatibility of the electronic records that constitute Company's books of account. If the electronic system that created such records is to be replaced by a system with which the records would be incompatible, Service Provider shall convert such pre-existing records to a format that is compatible with the new system. Service Provider shall maintain acceptable backup (hard copy or another durable medium, as long as the means to access the durable medium is also maintained at Company's principal office) of the records constituting Company's books of account. Such backup shall be forwarded to

BEDIVERE_000113

Company on a monthly basis and shall be maintained by Company at its principal office.

**5.7** Safeguarding Information. Service Provider shall implement and maintain appropriate measures designed to meet the objectives of all applicable laws with respect to safeguarding information. Service Provider shall adjust its information security program at the request of Company for any relevant changes dictated by Company's assessment of risk around its sensitive information. Confirming evidence that Service Provider has satisfied its obligations under this Agreement shall be made available, during normal business hours, for inspection by Company, anyone authorized by Company, and any governmental agency that has regulatory authority over Company's business activities.

## ARTICLE 6
## CHARGES AND PAYMENT

**6.1** Remuneration

**6.1.1** Service Provider shall be entitled to remuneration from Company equal to Service Provider's costs and expenses in furnishing the Services plus 10% (the "Charges"). Company shall not advance any funds to Service Provider.

**6.1.2** Service Provider shall submit to Company, within thirty (30) days after the end of each calendar month, a statement of its costs and expenses in providing the Services in the preceding calendar month, determined in accordance with the NAIC Accounting Practices and Procedures Manual and, where applicable, the apportionment basis for the Services pursuant to this Agreement, as well as any Charges not included in any previous statement. Service Provider shall provide statements to Company with the following level of detail (i) the location of where each of the Services were performed, and (ii) the aggregate percentage of all Services under said statement which are (or were) performed in the United States. Where necessary, Service Provider will also provide Company with applicable United States taxation forms so as to allow Company to calculate any applicable United States withholding. Payment for the Charges shall be made within thirty (30) days after the delivery of the Service Provider's statement for such Charges.

**6.1.3** The Charges shown in any such statement may be based on good-faith estimates by Service Provider of the costs and expenses attributable to the Services, which estimate may take into account the Charges for the Services provided hereunder in the preceding billing periods.

**6.1.4** Where the parties have a disagreement as to costs and expenses they shall attempt to mutually resolve the disagreement within 30 days of any statement as set forth in subsection 6.1.2 above, failing which the parties

BEDIVERE_000114

shall select a firm of independent certified public accountants which shall determine the Charges properly allocable to and payable by Company and shall, within a reasonable time not to exceed one hundred eighty (180) days, provide such determination, together with the basis therefor, in writing to both parties, whereupon such determination shall be binding. The expenses of any such determination by a firm of independent certified public accountants shall be borne as determined to be equitable by such accountants.

**6.1.5** Service Provider and Company each shall maintain its own books, accounts and records in such a way as to disclose clearly and accurately the nature and detail of the transactions between them, including such accounting information as is necessary to support the reasonableness of the Charges, and such additional information as the Company may reasonably request for purposes of its internal bookkeeping and accounting operations.

## ARTICLE 7
## AUDIT

**7.1** Company and persons authorized by it or any governmental agency having jurisdiction over Company shall have the right, at Company's expense, to conduct an audit of the relevant books, accounts, and records of Service Provider upon giving reasonable notice of its intent to conduct such an audit. In the event of such audit, Service Provider shall give to the party requesting the audit reasonable cooperation and access to all books accounts, and records necessary to audit during normal business hours.

## ARTICLE 8
## RIGHT TO CONTRACT WITH THIRD PARTIES AND ASSIGNMENT

**8.1** Nothing herein shall be deemed to grant Service Provider an exclusive right to provide services to Company, and Company retains the right to contract with any third party, Affiliated or not Affiliated, for the performance of services as are available to or have been requested by Company pursuant to this Agreement.

**8.2** Service Provider, with Company's consent, shall have the right to subcontract with any third party, Affiliated or not Affiliated, for the performance of the Services provided that Service Provider shall remain responsible for the performance of the Services by any such subcontractors in accordance with the terms of this Agreement; and provided further that the Charges for any such Services subcontracted to an Affiliate shall be determined on the bases described in Article 6.

**8.3** Subject to the exception stated below, this Agreement and any rights pursuant hereto shall not be assignable by any party hereto, except by operation of law.

However, the parties agree that Service Provider may assign all or portions of this Agreement and any rights pursuant to it to any wholly owned Affiliated company.

## ARTICLE 9
## EFFECTIVE DATE

**9.1** The terms and conditions of this Agreement shall become into full force and effect upon that date on which this Agreement has become executed by all parties.

## ARTICLE 10
## TERM AND TERMINATION OF AGREEMENT

**10.1** Term. Unless earlier terminated in accordance with Section 10.2, this Agreement shall commence as of the Effective Date, and shall remain in effect with respect to any Company until terminated by Company or Service Provider upon giving ninety (90) days or more advance written notice to the other, provided that electronic data processing services shall not be terminated by either party until one hundred and eighty (180) days or more advance written notice of termination. Subject to the terms (including any limitations and restrictions) of any applicable software licensing agreement then in effect between Service Provider and any licensor, Service Provider shall, upon termination of this Agreement, grant to Company a perpetual license, without payment of any fee, in any electronic data processing software developed or used by Service Provider in connection with the Services provided to Company hereunder, if such software is not commercially available and is necessary, in Company's reasonable judgment, for Company to perform subsequent to termination the functions provided by Service Provider hereunder.

**10.2** Termination for Cause. This Agreement is subject to immediate termination with respect to any Company in its entirety or with respect to any individual Service at the option of Company, upon written notice from any of Company to the Service Provider, if the Service Provider (i) has been found conclusively (by a regulatory body or court of competent jurisdiction) to be grossly negligent in the performance of its obligations hereunder, or (ii) is in material breach of this Agreement and such breach has not been cured within ninety (90) days of written notice from the Company of such breach.

## ARTICLE 11
## ARBITRATION

**11.1** Any dispute between the parties arising out of, or in connection with this Agreement, whether relating to its interpretation, performance, formation and/or validity, and whether arising before or after its termination, shall exclusively be resolved pursuant to the procedures set forth in this Article 11.

8

11.2 The wording and interpretation of this Agreement is based on the usual customs and practices of the insurance and reinsurance industry. While it is agreed to act in good faith in dealings with each other, it is understood and recognized that situations arise in which the parties to this Agreement may not reach an agreement. In the event that any dispute cannot be resolved to a mutual satisfaction, the dispute will first be subject to good-faith negotiation as described below in an attempt to resolve the dispute without the need to institute formal arbitration proceedings.

11.3 Within ten (10) days after either party has given the other the first written notification of the specific dispute, each party will appoint a designated officer to attempt to resolve the dispute. The officers will meet at a mutually agreeable location as early as possible and as often as necessary, in order to gather and furnish the other with all appropriate and relevant information concerning the dispute. The officers will discuss the problem and will negotiate in good faith without the necessity of any formal arbitration proceedings. During the negotiation process, all reasonable requests made by one officer to the other for information will be honored. The specific format for such discussions will be decided by the designated officers. If the officers cannot resolve the dispute within thirty (30) days of their first meeting, it is agreed that the parties will submit the dispute to formal arbitration as provided below. However, the parties may agree in writing to extend the negotiation period for an additional thirty (30) days.

11.4 No later than fifteen (15) days after the final negotiation meeting, in accordance with the negotiation period above, the officers taking part in the negotiation will give both parties written confirmation that they are unable to resolve the dispute and that they recommend establishing formal arbitration. An arbitration panel consisting of three past or present officers of Property & Casualty insurance and/or reinsurance companies not Affiliated with either party in any way will settle the dispute. Each party will appoint one arbitrator and the two arbitrators will select a third; provided, however, that if more than one of the Companies is a party to a dispute with Service Provider, the Companies shall collectively appoint one arbitrator, and if both ARM and ARI are a party to a dispute with one or more of the Companies, ARM and ARI shall collectively appoint one arbitrator. If the two arbitrators cannot agree on the choice of a third, the choice will be made by the American Arbitration Association. The arbitration proceedings will be conducted according to the Commercial Arbitration Rules of the American Arbitration Association which are in effect at the time the arbitration begins; provided that in the event of a conflict between such rules and this Agreement, the terms of this Agreement shall govern. The arbitration will take place in Company's state of domicile unless mutually agreed otherwise.

11.5 The arbitrators will issue a written decision on the dispute and a statement of any award to be paid as a result of their decision. The decision will be based on the terms and conditions of this Agreement as well as the usual customs and practices of the insurance and reinsurance industry, rather than on strict interpretation of the

LEGAL\21024036\4

9

BEDIVERE_000117

law. The decision will be final and binding on both parties and there will be no further appeal, except that either party may petition any court having jurisdiction regarding the award rendered by the arbitrators to enforce the award.

**11.6** The parties may agree to extend any of the negotiation or arbitration periods shown in this Article. Unless otherwise decided by the arbitrators, the parties will share equally in all expenses resulting from the arbitration, including the fees and expenses of the arbitrators, except that each party will be responsible for its own attorneys' fees.

## ARTICLE 12
## INDEPENDENT CONTRACTOR

**12.1** This Agreement is not a contract of employment. Nothing contained in this Agreement shall be construed to create the relationship of joint venture, partnership or employer and employee between Service Provider and Company. Each party is an independent contractor and shall be free, subject to the terms and conditions of this Agreement, to exercise judgment and discretion with regard to the conduct of its business. Company shall be solely responsible with respect to, and shall promptly pay or withhold, as required, all taxes or sums due to the federal, state and/or local taxing authorities and all insurance and benefits with respect to Company and Company's employees.

## ARTICLE 13
## CONFIDENTIALITY

**13.1** Confidential Information. Each of the parties hereby agrees that, unless otherwise required by law, the existence, scope and terms of this Agreement, and any information supplied pursuant hereto or in connection herewith or contained herein (collectively referred to as the "Proprietary Information"), is proprietary, will be kept confidential and, without the consent of the other party hereto (or, in the case of information supplied pursuant hereto or in connection herewith, the consent of the party supplying such information), may be disclosed only to those persons within the organizations of each of the parties, their respective counsel and other advisors who need to know of such proprietary information for the purpose of effecting the transactions contemplated hereby. Such person, counsel and other advisors shall be advised of the obligation to protect the Proprietary Information hereunder and shall agree, prior to receiving the Proprietary Information, to maintain its confidentiality. Notwithstanding the foregoing, Proprietary Information shall not include information already in the public domain or already in possession of the other party at the time of its disclosure by a party hereto. Notwithstanding the foregoing, either party may disclose Proprietary Information to any governmental regulator with jurisdiction over it or if disclosure is required or compelled by applicable law.

BEDIVERE_000118

13.2 Survival. Notwithstanding any other provision of this Agreement to the contrary, the provisions of this Article 13 shall survive the termination of this Agreement indefinitely.

## ARTICLE 14
## LATE PAYMENTS

14.1 Any late payment by either party shall accrue interest from the due date required for payment hereunder at a monthly rate of 1.5% per month.

## ARTICLE 15
## INDEMNIFICATION AND LIMITATIONS OF LIABILITY

15.1 Indemnification of Service Provider. Company shall indemnify, defend and hold harmless Service Provider and its directors, officers, agents, employees and shareholders from and against any and all claims, suits, hearings, actions, damages, reasonable attorneys' fees and costs (collectively, the "Indemnification Claims"), arising out of the provision of Services under this Agreement, or caused by or resulting from (a) any breach of this Agreement by Company; or (b) any act, error or omission by Company or by any of Company' officers, directors, shareholders, employees, agents, representatives or independent contractors during the term of this Agreement, except to the extent such act, error or omission is attributable to Service Provider and was not taken or failed to be taken at the direction of Company.

15.2 Indemnification of Company. Service Provider shall indemnify, defend and hold harmless Company and its directors, officers, agents, employees and shareholders from and against any and all Indemnification Claims caused by or resulting from any gross negligence or willful misconduct of Service Provider.

15.3 Survival of Indemnification. The indemnification provided under this Article 15 shall survive the expiration or termination of this Agreement indefinitely.

15.4 Excluded Damages. In no event will Service Provider or its subcontractors be liable for incidental, punitive, special or similar damages (except to the extent such damages are payable to third parties) regardless of whether such liability is based on breach of contract, tort, strict liability, breach of warranties, failure of essential purpose or otherwise and even if advised of the likelihood of such damages. Each of the parties will take commercially reasonable steps to mitigate the liability of the other party.

## ARTICLE 16
## RECEIVERSHIP

16.1 If Company is placed in receivership or seized by the Pennsylvania Insurance Commissioner ("Commissioner") under Article V of The Insurance Department Act of 1921 (40 P.S. §§221.1—221.63):

    (a)    the rights of Company under this Agreement shall extend to the receiver or Commissioner; and

    (b)    the Books and Records shall be made available to the receiver or Commissioner immediately upon the receiver or Commissioner's request.

16.2 Service Provider shall not have an automatic right to terminate this Agreement if Company is placed in receivership pursuant to Article V of The Insurance Department Act of 1921.

16.3 Service Provider will continue to maintain its systems, programs and other infrastructure used for Company under this Agreement notwithstanding a seizure of Company by the Commissioner under Article V of The Insurance Department Act of 1921, and shall make them available to the receiver and Commissioner for so long as Service Provider continues to receive timely payment for such services rendered.

## ARTICLE 17
## GENERAL PROVISIONS

17.1 Further Instruments. Each party shall execute and deliver all further instruments, documents and papers, and shall perform any and all acts necessary, to give full force and effect to all of the terms and provisions of this Agreement.

17.2 Severability. If any provision of this Agreement, as applied to any part or to any circumstance, shall be found by a court of competent jurisdiction to be void, illegal, invalid or unenforceable, the same shall in no way affect any other provision of this Agreement, the application of any such provision in any other circumstance, or the validity or enforceability of this Agreement unless the deletion of such provision shall cause this Agreement to become materially adverse to either party, in which event the parties shall use reasonable commercial efforts to arrive at an accommodation that best preserves for the parties the benefits and obligations of the offending provision.

17.3 Notices. All notices, statements or demands shall be in writing and shall be served in person, by facsimile transmission, or by private courier overnight delivery. Service shall be deemed conclusively made (a) at the time of service, if personally served, (b) at the time of transmission, if served by facsimile, provided that a copy thereof is forwarded by pre-paid courier, properly addressed and (c) within twenty-four (24) hours after delivery by the party giving the notice, statement or demand to the private overnight deliverer, if served by private overnight delivery.

Any notice or demand required to be made under this Agreement to the Service Provider shall be given to:

Armour Risk Services (Bermuda) Limited
Bermuda Commercial Bank Building
3rd Floor
19 Par-La-Ville Road
Hamilton HM 11
Bermuda

Pauline Richards:

Any notice or demand required to be made under this Agreement to Company shall be given to:

c/o OneBeacon Insurance Company
150 Royall Street
Canton
MA
02021-1030
USA

Standley Hoch:

Any party may, by virtue of written notice in compliance with this paragraph, alter or change the address or the identity of the person to whom any notice or copy thereof is to be sent.

17.4 Waivers. A waiver by any party of any of the terms and conditions of this Agreement in any one instance shall not be deemed or construed to be a waiver of such term or condition for the future, or of any subsequent breach thereof, nor shall it be deemed a waiver of performance of any other obligation hereunder.

17.5 Entire Agreement. This Agreement, together with any schedules and/or exhibits attached hereto, contains the entire understanding of the parties hereto relating to the subject matter hereof and supersedes all prior and collateral agreements, understandings, statements, commitments and negotiations of the parties. Each party acknowledges that no representations, inducements, promises or agreements, oral or written, with reference to the subject matter hereof have been made other than as expressly set forth herein.

17.6 Governing Law; Venue. This Agreement is governed by, and will be construed in accordance with the law of the Commonwealth of Pennsylvania. Both parties submit to the jurisdiction of any federal or state court in the United States of America.

17.7 Gender and Number. In all matters of interpretation, whenever necessary to give effect to any provision of this Agreement, each gender shall include the other, the singular shall include the plural and the plural shall include the singular.

**17.8** Headings. The titles of the articles, sections and paragraphs of this Agreement are for convenience only and shall not in any way affect the interpretation of any provision or condition of this Agreement.

**17.9** Third Parties. Except as may be expressly set forth herein, the parties hereto do not intend to confer any rights or remedies upon any person other than the parties hereto.

**17.10** Counterparts. This Agreement may be executed in counterparts which, taken together, shall constitute the whole of the agreement as between the parties.

**17.11** Amendment. This Agreement may not be amended except by a writing signed by each of the parties hereto.

LEGAL\21024036\4

BEDIVERE_000122

IN WITNESS WHEREOF, the parties have executed this Agreement effective as of the Effective Date.

**OneBeacon Insurance Company**

By: _[signature]_
Name: Standley Hoch
Title: President
Date: December 23, 2014

**Potomac Insurance Company**

By: _[signature]_
Name: Standley Hoch
Title: President
Date: December 23, 2014

**OneBeacon American Insurance Company**

By: _[signature]_
Name: Standley Hoch
Title: President
Date: December 23, 2014

**The Employers' Fire Insurance Company**

By: _[signature]_
Name: Standley Hoch
Title: President
Date: December 23, 2014

**Armour Risk Services (Bermuda) Limited**

By: _[signature]_
Name: PAULINE RICHARDS
Title: SECRETARY
Date: Dec 23, 2014

**Armour Risk Management Inc.**

By: _[signature]_
Name: Timothy J. Mahon
Title: VP + Controller
Date: December 23, 2014

LEGAL\21024036\4

BEDIVERE_000123

## Schedule I

### Claim Services

- To investigate, evaluate, adjust, settle or reject each claim included in the Company's business;
- To perform all necessary administrative work in connection with claims or loss reports;
- To record and maintain records of claims-related information;
- To report detailed claim information as needed for reinsurance processing, statutory financial reporting, including Schedule P, and any other regulatory purpose;
- To pursue salvage, subrogation and deductibles for the Company's business;
- To provide such additional reporting as may be requested by the Company concerning large losses, loss detail reports and monthly management reports.

### Reinsurance Services

- Process information for direct claims and assumed reinsurance, identify amounts ceded to third party reinsurance programs, and to bill and collect amounts due from reinsurers;
- Record amounts receivable, apply cash receipts and develop an aging of outstanding balances at agreed-upon intervals;
- Calculate experience-related premium and commission adjustments and to bill (remit) amounts due from (to) reinsurers;
- Request and maintain collateral required from unauthorized reinsurers.

### Actuarial Services

- Prepare, update and maintain historical summaries of loss and loss adjustment expense development by product and line of business;
- Estimate ultimate loss and LAE by product and line of business;
- Provide such additional analysis as may be requested in connection with establishing and updating loss and LAE reserves.

### Accounting and Financial Services

- General operational accounting and financial reporting, including general ledger accounting services, account reconciliations, data reconciliations, preparation of statutory reporting (quarterly and annual statements), and preparation of monthly financial summaries;
- Support for audits;
- Budgeting, financial analysis, planning and forecasting;
- Internal controls testing, oversight, and governance;
- Cash management and treasury services, including accounts payable, expense management, OFAC reporting, and cash settlements;
- Bank reconciliation, escheat and 1099 processing;
- Investment accounting, reporting and analysis, including Schedule D preparation;

**Accounting and Financial Services cont.**

- Statistical reporting of policy, premium and claims information, and such other reporting of statistical or financial data as is required by state insurance departments;
- Management reporting at agreed-up intervals including reinsurance collections and aging of outstanding balances, activity reports for direct and ceded business, and status of collateral accounts maintained for unauthorized reinsurers;
- Preparation of filings and analysis with respect to federal income tax, state premium tax, property and other taxes, licenses and fees.

**Other Accounting, Compliance and Administrative Services**

- Process summaries of accounting and financial information from third party administrators, including administrators of fronted reinsurance arrangements and bulk reinsurance or portfolio transfers;
- Process summaries of accounting and financial information from pools and associations;
- Provide administrative support for state licensing, compliance and reporting activity;
- Administer and maintain records relating to policies and claims, including financial and accounting records, underwriting and policy information, claim correspondence, investigations and notes, reinsurance reporting and recoveries, and such other records as are necessary or required for the conduct of the Company's business;
- Administer and maintain records relating to charter, bylaws, Board of Directors meeting minutes, and maintenance of legal entity permits, licenses and authorizations;
- Oversight, review and execution of regulatory and compliance matters, including market conduct and financial examinations, updates and filings of regulatory matters, attendance at hearings and other meetings, and consumer affairs;
- Vendor and facilities management, including sourcing of services, contract negotiation, processing and payment of invoices, audits of services, quality and compliance with contract terms.

**Information Technology**

- Oversight and management of information technology services;
- Business analysis, application development, quality assurance testing, infrastructure and quality assurance and database administration support;
- Batch support and data center monitoring, help desk and after hours support;
- Disaster recovery services management and administration.

BEDIVERE_000125