*Exhibit 15*

*Excerpts from the Transcript of PGIC's
Rule 30(b)(6) Deposition, dated
October 25-26, 2023; December 5, 2023;
December 13, 2023*

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

----------------------------------- )

SPARTA INSURANCE COMPANY (as              )

successor in interest to Sparta )

Insurance Holdings, Inc.,                         )

             Plaintiff,              )Case No.

      vs.                                  )21-11205-FDS

PENNSYLVANIA GENERAL INSURANCE        )

COMPANY (now known as Pennsylvania  )

Insurance Company),                              )

            Defendant.              )

----------------------------------- )


DEPOSITION OF JEFFREY SILVER

VOLUME I

WASHINGTON, D.C.

OCTOBER 25, 2023


REPORTED BY: Tina Alfaro, RPR, CRR, RMR

1    BY MR. CLARK:

2        Q.   Exhibit 21 is Plaintiff SPARTA Insurance

3    Company's notice of Rule 30(b)(6) deposition of

4    Defendant Pennsylvania General Insurance Company,

5    and it attaches as Schedule A 45 matters on which

6    examination will be conducted.

7            Sir, have you seen Exhibit 21 before?

8        A.   Yes.

9        Q.   When was the first time you saw

10   Exhibit 21?

11       A.   I don't recall a specific date.  It was

12   given to me by counsel.

13       Q.   Do you recall a month when you first saw

14   Exhibit 21?

15       A.   I don't recall the specific month.

16       Q.   Do you understand that today you are

17   testifying pursuant to this notice of deposition,

18   Exhibit 21?

19       A.   Yes.

20       Q.   Okay.  Do you understand that in addition

21   to testifying to your own personal knowledge, you

22   have been designated by PGIC as the corporate

1    representative of PGIC to provide testimony on

2    behalf of the corporation?

3         A.  Yes.

4         Q.  Okay.  This is the deposition of PGIC.

5    All of your testimony is on behalf of PGIC.  To the

6    extent that your counsel objects to a particular

7    question as outside the scope of this notice in

8    Exhibit 21, we can take that on a question-by

9    -question basis.  Okay?

10        A.  Yes.

11        Q.  Okay.  Let's go back to Exhibit 1.  When

12   was the first time that PGIC saw Exhibit 1?

13        A.  It would have been the same time, in the

14   early months of 2021.

15        Q.  Okay.  PGIC's a signatory to Exhibit 1,

16   correct?

17        A.  Yes.

18        Q.  Okay.  So PGIC must have seen it at least

19   as early as the day PGIC signed Exhibit 1, right?

20        A.  Yes.

21        Q.  Okay.  And Exhibit 1 is dated June 15th,

22   2005, right?

1      A.  It is.

2                    (PGIC Exhibit 2 was marked for

3                         identification.)

4   BY MR. CLARK:

5      Q.  Okay.  Let's turn to Exhibit 2.  Exhibit 2

6   is a document that bears the Bates label

7   PGIC-0004097.  It's a stock purchase agreement

8   dated March 12, 2007 by and among PGIC, OneBeacon

9   Insurance Company, and SPARTA Insurance Holdings.

10  Do you see that, sir?

11     A.  I do.

12     Q.  Okay.  And when was the first date you

13  personally saw Exhibit 2?

14     A.  The first time I saw Exhibit 2 would have

15  been during the course of this litigation.

16     Q.  Can you be any more specific as to when

17  the first time you saw Exhibit 2 would have been?

18     A.  It was provided to me via discovery in

19  this -- in this litigation.

20     Q.  The litigation was filed a couple years

21  ago, sir.  Do you have any memory as to when in the

22  past couple years you first saw Exhibit 2?



1   stock purchase agreement dated as of March 26th,

2   2007; is that correct, sir?

3      A.  Yes.

4      Q.  Have you seen Exhibit 3 prior to today?

5      A.  Yes.

6      Q.  And when was the first time you saw

7   Exhibit 3?

8      A.  It would be the same time that I would

9   have seen the stock purchase agreement that we just

10  referred to, during the course of this litigation.

11     Q.  And PGIC is a signatory to Exhibit 3,

12  correct?

13     A.  It is.

14                (PGIC Exhibit 4 was marked for

15                    identification.)

16  BY MR. CLARK:

17     Q.  Let's turn to Exhibit 4.  Exhibit 4 is a

18  document that bears the Bates label SPARTA-176.

19  It's a document titled "Amendment No. 2" to the

20  stock purchase agreement dated as of July 30, 2007;

21  is that correct, sir?

22     A.  Yes, that's what the document states.

1      Q.  And when was the first date that you saw

2  Exhibit 4?

3      A.  It would have been the same time as I saw

4  the documents, the stock purchase agreement and

5  amendment No. 1, during the course of this

6  litigation.

7      Q.  And PGIC is a signatory to Exhibit 4,

8  correct?

9      A.  It is.

10                    (PGIC Exhibit 5 was marked for

11                        identification.)

12  BY MR. CLARK:

13      Q.  Let's turn to Exhibit 5.  Exhibit 5 is a

14  document that bears the Bates label PGIC-0005137.

15  This is an instrument of transfer and assumption

16  made as of October 1, 2012 by and between OneBeacon

17  Insurance Company and PGIC; is that correct, sir?

18      A.  Yes.

19      Q.  And when was the first time you saw

20  Exhibit 5?

21      A.  I would have seen it in connection with

22  the stock purchase agreement by and between North

1    American Casualty and OneBeacon for the acquisition

2    of PGIC.

3        Q.   Okay.   And PGIC is a signatory to

4    Exhibit 5, correct?

5        A.   Yes.

6                        (PGIC Exhibit 6 was marked for

7                            identification.)

8    BY MR. CLARK:

9        Q.   Let's turn to Exhibit 6.   Exhibit 6 is a

10   document that bears the Bates label PGIC-0016032.

11   It's a document titled "Stock Purchase Agreement"

12   by and between OneBeacon Insurance Group, LLC and

13   North American Casualty Co, closing dated

14   October 1, 2012; is that correct?

15       A.   Yes.

16       Q.   Is this the stock purchase agreement with

17   NAC that you mentioned a few moments ago?

18       A.   It is.

19       Q.   Okay.   When was the first time you saw

20   Exhibit 6?

21       A.   I would have seen Exhibit 6 somewhere

22   around the June 2012 time period prior to the



Redacted

1      Q.  PGIC's 2012 annual statement identifies

2   PGIC's directors as Sidney Ferenc, Steven Menzies,

3   Jeffrey Silver, Marc Tract, and Jon McCright,

4   correct?

5      A.  Yes.

6      Q.  PGIC's 2012 annual statement was signed by

7   Steven Menzies as president and treasurer and

8   Jeffrey Silver as secretary, correct?

9      A.  Yes.

10                      (PGIC Exhibit 32 was marked

11                          for identification.)

12  BY MR. CLARK:

13     Q.  Let's turn to Exhibit 32.  It's a document

14  bearing the Bates No. PGIC-0008968.  It's the

15  annual statement for the year-ended December 31,

16  2013 for PGIC; is that correct?

17     A.  Yes.

18     Q.  Was Exhibit 32 prepared in the ordinary

19  course of PGIC's business?

20     A.  Yes.

21     Q.  And was Exhibit 32 submitted by PGIC to

22  the Iowa Division of Insurance?



Redacted

1    PGIC's directors as Sidney Ferenc, Steven Menzies,

2    Jeffrey Silver, Marc Tract, and Jon McCright,

3    correct?

4         A.  Yes.

5         Q.  PGIC's 2013 annual statement is signed by

6    Steven Menzies as president and treasurer and

7    Jeffrey Silver as secretary, correct?

8         A.  This document is not signed, but the

9    answer to your question is yes.

10        Q.  Is there a signed version of Exhibit 32?

11        A.  I'm sure there is.

12        Q.  Do you know why PGIC failed to produce

13   that document?

14        A.  I don't know the answer to that question.

15                        (PGIC Exhibit 33 was marked

16                           for identification.)

17   BY MR. CLARK:

18        Q.  Let's turn to Exhibit 33.  It's a document

19   bearing the Bates label PGIC-0009238.  It's the

20   annual statement, Pennsylvania General Insurance

21   Company for 2014, correct?

22        A.  Yes.



Redacted

1    PGIC's officers as Steven Menzies, president and

2    treasurer; Jeffrey Silver as secretary; and Sidney

3    Ferenc as chief executive officer, correct?

4        A.  Yes.

5        Q.  PGIC's 2014 annual statement also

6    identifies Robert Stafford and Ellen Gardiner as

7    vice president, correct?

8        A.  Yes.

9        Q.  PGIC's 2014 annual statement identifies

10   PGIC's directors as Steven Menzies, Jeffrey Silver,

11   Sidney Ferenc, Marc Tract, and Jon McCright,

12   correct?

13       A.  Yes.

14       Q.  PGIC's 2014 annual statement includes

15   signature lines for Steven Menzies as president and

16   treasurer and Jeffrey Silver as secretary, correct?

17       A.  Yes.

18                          (PGIC Exhibit 34 was marked

19                              for identification.)

20   BY MR. CLARK:

21       Q.  Let's turn to Exhibit 34.

22       A.  I think I need a new book.

1       Q.  Exhibit 34 is a document Bates-labeled

2   PGIC-0009572.  It is the annual statement of the

3   Pennsylvania General Insurance Company for 2015,

4   correct?

5       A.  Yes.

6       Q.  Did PGIC prepare Exhibit 34 in the

7   ordinary course of its business?

8       A.  Yes.

9       Q.  Did PGIC -- strike that.

10          Did PGIC submit Exhibit 34 to the Iowa

11  Department of Insurance?

12      A.  Yes.

13      Q.  PGIC's 2015 annual report again references

14  PGIC's employer ID number of 23-1471444, correct?

15      A.  Yes.

16      Q.  PGIC's 2015 annual statement identifies

17  PGIC's date of incorporation as 1955, correct?

18      A.  Yes.

19      Q.  PGIC's 2015 annual report identifies the

20  main administrative office as 10805 Old Mill Road,

21  Omaha, Nebraska, correct?

22      A.   Yes.



Redacted

1      Q.  Let's turn to Exhibit 35.  It's a document

2  bearing the Bates label PGIC-0010128.  It's titled

3  "Annual statement for the year-ended December 31,

4  2016 for Pennsylvania Insurance Company," correct?

5      A.  Yes.

6      Q.  Did PGIC prepare Exhibit 35 in the

7  ordinary course of PGIC's business?

8      A.  Yes.

9      Q.  And did PGIC submit Exhibit 35 to the

10  Ohio -- the Iowa Department of Insurance?

11      A.  Yes, to the Iowa Division of Insurance.

12      Q.  PGIC's -- strike that.

13          PGIC's 2016 annual statement includes

14  PGIC's employer ID number of 23-147144 [sic],

15  correct?

16      A.  Yes.

17      Q.  PGIC's 2016 annual statement references

18  PGIC's date of incorporation as 1955, correct?

19      A.  Yes.

20      Q.  PGIC's 2016 annual statement identifies

21  PGIC's main administrative office as 10805 Old Mill

22  Road, Omaha, Nebraska, correct?



Redacted

1                    (PGIC Exhibit 36 was marked

2                        for identification.)

3    BY MR. CLARK:

4        Q.  Let's turn to Exhibit 36.  Exhibit 36 is a

5    document that bears the Bates label PGIC-0010438.

6    It's the annual statement for the year-ended

7    December 31, 2017 for Pennsylvania Insurance

8    Company, correct?

9        A.  Yes.

10       Q.  Did PGIC prepare Exhibit 36 in the

11   ordinary course of PGIC's business?

12       A.  Yes.

13       Q.  Did PGIC submit Exhibit 36 to the Iowa

14   Department of Insurance?

15       A.  Yes.

16       Q.  PGIC's 2017 annual statement references

17   PGIC's employer ID number of 23-1471444, correct?

18       A.  Yes.

19       Q.  PGIC's 2017 annual statement references

20   PGIC's date of incorporation in 1955, correct?

21       A.  Yes.

22       Q.  PGIC's 2017 annual statement identifies



Redacted

1    Q.  PGIC's 2017 annual statement includes

2    signature lines for Steven Menzies as president and

3    treasurer and Jeffrey Silver as secretary, correct?

4    A.  Yes.

5    Q.  Let's turn to Exhibit 37.

6        MR. KAPLAN:  Chris, can we go off the

7    record just real quick?

8        MR. CLARK:  Sure.

9        THE VIDEOGRAPHER:  Going off the record at

10   11:08.

11               (A break was had.)

12       THE VIDEOGRAPHER:  Back on the record at

13   11:10.

14       MR. CLARK:  During the break counsel for

15   PGIC and counsel for SPARTA conferred and have

16   agreed to stipulate that Exhibits 37, 38, 39, 40,

17   41, 42, and 43 are documents that PGIC created in

18   the ordinary course of business and that PGIC

19   submitted to a state regulator.

20       Do I have that right, Mr. Kaplan?

21       MR. KAPLAN:  That's correct.

22       MR. CLARK:  Thank you for that

1    make sure that that's okay with my client first,

2    but --

3        MR. CLARK:  Yeah.  I'm going to -- if you

4    don't mind, I'm going to keep doing a couple of

5    these questions from the documents on the

6    transcript, but I will move quickly.

7        MR. KAPLAN:  No.  It's up to you.  I just

8    wanted to save you time if it would be helpful.

9    Your call.

10        MR. CLARK:  I appreciate that.

11   BY MR. CLARK:

12       Q.  Let me try it this way.  Mr. Silver, for

13   Exhibits 37, 38, 39, 40, 41, and 42, do all of

14   those documents refer to PGIC's employer ID

15   number 23-1471444?

16       A.  I'll just take one minute to confirm that.

17           The documents were numbers --

18       Q.  37 through 42.

19       A.  Yes.  I can confirm that they all reflect

20   the employer identification number 23-1471444.

21       Q.  For Exhibits 37, 38, 39, 40, 41, and 42,

22   do all of those PGIC annual reports refer to PGIC's

Redacted

1    Q.  Turn back to Exhibit 37.  Does PGIC's 2018

2    annual statement identify as PGIC's officers Steven

3    Menzies, president, chief executive officer, and

4    treasurer; Sidney Ferenc as chairman; Jeffrey

5    Silver as secretary; Robert Stafford as vice

6    president; and Justin Smith as vice president?

7    A.  Yes.

8    Q.  Does PGIC's 2018 annual statement identify

9    as its directors Steven Menzies, Jeffrey Silver,

10   Sidney Ferenc, Jon McCright, and Marc Tract?

11   A.  Yes.

12   Q.  And does PGIC's 2018 annual statement

13   include signature lines for Steven Menzies as

14   president, chief financial officer, and treasurer;

15   and Jeffrey Silver as secretary?

16   A.  Yes.

17                    (PGIC Exhibit 38 was marked

18                        for identification.)

19   BY MR. CLARK:

20   Q.  Turn to Exhibit 38.  This document bears

21   the Bates label of PGIC-0011082.  It's the annual

22   statement of Pennsylvania Insurance Company for

1    2019; is that correct?

2         A.   Yes.

3         Q.   Does PGIC's 2019 annual statement identify

4    as its officers Steven Menzies, president, chief

5    executive officer, and treasurer; Jeffrey Silver as

6    secretary; Robert Stafford as vice president; and

7    Justin Smith as vice president?

8         A.   Yes.

9         Q.   Does PGIC's 2019 annual statement identify

10   PGIC's directors as Steven Menzies, Jeffrey Silver,

11   Robert Stafford, Jon McCright, and Marc Tract?

12        A.   Yes.

13        Q.   Does PGIC's 2019 annual statement include

14   signature lines for Steven Menzies, president,

15   chief executive officer, and treasurer; and Jeffrey

16   Silver as secretary?

17        A.   Yes.

18                        (PGIC Exhibit 39 was marked

19                           for identification.)

20   BY MR. CLARK:

21        Q.   Let's turn to Exhibit 39.  Exhibit 39 is a

22   document that bears the Bates label PGIC-0011238.

1    It's the annual statement for PGIC for 2020; is

2    that correct?

3         A.   Yes.

4         Q.   2020 annual statement for PGIC references

5    the New Mexico Insurance Department, correct?

6         A.   Yes.

7         Q.   Does PGIC's 2020 annual statement identify

8    as PGIC's officers Steven Menzies, president, chief

9    executive officer, and treasurer; Jeffrey Silver,

10   secretary; Robert Stafford, vice president; and

11   Justin Smith as vice president?

12        A.   Yes.

13        Q.   Does PGIC's 2020 annual statement identify

14   PGIC's directors as Steven Menzies, Jeffrey Silver,

15   Robert Stafford, Jon McCright, and Marc Tract?

16        A.   Yes.

17        Q.   Does PGIC's 2020 annual statement include

18   signature lines for Steven Menzies, president,

19   chief executive officer, and treasurer; and Jeffrey

20   Silver, secretary?

21        A.   Yes.

22

1                    (PGIC Exhibit 40 was marked

2                         for identification.)

3    BY MR. CLARK:

4        Q.   Turning to Exhibit 40.  It's a document

5    bearing the Bates label PGIC-0011387, annual

6    statement of PGIC for 2021, correct?

7        A.   Yes.

8        Q.   Does PGIC's 2021 annual statement identify

9    PGIC's officers as Steven Menzies, president, chief

10   executive officer, and treasurer; Jeffrey Silver,

11   secretary; Robert Stafford, vice president; Justin

12   Smith as vice president?

13       A.   Yes.

14       Q.   Does PGIC's 2021 annual statement identify

15   PGIC's directors as Steven Menzies, Jeffrey Silver,

16   Robert Stafford, Jon McCright, and Marc Tract?

17       A.   Yes.

18       Q.   Does PGIC's 2021 annual statement include

19   signature lines for Steven Menzies, president and

20   chief executive officer and treasurer; and Jeffrey

21   Silver as secretary?

22       A.   Yes.

1              (PGIC Exhibit 41 was marked

2                  for identification.)

3    BY MR. CLARK:

4        Q.  Turn to Exhibit 41.  It's a document that

5    bears the Bates label PGIC-0021448.  It's the

6    annual statement of PGIC for 2022, correct?

7        A.  Yes.

8        Q.  Does PGIC's 2022 annual statement identify

9    as PGIC's officers Steven Menzies, president, chief

10   executive officer, and treasurer; Jeffrey Silver as

11   secretary; Robert Stafford as vice president; and

12   Justin Smith as vice president?

13       A.  Yes.

14       Q.  Does PGIC's 2022 annual statement identify

15   PGIC's directors as Steven Menzies, Jeffrey Silver,

16   Robert Stafford, Jon McCright, and Marc Tract?

17       A.  Yes.

18       Q.  Does PGIC's annual statement for 2022

19   include signature lines for Steven Menzies,

20   president, chief executive officer, and treasurer;

21   and Jeffrey Silver as secretary?

22       A.  Yes.

1                    (PGIC Exhibit 42 was marked

2                         for identification.)

3    BY MR. CLARK:

4        Q.  Let's turn to Exhibit 42.  It's a document

5    bearing the Bates label PGIC-0020645.  This is a

6    quarterly statement of PGIC as of June 30, 2022,

7    correct?

8        A.  Yes.

9                    (PGIC Exhibit 43 was marked

10                        for identification.)

11   BY MR. CLARK:

12       Q.  Let's turn to Exhibit 43.  Exhibit 43 is a

13   quarterly statement as of June 30, 2023 for

14   Pennsylvania Insurance Company, correct?

15       A.  Yes.

16       Q.  Does PGIC's quarterly statement as of

17   June 30, 2023 identify PGIC's officers as Steven

18   Menzies, president, chief executive officer, and

19   treasurer; Jeffrey Silver as secretary; Robert

20   Stafford as vice president; and Justin Smith as

21   vice president?

22       A.  Yes.

1      Q.  Does PGIC's quarterly statement as of

2  June 30, 2023 identify PGIC's directors as Steven

3  Menzies, Jeffrey Silver, Robert Stafford, Jon

4  McCright, and Marc Tract?

5      A.  Yes.

6      Q.  PGIC's June 30, 2023 quarterly statement

7  has signature lines for Steven Menzies, president

8  and chief executive officer and treasurer; and

9  Jeffrey Silver as secretary, correct?

10     A.  Yes.

11     Q.  Mr. Silver, for all of PGIC's annual and

12  quarterly statements we just reviewed, do you have

13  any present knowledge of any inaccuracies in those

14  documents sitting here today?

15     A.  The ones that we reviewed and for which

16  you identified me as an officer and director, no.

17     Q.  And for the other PGIC annual or quarterly

18  statements, are you aware of any inaccuracies in

19  them that you could point us to today?

20     A.  Not as I sit here today.

21                    (PGIC Exhibit 44 was marked

22                         for identification.)

1    existence without interruption as a corporation

2    organized under the laws of the State of Iowa does

3    hereby elect, pursuant to the laws of the State of

4    Iowa, to become redomesticated as an Iowa

5    corporation."

6              Did I read that accurately?

7        A.   You did.

8        Q.   Is that a true statement?

9        A.   Yes.

10       Q.   Why did PGIC redomesticate to Iowa in

11   2012?

12             MR. KAPLAN:  Objection as outside the

13   scope, but you can answer in your individual

14   capacity to the extent that you know, Mr. Silver.

15             MR. CLARK:  Why is that outside the scope?

16             MR. KAPLAN:  Well, if you point me to a

17   topic.  I'm not remembering a topic for which

18   that's inside the scope.  I would withdraw the

19   objection if you point me to one.

20             MR. CLARK:  Just give me one second here.

21   Topic 28 states "Any filings you, PGIC, submitted

22   to regulatory bodies for 2005 through the present."



Redacted



1    General decided to do that.

2        Q.  Okay.  And you understand you're

3    testifying today not just as to your personal

4    knowledge, but you're testifying generally as to

5    the collective knowledge of Pennsylvania General,

6    right?

7        A.  I understand that.

8        Q.  Okay.  So please tell me based on the

9    documents you reviewed why Pennsylvania General

10   deemed it desirable to transfer any and all of

11   American's liabilities to and have them assumed by

12   Pennsylvania General.

13       A.  The documents that I recall reviewing

14   indicated that OneBeacon was deciding to divest

15   itself of certain of its insurance subsidiaries.

16       Q.  And why would that be desirable for

17   Pennsylvania General to assume all of the

18   liabilities of American?

19       A.  I don't know the answer to that question.

20       Q.  Okay.

21           You referred to some documents.  Can you

22   tell us what documents you reviewed that provided

1   you with that information?

2        A.   I recall there was some documents from

3   OneBeacon that indicated some interest in

4   diversifying or divesting themselves of certain of

5   their insurance subsidiaries to focus on other

6   lines of business.

7        Q.   Were those documents e-mails?

8        A.   I believe they were.

9        Q.   Okay.  You looked at them recently?

10       A.   Yes.

11       Q.   Okay.  Were they Word documents,

12   PowerPoints?  What did they look like?

13       A.   I'm sorry.  I don't -- they were just

14   ordinary e-mails to me.

15       Q.   E-mails.  Okay.

16            Other than reading the e-mails, do you

17   have any other basis for your testimony as to why

18   it was desirable for Pennsylvania General to assume

19   the liabilities of American in Exhibit 1?

20       A.   No.

21       Q.   Okay.

22            Turning back to Exhibit 1, the 2005

1    agreement, paragraph 2 it states that "The

2    liabilities and assets of American shall be

3    transferred to Pennsylvania General and

4    Pennsylvania General shall thereby succeed to the

5    liabilities and assets of American."

6          Did I read that correctly?

7    A.  You did.

8    Q.  Is it your understanding that Pennsylvania

9    General received substantially all of the assets of

10   American in connection with the 2005 agreement in

11   Exhibit 1?

12         MR. KAPLAN:  I'm going to object -- I'm

13   going to object to the form of that question.  You

14   can go ahead and answer if you can.

15   A.  I do not have knowledge of that.

16   Q.  Okay.  Do you have any reason to dispute

17   the fact that Pennsylvania General received

18   substantially all of the assets of American in

19   connection with the 2005 agreement?

20         MR. KAPLAN:  Same objection.

21   A.  I do not.

22   Q.  Okay.  If you turn to the second page of

1      the 2005 agreement, paragraph 4 states "With the

2      exception of the retained assets, the assets of

3      American as of the effective date and time shall

4      include any and all of American's assets of every

5      nature and description of whatever kind in

6      wheresoever situated including without limitation

7      the following" and then there's some lettered

8      paragraphs A through F; do you see that?

9          A.  I do.

10         Q.  Do you have any information concerning the

11     assets referred to in paragraph 4 of the 2005

12     agreement?

13         A.  No.

14         Q.  Okay.

15             Paragraph 5 of the 2005 agreement states

16     "With the exception of the retained assets, the

17     liabilities of American as of the effective date

18     and time shall include any and all of American's

19     liabilities or contractual commitments of every

20     nature and description whether absolute, accrued,

21     contingent, or otherwise or whether do now or in

22     the future including without limitation the

1   just wanted to correct my own statement.

2          MR. CLARK:  Thank you.

3   BY MR. CLARK:

4          Q.  Mr. Silver, would you turn to the page

5   that ends in PGIC-69 in Exhibit 2.  It's PGIC-4169.

6          A.  I'm sorry.  My document starts at 4097.

7          Q.  Right.  If you turn halfway or so into the

8   document, there's a page that ends 4169.  It's just

9   before the Exhibit A.

10         A.  Oh, 4169.  I'm sorry.  Okay.

11         Q.  Do you see this is a signature page?

12         A.  Yes.

13         Q.  Do you know who T. Michael Miller is?

14         A.  I don't know who he is personally.

15         Q.  Have you ever spoken with Mr. Miller?

16         A.  I have not.

17         Q.  Okay.  And you see here Mr. Miller signed

18   Exhibit 2 on the top block here on behalf of

19   Pennsylvania General Insurance Company as the chief

20   executive officer?

21         A.  And OneBeacon Insurance Company, yes, I

22   see that.

1        Q.   You anticipated my next question.  So on

2   the page ending 4169 there are several signature

3   blocks, right?

4        A.   Yes.

5        Q.   There's three of them.  So the first one

6   here is for Pennsylvania General Insurance Company,

7   right?

8        A.   Yes.

9        Q.   And T. Michael Miller signs as chief

10  executive officer of Pennsylvania General Insurance

11  Company, correct?

12       A.   Yes, that's what the document reflects.

13       Q.   And then below that there's another

14  signature block where Mr. Miller signs on behalf of

15  OneBeacon Insurance Company, correct?

16       A.   That's what the document reflects.

17       Q.   If you turn the page you'll see that

18  there's a signature block for SPARTA Insurance and

19  that's signed by G.L. Estes; do you see that?

20       A.   Yes.

21       Q.   If you turn to the first page of

22  Exhibit No. 2, at the top it says "Stock Purchase



Redacted

1      A.  Yes.

2      Q.  Section 1.2 is the purchase price; do you

3   see that?

4      A.  Yes.

5      Q.  And you see the purchase price is

6   calculated first as the amount of the company's

7   paid-in capital and surplus; do you see that?

8      A.  Yes.

9      Q.  And then plus $12 million; do you see

10  that?

11     A.  Yes, that's what the document reflects.

12     Q.  As of the time of the 2007 transaction,

13  AEIC was licensed in all 50 U.S. states, correct?

14         MR. KAPLAN:  Objection to form, beyond the

15  scope.

16     A.  I don't --

17         MR. KAPLAN:  You can answer if you know.

18         THE WITNESS:  I don't have personal

19  knowledge of that.

20     Q.  If you turn to section 1.3 on page 4 of

21  the contract, you see there's a section called

22  "Adjustment to purchase price"; do you see that?



Redacted

1      Q.  Okay.  And in the next line it states that

2   the purchase price shall be decreased in the amount

3   of $175,000 with respect to each other rescinded

4   insurance license; do you see that?

5      A.  The document states that.

6      Q.  Turn a few more pages in to page 7 of the

7   contract, which is PGIC-4103, and the last

8   paragraph of this contract states that "The

9   seller" -- that's PGIC -- "shall deliver to

10  purchaser" -- that's SPARTA -- "all of the shares

11  of AEIC free and clear of debts, liabilities, and

12  obligations"; do you see that?

13     A.  The document provides that.

14     Q.  If you turn the page, you'll get to

15  article 2, which is the warranties and

16  representations by seller; do you see that section?

17     A.  I do.

18     Q.  Okay.  And the seller in this contract is

19  PGIC, correct?

20     A.  Yes.

21     Q.  So article 2 contains only the warranties

22  and representations by PGIC, correct?

1      A.  Yes.

2      Q.  Okay.

3           Section 2.3 starts on the bottom of this

4    page, but if you turn to the next page, the first

5    full sentence on page 9 states "Company" -- that's

6    AEIC -- "is in good standing in each such

7    jurisdiction with no restrictions on such licenses

8    other than those noted on schedule 2.3 and is

9    qualified to write those lines of business in each

10   such state as are indicated on the license in each

11   such jurisdiction."

12          Did I read that correctly?

13     A.  Yes.

14     Q.  At the bottom of this page, section 2.4;

15   do you see that?

16     A.  Yes.

17     Q.  Section 2.4 is a representation and

18   warranty by PGIC concerning the authority relating

19   to the reinsurance agreement; do you see that?

20     A.  Section 2.4 is titled as you indicated.

21     Q.  And section 2.4 is in the section of the

22   warranties and representations by PGIC, correct?

1      A.   That's what the document reflects.

2      Q.   Okay.  Take a moment and read section 2.4

3   to yourself, and then I'll ask you some questions

4   about it.

5                    (Witness reviewing document.)

6      A.   Okay.

7      Q.   Have you read section 2.4 of the 2007

8   agreement before today?

9      A.   Yes.

10      Q.   Okay.  So the first portion of this

11   paragraph, we'll take it piece by piece, says "As

12   of the date of the execution and delivery of the

13   instrument of transfer and assumption between the

14   seller" -- that's PGIC -- "and the company" --

15   that's AEIC -- "attached hereto as Exhibit A

16   (reinsurance agreement)."

17                    Did I read that correctly?

18      A.   You did.

19      Q.   Now, if you turn to Exhibit A to this

20   document, there's a little tab down at the bottom

21   here for you, that starts on PGIC-4173, that

22   Exhibit A is the 2005 agreement we marked as

1    Exhibit 1 earlier today, correct?

2         A.   It appears to be so.

3         Q.   Do you have any reason to believe that

4    it's not?

5         A.   No.

6         Q.   Okay.  So the 2005 transfer and assumption

7    agreement we marked as Exhibit 1 this morning is

8    itself attached as Exhibit A to Exhibit 2, which is

9    the 2007 stock purchase agreement, correct?

10        A.   Can I have that back just one more time?

11        Q.   Sure.

12             The 2005 transfer and assumption agreement

13   that we marked as Exhibit 1 this morning is itself

14   attached as Exhibit A to this Exhibit 2, the 2007

15   stock purchase agreement?

16        A.   Yes.

17        Q.   If you continue down on page 10 of the

18   contract in the section 2.4, it says "The

19   execution, delivery, and performance of the

20   reinsurance agreement by each of seller, PGIC, and

21   the company, AEIC, and the consummation of the

22   transactions contemplated therein have been duly

1    authorized and approved by all required corporate

2    action on the part of seller" -- that's PGIC --

3    "and the company" -- AEIC -- "respectively, and

4    such corporate actions have not been and will not

5    have been rescinded and remain in full force and

6    effect."

7         Did I read that correctly?

8    A.   Yes.

9    Q.   Do you have any factual information to

10   suggest that that statement is not true and

11   correct?

12   A.   Not as I sit here today.

13   Q.   Okay.  If you continue on down to the next

14   paragraph, the second sentence starts "Company" --

15   and that's AEIC -- "has provided prompt, written

16   notice in the form of Exhibit A to the reinsurance

17   agreement to all holders of policies as to which

18   company" -- that's AEIC -- "had unearned premiums

19   recorded as of June 30, 2005 pursuant to section 7

20   of the reinsurance agreement (other than holders of

21   the policies constituted in the retained business

22   as defined in the reinsurance agreement)."

1          Did I read that correctly?

2     A.  Yes.

3     Q.  So PGIC is representing and warranting to

4  SPARTA in that sentence that notices were provided

5  to all of the holders of AEIC policies as set forth

6  in this provision, right?

7          MR. KAPLAN:  Objection to form.

8     A.  I disagree because the company, as I

9  understand it, it is AEIC.

10    Q.  That is true.

11    A.  It says "Company has provided prompt,

12  written notice in the form of Exhibit A."  So it

13  would not have been PGIC that would have provided

14  any notice.  It was the company as I read -- as I

15  read this document.

16    Q.  You agree with me that article 2 of this

17  contract -- strike that.

18          You agree with me that AEIC is not a

19  signatory or a party to the 2007 stock purchase

20  agreement, right?

21    A.  I would agree they're not a signatory to

22  that document.

1      Q.  Okay.  And AEIC is defined as the company

2    in the 2007 agreement, correct?

3      A.  That's what the document provides.

4      Q.  Section 2 of the 2007 SPA is the reps and

5    warranties by PGIC, correct?  It's on page 8 of the

6    contract.

7      A.  The title under article 2 is "Warranties

8    and Representations by (inaudible)."

9      Q.  And if you read the introductory sentence

10   right there, it says "To induce purchaser" --

11   that's SPARTA -- "to enter into the agreement and,

12   I, to proceed as required herein in anticipation of

13   the closing on the closing date and, II, to cause

14   the transactions provided for in this agreement to

15   be consummated on the closing date, seller" --

16   that's PGIC -- "warrants and represents to

17   purchaser as follows."

18        Then if you go back to the paragraph we

19   were talking about on page 10, it's PGIC that's

20   representing and warranting that AEIC has indeed

21   provided the notices required to be sent to all of

22   the policyholders?



Redacted



Redacted

1      Q.  Maybe you could just tell me is there any

2   party other than AE -- other than PGIC that's

3   making any representation and warranty in

4   section 2.4?  That's the question, it's about the

5   representation and warranty, sir, not other

6   conduct.

7      A.  And my answer is there's a specific

8   reference to what the company, who is AEIC, is

9   doing.  So the answer to my question -- to answer

10  your question is yes, I think there's a reference

11  to the company making certain indications of what

12  has happened under the transfer and assumption

13  agreement.

14     Q.  Can you -- can you please identify for me

15  the page of Exhibit 2 where the company signs the

16  contract.

17         MR. KAPLAN:  Asked and answered.

18     A.  The company is not a signatory to the

19  contract.

20     Q.  So how can the company be making any

21  representation and warranty to anybody in a

22  document it didn't sign?



Redacted



Redacted

1      A.   Yes.

2      Q.   2.8B states "The reinsurance agreement

3   does and will at closing constitute a legal, valid,

4   and binding obligation of each of seller" -- that's

5   PGIC -- "and the company" -- AEIC -- "enforceable

6   against each of seller" -- that's PGIC -- "and the

7   company" -- AEIC -- "respectively in accordance

8   with its terms."

9           Did I read that correctly?

10     A.   Yes.

11     Q.   Does PGIC agree that the reinsurance

12  agreement is enforceable against PGIC?

13          MR. KAPLAN:   Objection to the form, calls

14  for a legal conclusion.

15     A.   At what point in time are you asking?

16     Q.   Today.

17     A.   No.

18     Q.   Why not?

19     A.   Because of the 2012 SPA, stock purchase

20  agreement, the 2012 transfer and assumption

21  agreement, the regulatory approvals approving each

22  of those documents, our answers to interrogatories

1   which set forth multiple reasons for that, our

2   answer to your amended second -- second complaint.

3        Q.  Anything else?

4        A.  Not that I can recall at this time.

5        Q.  The regulatory approval -- strike that.

6            The 2005 reinsurance agreement received

7   regulatory approval, correct?

8        A.  Yes.

9        Q.  So why is that regulatory approval not

10  effective but the 2012 regulatory approval somehow

11  is?

12           MR. KAPLAN:  Give me one second.  I'm

13  going to object to the form of that question and

14  also, Mr. Silver, to the extent that you can answer

15  that question without reference to privileged

16  attorney-client communications, you can do so.

17  Otherwise I instruct you not to answer.

18       A.  I cannot answer based on that instruction.

19           MR. CLARK:  Mr. Kaplan, I'm going to press

20  just a bit there.  So the witness has testified

21  that in his view the 2005 contract is not

22  enforceable because of some 2012 regulatory

1    approval, but that is notwithstanding the fact that

2    in 2005 the regulators approved the transfer and

3    assumption agreement.  It seems to me that if that

4    is an argument PGIC wants to assert as a defense in

5    this case, it cannot hide behind privilege and not

6    provide the basis for that position.

7              MR. KAPLAN:  But it's not -- that's

8    misstating what he said.  He listed six reasons --

9    six sources of things that explain the basis for

10   the position, that it was novated, et cetera, and

11   you're -- first of all, I think you're misstating

12   what he said.  He's not saying it was the 2012

13   regulatory approval in isolation.  And so to the

14   extent that you're making an argument that this

15   is -- it becomes like an oral argument, and that

16   type of sparring, to the extent that it's

17   informed -- that his answers are informed by

18   counsel, by the -- are privileged.  You're welcome

19   to ask him about all of the things that he said are

20   the basis for our -- for our agreement, but not --

21   he's not going to answer questions as if you're --

22   you know, when you're taking something in isolation

1    just referenced?

2         A.   The Pennsylvania Department of Insurance.

3         Q.   So to be clear, PGIC's position is that

4    the Pennsylvania Department of Insurance issued an

5    order that in some way modifies or supersedes the

6    order of the Massachusetts regulator reflected in

7    Exhibit 53?

8         MR. KAPLAN:   Objection to the form.

9         A.   The testimony is not with respect to what

10   the Commonwealth of Massachusetts did.   My

11   testimony is what the Pennsylvania Department of

12   Insurance did in 2012 approving the sale of

13   Pennsylvania Insurance Company as a clean shell as

14   well as the transfer and assumption agreement.

15        Q.   Move to strike as nonresponsive.

16             Sir, I'm trying to understand is PGIC

17   taking the position that some ruling by the

18   Pennsylvania regulators years later in some way

19   modified or amended or supersedes or nullifies the

20   Massachusetts approval reflected in Exhibit 53?

21        A.   You're not --

22             MR. KAPLAN:   Objection to the form,

1  misstates the testimony.  Go ahead.

2          THE WITNESS:  You're not understanding my

3  answer.  I'll try this one more time for you and

4  try and make it as clear as I can.

5          PGIC is not asserting that somehow this

6  approval from the Commonwealth of Massachusetts,

7  Exhibit 53, is somehow rescinded, overwhelmed,

8  whatever question -- whatever description you

9  wanted to use.  What I am saying is the underlying

10  agreement which is approved in Exhibit 53 is now

11  terminated, superseded, modified, whatever term you

12  want to use, by the 2012 stock purchase agreement,

13  the 2012 transfer and assumption agreement, and the

14  regulatory approvals for both those documents

15  indicating that it was a sale of Pennsylvania

16  Insurance Company as a clean shell.

17      Q.  Thank you.

18          Let's turn to page 22, section 2.19.

19      A.  I'm sorry?

20      Q.  I'm sorry.  Back in Exhibit 2, let's turn

21  to section 2.19, which is the section titled

22  "Assets and Property, No Liabilities."  Please let

1   me know when you're there.

2        A.   Okay.  I'm there.

3        Q.   Paragraph B states "All liabilities of the

4   company" -- that's AEIC -- "that have arisen or

5   could arise under any insurance contract or any

6   reinsurance treaty or otherwise have been and will

7   be assumed by seller" -- that's PGIC -- "pursuant

8   to the reinsurance agreement.  The company" --

9   AEIC -- "has and will at closing have no

10  liabilities of any nature whether absolute,

11  accrued, contingent, or otherwise, or whether due

12  or to become due other than those assumed by

13  seller" -- that's PGIC -- "pursuant to the

14  reinsurance agreement."

15            Did I read that correctly?

16       A.   Yes.

17       Q.   After the 2007 stock purchase agreement

18  was AEIC a clean shell?

19            MR. KAPLAN:  Objection to the form.

20                      (Witness reviewing document.)

21       A.   My answer is -- or referenced to the

22  language at the bottom of page 10 of Exhibit 2 that

1   states that "Notwithstanding the provisions of this

2   section 2.4 or any other provisions of this

3   agreement, it is acknowledged and agreed that

4   seller makes no representation that the reinsurance

5   agreement constitutes a novation or that

6   policyholders did not have any right of consent

7   with respect thereto."  That's what that sentence

8   provides.

9       Q.  Are you done answering, sir?

10      A.  I am.

11      Q.  So I'd like you to answer my question.

12  After the 2007 stock purchase agreement was AEIC a

13  clean shell or was it not?

14          MR. KAPLAN:  Objection to the form.

15      A.  It was not a clean shell.

16      Q.  Okay.  So the 2005 transfer and assumption

17  agreement did not create a clean shell, but the

18  2012 agreement did create a clean shell; is that

19  PGIC's testimony?

20      A.  No.  The 2005 agreement had certain

21  retained business that remained with AEIC.  So it

22  had some business residual that remained with the



Redacted

1    know when you're there.

2         A.  I'm sorry.  What page?  43?

3         Q.  It's 43.

4         A.  Okay.

5         Q.  Do you see section 6.12 titled

6    "Reinsurance Agreement"?

7         A.  Yes.

8         Q.  And the 2007 SPA states "The reinsurance

9    agreement shall be in full force and effect."  Did

10   I read that correctly?

11        A.  Yes.

12        Q.  And do you agree that that is a condition

13   precedent to the obligation of SPARTA to close the

14   2007 transaction with PGIC?

15            MR. KAPLAN:  Objection to the form.

16        A.  That section 6.12 is found under article

17   6, "Conditions precedent to obligation of purchaser

18   to close," yes.

19        Q.  Let's turn to article 8,

20   "Indemnification," which starts on page 46.  Do you

21   see section 8.1 is titled "Indemnity by seller"?

22        A.  Yes.

1    Q.  And seller is PGIC, right?

2    A.  Yes.

3    Q.  PGIC's the only seller in the 2007 SPA,

4    correct?

5    A.  The document reflects PGIC as the seller.

6    Q.  Okay.  Let's turn now to page 62 in

7    article 10.

8    A.  62?

9    Q.  Yes, please.  Do you see section 10.1

10   titled "Modification"?

11   A.  I do.

12   Q.  Section 10.1 states that "Purchaser" --

13   that's SPARTA -- "and seller" -- PGIC -- "may by

14   mutual consent of their duly and properly

15   authorized representatives amend, modify, or

16   supplement this agreement in such a manner as may

17   be agreed upon by them in writing at any time."

18        Did I read that correctly?

19   A.  Yes.

20   Q.  Okay.  Section 10.2 addresses waiver; do

21   you see that?

22   A.  Yes.

1      Q.  Section 10.2 states "Each of purchaser" --

2   that's SPARTA -- "and seller" -- PGIC -- "may

3   pursuant to action by its duly and properly

4   authorized representatives combined instrument in

5   writing extend the time for or waive the

6   performance of any of the obligations of the other

7   or waive compliance by the other with any of the

8   covenants or conditions contained therein."

9          Did I read that correctly?

10     A.  Yes.

11     Q.  Okay.  Any modification or waiver of the

12   2007 SPA must be in writing, correct?

13         MR. KAPLAN:  Objection to the form of the

14   question.

15     A.  That's what the language provides.

16     Q.  Okay.  And indeed PGIC and SPARTA agreed

17   several times in writing to modify certain aspects

18   of the 2007 SPA, correct?

19     A.  I recall from this morning's documents

20   that there were certain amendments to the stock

21   purchase agreement.

22     Q.  Let's take a look at Exhibit 3 for a

1    moment.  That's amendment 1 to the stock purchase

2    agreement; do you see that, sir?

3         A.  I do.

4         Q.  And that's a written amendment to the

5    stock purchase agreement, correct?

6         A.  The document appears to say that.

7         Q.  Okay.  Let's look at Exhibit 4.  It's

8    amendment No. 2 to the stock purchase agreement; do

9    you see that?

10        A.  I do.

11        Q.  Okay.  Is PGIC aware of any other written

12   amendments to the stock purchase agreement?

13             MR. KAPLAN:  Objection to form.

14        A.  We take the position that the 2012 stock

15   purchase agreement and the 2012 transfer and

16   assumption agreement in effect modified,

17   terminated, whatever term you want to use, the

18   stock purchase agreement of 2007.

19        Q.  Can PGIC identify any writing signed by

20   SPARTA that amends the stock purchase agreement

21   marked as Exhibit 2?

22             MR. KAPLAN:  Objection to the form.

1      MR. CLARK:  What's objectionable about

2  that?

3      MR. KAPLAN:  The use of the word "amends."

4  These are legal terms of art.

5      MR. CLARK:  Okay.  Give me one moment.

6      Mr. Silver, let's go back to the stock

7  purchase agreement, Exhibit 2, for a moment, and

8  turn to page 67.  I'll direct your attention to

9  section 12.4 titled "Amendments and Waivers"; do

10  you see that?

11      A.  I see paragraph 12.4.

12      Q.  Okay.  And what's the title of section

13  12.4?

14      A.  "Amendments and Waivers."

15      Q.  Could you please read section 12.4 into

16  the record.

17      A.  "Except as otherwise specifically stated

18  herein, no provision of this agreement may be

19  amended except by and only by a written instrument

20  executed by the parties hereto with respect to

21  successors of interest."

22      Q.  Other than Exhibit 3 and 4, is PGIC aware

1  of any document signed by SPARTA that amends the

2  2007 stock purchase agreement?

3      A.  If your question is asking a document

4  signed by SPARTA, I'm not aware of such a document

5  other than what I've indicated before as effecting

6  the amendment, termination, whatever you want to

7  call it.

8      Q.  And none of those documents are signed by

9  SPARTA, correct?

10      A.  I don't recall those documents being

11  signed by SPARTA.

12      Q.  Other than Exhibits 3 and 4, is PGIC aware

13  of any document signed by SPARTA that modifies or

14  waives any provision of the 2007 stock purchase

15  agreement?

16      A.  Answering your question about a document

17  signed by SPARTA, I am not aware of such a

18  document.

19      Q.  Okay.

20          Let's turn to section 12.9, which is

21  titled "Notices"; do you see that, sir?

22      A.  I do.

1   about documents signed by SPARTA, there are some

2   e-mails that I recall seeing that indicated that

3   SPARTA was aware of the 2012 stock purchase

4   agreement and 2012 transfer and assumption

5   agreement.  I don't recall the dates of those

6   e-mails, but I recall those e-mails.

7       Q.  Okay.  And in any of those e-mails do

8   those e-mails, to your recollection, include a

9   signature by SPARTA?

10      A.  They include an e-mail signed by a

11  representative of SPARTA.

12      Q.  I'm going to be very precise in the word

13  "signature."  You're saying with pen and ink and an

14  actual signature or you just mean an e-mail that

15  says my name is so-and-so?

16      A.  It's an e-mail from an officer of SPARTA.

17      Q.  Okay.  And is that e-mail before or after

18  the October 1st, 2012 stock purchase agreement?

19      A.  You mean the October 12th, 2012 stock

20  purchase agreement?

21      Q.  Is that e-mail before or after the October

22  2012 stock purchase agreement?

1       A.  It is after.

2       Q.  Okay.  So your position is that -- well,

3   strike that.

4           Let's take a look at Exhibit 2 again,

5   section 12.15.  It's on page 70.  Do you see

6   section 12.15?

7       A.  I do.

8       Q.  Okay.  Could you please read the

9   first -- well, I'll read it.

10          Section 12.15 is titled "Assignment" and

11  it says "This agreement shall not be assignable by

12  any party without the prior written consent of the

13  other parties and any attempt to assign this

14  agreement without such consent shall be void.

15  Provided, however, that purchaser "-- SPARTA --

16  "may assign all or any portion of this agreement to

17  any affiliate of purchaser" -- SPARTA -- "if such

18  affiliate assumes the obligation of purchaser" --

19  SPARTA -- "hereunder."

20          Did I read that correctly?

21      A.  Yes.

22      Q.  Okay.  Is PGIC aware of any writing signed

1   by SPARTA that provides prior written consent to

2   the assignment of the SPA?

3          MR. KAPLAN:  Objection to the form.

4      A.  I'm sorry.  Can I have the question back,

5   please, Madam Court Reporter or whoever?

6          THE REPORTER:  Do you want me to read it?

7          MR. CLARK:  Sure.

8                  (Record read as requested.)

9          MR. KAPLAN:  Same objection.

10  BY THE WITNESS:

11     A.  No.

12     Q.  Okay.

13         Under section 12.5 of the SPA PGIC could

14  not assign the SPA without SPARTA's prior written

15  consent, correct?

16         MR. KAPLAN:  Objection to the form.  And,

17  Chris, I don't think you meant 12.5.

18         MR. CLARK:  Correct.  Let me ask it again.

19  Withdrawn.

20         Under section 12.15 of the 2007 SPA PGIC

21  could not assign the 2000 SPA -- 2007 SPA without

22  SPARTA's prior written consent, correct?

1          MR. KAPLAN:  Objection to the form.

2     A.  That appears to be what the language

3  indicates.

4     Q.  Okay.  If you turn to page 71 of the 2007

5  SPA, section 12.16 discusses certain post-closing

6  covenants; do you see that?

7     A.  I do.

8     Q.  12.16B states "At all times during the

9  term of the reinsurance agreement seller" -- that's

10  PGIC -- "shall employ a sufficient number of

11  trained, experienced personnel and will retain one

12  or more third-party administrators capable of

13  providing the administrative services to seller

14  necessary for seller to perform its obligations

15  under the reinsurance agreement."

16          Did I read that correctly?

17     A.  Yes.

18     Q.  Has PGIC complied with section 12.16B of

19  the SPA?

20          MR. KAPLAN:  Objection to the form.

21     A.  Yes, in view of the fact that since the

22  date of 2012 we have never heard from SPARTA with

1    respect to any claims that it may have had, and our

2    understanding is that all claims were handled

3    through OneBeacon -- directly between SPARTA and

4    OneBeacon and we received -- "we" being

5    Pennsylvania Insurance Company received no notice

6    of any claims until after Bedivere's liquidation in

7    2021.

8        Q.   Does PGIC maintain that in 2023 it is

9    complying with section 12.16B of the SPA?

10        MR. KAPLAN:  Objection to the form.

11        A.   To the extent that any obligations of PGIC

12    under the stock purchase agreement were transferred

13    and assumed by OneBeacon under the stock purchase

14    agreement and transfer and assumption agreement,

15    the answer is yes.

16        Q.   And to the extent those obligations were

17    not transferred and assumed, would the answer be

18    no?

19        MR. KAPLAN:  Objection, calls for

20    speculation, incomplete hypothetical.

21        MR. CLARK:  It's the predicate in his own

22    answer.

1  and assumption agreement on behalf of OneBeacon

2  Insurance Company, correct?

3      A.  Yes.

4      Q.  SPARTA is not a signatory to the 2012

5  transfer and assumption agreement marked as

6  Exhibit 5, correct?

7      A.  SPARTA is not a signatory to that

8  document.

9      Q.  Prior to the date the transfer and

10  assumption agreement was executed, did anyone tell

11  SPARTA that this document would be signed?

12      A.  I don't have any knowledge whether

13  OneBeacon Insurance Company advised SPARTA one way

14  or the other or Pennsylvania General Insurance

15  Company advised SPARTA one way or the other.

16      Q.  Sitting here today, you don't know for

17  certain anyone who did tell SPARTA about the

18  2012 transfer and assumption agreement before it

19  was signed?

20      A.  I don't know one way or the other.

21      Q.  But you can't point me to something today

22  and say here's an example of where SPARTA received

1   a copy of this in advance?

2        A.  That's correct.

3        Q.  Okay.

4        A.  At this point in time.

5        Q.  Okay.

6        A.  Or subsequently they did, but I don't

7   recall anything at this point in time.

8        Q.  Okay.

9            Let's turn to Exhibit 6.  Exhibit 6 is the

10  2012 SPA between OneBeacon Insurance Group and

11  North American Casualty, correct?

12       A.  Yes.

13       Q.  And if we turn to the signature page for

14  this document, OneBeacon Insurance Company is

15  signed for by T. Michael Miller, correct?

16       A.  No.

17       Q.  Sorry.  T. Michael Miller signs the 2012

18  SPA for OneBeacon Insurance Group?

19       A.  Yes.

20       Q.  Okay.  And Steven Menzies signs for North

21  American Casualty Co, correct?

22       A.  Yes.

1      Q.  SPARTA is not a signatory to the 2012 SPA

2   that's been marked as Exhibit 6, right?

3      A.  That's correct.

4      Q.  Was the 2012 SPA provided to SPARTA before

5   it was signed?

6      A.  I don't have any information as to whether

7   or not OneBeacon Insurance Group did or did not

8   provide it to SPARTA before it was signed.

9      Q.  North American Casualty did not provide it

10  to SPARTA before Exhibit 6 was signed, correct?

11     A.  We did not.

12     Q.  And the "we" is North American Casualty?

13     A.  Yes.

14     Q.  AEIC also was not a party to the 2012 SPA

15  that is marked as Exhibit 6, correct?

16     A.  AEIC is not a signatory to the stock

17  purchase agreement, 2012 stock purchase agreement.

18     Q.  AEIC is also not a party to the 2012 SPA,

19  correct?

20     A.  They're not a signatory.

21     Q.  You're making a distinction between the

22  word "signatory" and "party."  Is that intentional?

1    A.  Yes.

2    Q.  Okay.  Please tell me what distinction

3    you're trying to draw.

4    A.  The distinction is simply that AEIC is not

5    a signatory to the 2012 stock purchase agreement.

6    Whether they're a party to the 2012 stock purchase

7    agreement I guess is one of the issues to be

8    decided.

9    Q.  Let's take a look at Exhibit 6.  If you'd

10   turn to page 1 of the contract, it's the page

11   ending PGIC-16035.  Are you there?

12   A.  Yes.

13   Q.  Do you see there the first paragraph right

14   beneath the word "Stock purchase agreement"?

15   A.  The first whereas?

16   Q.  I'm sorry.  So the very first paragraph

17   before the word "Background"; do you see that?

18   A.  Yes.

19   Q.  And do you see in that paragraph the term

20   "party" and "parties" are defined?

21   A.  Yes.

22   Q.  The words "American Employers Insurance

1    Company" or "AEIC" are not contained in the first

2    paragraph of the 2012 SPA, true?

3        A.  The document reflects that.

4        Q.  Okay.  Pursuant to the language of the

5    2012 SPA, AEIC is not included as a defined party

6    under the terms of that contract, correct?

7        A.  The document so reflects that.

8        Q.  AEIC also is not a party to the 2012

9    transfer and assumption agreement reflected in

10   Exhibit 5, correct?

11       A.  It was not a signatory to Exhibit 5.

12       Q.  AEIC did not sign Exhibit 5?

13       A.  That's correct.

14       Q.  If you take a look at Exhibit 5, the first

15   paragraph defines the terms "parties" and "party,"

16   correct?

17       A.  The document reflects that.

18       Q.  The words "American Employers Insurance

19   Company" and "AEIC" are not included in that first

20   paragraph of Exhibit 5, correct?

21       A.  The document so reflects that.

22       Q.  So AEIC is not a contractually-defined

1    party in the 2012 transfer and assumption agreement

2    that's marked as Exhibit 5, correct?

3        A.  AEIC is not identified as a party in the

4    document itself.

5        Q.  Okay.

6            PGIC does not have any document that

7    SPARTA consented in writing to the 2012 SPA on or

8    before October 1, 2012, correct?

9            MR. KAPLAN:  Objection to the form of the

10   question.

11       A.  I disagree.

12       Q.  Okay.  Please tell me the document.

13       A.  There are documents that -- where we

14   produced in answers to interrogatories I think that

15   reflect the consent by SPARTA.  If you give me one

16   moment I'll give you those documents.

17           MS. SCORDATO:  (Inaudible.)

18           MR. CLARK:  Mr. Kaplan, do you have a

19   folder of those documents that --

20           MR. KAPLAN:  We have a folder related to

21   your topic on consent.  Let me --

22           MS. SCORDATO:  (Inaudible.)

1          MR. KAPLAN:  I have mine, but you should

2     give --

3          MS. SCORDATO:  I wanted to make sure you

4     have yours.

5          MR. KAPLAN:  Yeah.

6          MR. CLARK:  Just for the record and to

7     keep our exhibits manageable, this folder contains

8     six things, four of which are responsive to

9     interrogatories and RFA's which are already in the

10    exhibit set.  There appear to be two additional

11    documents that I'm happy to mark if you would like

12    if that would help, Mr. Silver.

13                        (Whereupon a discussion was had

14                         sotto voce.)

15         MR. CLARK:  Do you want to go off the

16    record for a moment?

17         MR. KAPLAN:  Yeah.  Let's just go off the

18    record for just a second.

19         THE VIDEOGRAPHER:  Going off the record at

20    4:55.

21                        (A break was had.)

22         THE VIDEOGRAPHER:  Back on the record at

1    interrogatories and requests for admissions, are

2    you aware of any other document where PGIC claims

3    SPARTA consented in writing to the 2012 transfer

4    and assumption agreement before October 1, 2012?

5         A.   No.

6         Q.   Thank you.

7              Is PGIC contending that SPARTA verbally or

8    orally consented to the 2012 SPA at any time?

9              MR. KAPLAN:   I'm going to object to the

10   form on that.  Are you -- Chris, are you excluding

11   the discovery responses there?

12             MR. CLARK:   Yeah.  Let me withdraw and ask

13   it the same way.

14             Other than as set forth in PGIC's

15   responses to SPARTA's interrogatories and requests

16   for admission, does PGIC claim that SPARTA

17   consented orally to the 2012 transfer and

18   assumption agreement at any point in time?

19             MR. KAPLAN:   I'm going to object to the

20   form, but if you can answer, Jeff, go ahead.

21        A.   Just so I understand, you're now asking

22   before 2012 and after 2012?

1     Q.  Orally, in a conversation.

2     A.  I'm not aware of such.

3     Q.  Okay.

4     Then other than as set forth in PGIC's

5 responses to SPARTA's interrogatories and requests

6 for admission, is PGIC aware of any oral

7 conversation in which SPARTA allegedly consented to

8 the 2012 SPA at any point in time?

9     A.  I'm not aware of such.

10    Q.  Okay.  Thank you.

11    In 2013 did anyone at PGIC communicate

12 with anyone at SPARTA regarding the 2012 SPA or

13 2012 transfer and assumption agreement?

14    A.  Not that I can recall at this time.

15    Q.  In the time period 2014 through 2020, did

16 anyone at PGIC communicate with anyone at SPARTA

17 regarding the 2012 SPA or 2012 transfer and

18 assumption agreement?

19    A.  Other than what's in our answers to

20 interrogatories and RFA's, I'm not aware of such.

21    Q.  Let's go back to Exhibit 6, the 2012 SPA.

22 The 2012 SPA is a stock purchase agreement,

1    correct?

2        A.  Yes.

3        Q.  NAC purchased the shares of PGIC's stock

4    in this transaction, correct?

5        A.  Yes.

6        Q.  Let's turn to article 4 of the 2012 SPA.

7    It's on the page that ends in PGIC-16041.

8    Article 4 talks about the representations and

9    warranties of the seller; do you see that, sir?

10       A.  Yes.

11       Q.  And in this transaction the seller is

12   OneBeacon Insurance Group, correct?

13       A.  Yes.

14       Q.  Was NAC represented by legal counsel in

15   connection with the negotiation and execution of

16   the 2012 SPA?

17       A.  No.

18           MR. KAPLAN:  Sorry, Chris, I know the

19   answer to the question, but did you mean outside

20   legal counsel?

21           MR. CLARK:  That's a good question.

22   BY MR. CLARK:

1      Q.  Did NAC have any legal counsel, in-house

2  or outside counsel, in connection with negotiation

3  and execution of the 2012 SPA?

4      A.  Yes.

5      Q.  Okay.  Who was that legal counsel?

6      A.  Myself.

7      Q.  Did you have any other lawyers helping you

8  in connection with the 2012 transaction?

9      A.  I don't recall any.

10     Q.  Do you have any paralegals or support

11 people who assisted you in connection with the

12 2012 transaction?

13     A.  I have -- I can't call her a secretary

14 anymore.  I had an administrative assistant who was

15 of assistance to me.

16     Q.  Other than your administrative assistant,

17 did you have any other assistants in connection

18 with your work on the 2012 stock purchase

19 agreement?

20     A.  Not from a legal perspective, no.

21     Q.  Did you have any assistants from a

22 nonlegal perspective?

1      A.  Well, I had some of the financial

2   statements reviewed by some of our folks as well as

3   some of our actuaries.

4      Q.  And when you say "our folks" and "our

5   actuaries," do you mean NAC?

6      A.  Yes.

7      Q.  Who from NAC participated in the due

8   diligence process?

9      A.  It would have been Robert Stafford and

10  Ellen Gardner.

11     Q.  Anyone else?

12     A.  They may have had some people in their

13  departments, but those are the people that were

14  primarily involved.

15     Q.  Did Steven Menzies in any way participate

16  in connection with the 2012 stock purchase

17  agreement?

18     A.  Other than being aware of it and signing

19  the document, no.

20     Q.  Okay.  Has there ever been any alternative

21  dispute resolution proceeding that has been related

22  to the 2012 stock purchase agreement?

1   form.

2       A.  I'm not sure I'm willing to concede that.

3       Q.  Okay.

4           Does -- do you have -- strike that.

5           What is the maximum amount that NAC

6   potentially could recover against OBIG arising out

7   of the 2012 SPA?

8           MR. KAPLAN:  Objection to form.

9       A.  I'm not sure there is a maximum amount.

10      Q.  Why?

11      A.  I think it depends on the nature of the

12  indemnification and the basis for the

13  indemnification claim.

14      Q.  If you turn to page 37 of the contract,

15  page ending in 71, there's a notice provision 11.2;

16  do you see that?

17      A.  Yes.

18      Q.  And notice was to be provided to the buyer

19  to the attention of Steven Menzies, correct?

20      A.  Yes.

21      Q.  With a copy to you as executive vice

22  president and general counsel, correct?

1      A.  Yes.

2      Q.  Was North American Casualty told in

3  connection with the 2012 agreement of the existence

4  of the 2005 transfer and assumption agreement we

5  discussed earlier today?

6      A.  I don't recall being told about that

7  document.

8      Q.  You testified earlier today that the first

9  time you became aware of Exhibit 1, the 2005

10  transfer and assumption agreement, was at some

11  point in 2021, right?

12      A.  Yes.

13      Q.  Let's turn to Exhibit 7, and this is the

14  disclosure schedules to the 2012 SPA that we

15  discussed earlier today, right?

16      A.  Yes.

17      Q.  Let's turn to Exhibit 7 to the page ending

18  PGIC-16108, and this is --

19      A.  I'm sorry.  What page?

20      Q.  I'm sorry.  It's PGIC-16108.

21      A.  Okay.

22      Q.  And this is schedule 4.1.13 titled

1    "Contract"; do you see that?

2        A.  Yes.

3        Q.  If you turn the page, you'll see there's a

4    number of paragraphs here, right?  The third one is

5    titled "Instrument of transfer and assumption

6    agreement by and between American Employers

7    Insurance Company and Pennsylvania General

8    Insurance Company dated June 15th, 2005.  (Note

9    that American Employers Insurance Company is no

10   longer an affiliate of the company)."  Did I read

11   that correct?

12       A.  Yes.

13       Q.  And the June 15, 2005 transfer and

14   assumption agreement is Exhibit 1, which we were

15   talking about earlier today, correct?

16       A.  Yes.

17       Q.  So in connection with the 2012 agreement,

18   NAC was indeed told of the existence of the 2005

19   transfer and assumption agreement, wasn't it,

20   sir?

21       A.  Yes.  We did not have a copy of it, but we

22   were told about it, yes.



Redacted



Redacted



Redacted



Redacted





Redacted



Redacted

1      Q.   In the subject it says "Consents of

2   directors, PGIC and OBIG, LLC"; do you see that?

3      A.   Yes.

4      Q.   And Ms. McCarthy refers in the first

5   paragraph to the anticipated sale of PGIC, correct?

6      A.   Yes.

7      Q.   And this document is roughly six months

8   before the October 1, 2012 transfer and assumption

9   agreement that is Exhibit 5, correct?

10      A.   Approximately.

11      Q.   You'll see in the second paragraph of

12   Ms. McCarthy's e-mail there's a severance to

13   Essentia Insurance Company; do you see that?

14      A.   Yes.

15      Q.   And Essentia Insurance Company is simply a

16   new name for ACIC, correct?  A different name for

17   ACIC.

18      A.   That's my understanding.

19      Q.   If you turn back a page here, turn back

20   two pages, there's an e-mail from Anne Marie

21   Andrews on Monday, April 9th; do you see that?

22      A.   Yes.



Redacted



Redacted



Redacted



Redacted



Redacted



Redacted



Redacted



Redacted

1                    C E R T I F I C A T E

2            I, TINA M. ALFARO, Registered Professional

3    Reporter, Certified Realtime Reporter, and

4    Registered Merit Reporter, the officer before whom

5    the foregoing deposition was taken, do hereby

6    certify that the foregoing transcript is a true and

7    correct record of the testimony given; that said

8    testimony was taken by me stenographically and

9    thereafter reduced to typewriting under my

10   direction; that reading and signing was requested;

11   and that I am neither counsel for, related to, nor

12   employed by any of the parties to this case and

13   have no interest, financial or otherwise, in its

14   outcome.

15            IN WITNESS WHEREOF, I have hereunto set my

16   hand on this 1st day of November,

17   2023.

18

19

20

21   _____

22   Tina M. Alfaro, RPR, CRR, RMR

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

------------------------------------ )

SPARTA INSURANCE COMPANY (as      )

successor in interest to Sparta )

Insurance Holdings, Inc.,           )

          Plaintiff,       )Case No.

     vs.                 )21-11205-FDS

PENNSYLVANIA GENERAL INSURANCE    )

COMPANY (now know as Pennsylvania   )

Insurance Company),          )

          Defendant.       )

------------------------------------ )


DEPOSITION OF JEFFREY SILVER

VOLUME II

WASHINGTON, D.C.

OCTOBER 26, 2023


REPORTED BY:  Tina Alfaro, RPR, CRR, RMR

1    label INTACT-SPARTA-PIC-54.  Exhibit 68 is a

2    declaration of Brian C. Bendig dated April 3, 2023

3    with the caption for this litigation.

4         Do Exhibits 5, 6, 58, 59, 60, 61, 62, 63,

5    64, 65, 66, 67, and 68 represent all of the

6    documents that reflect the termination or

7    modification of the 2005 transfer and assumption

8    agreement or the 2007 stock purchase agreement that

9    PGIC is currently aware of?

10        A.  As I sit here, yes.

11        Q.  Let's turn to Exhibit 58.

12        A.  I have Exhibit 58.

13        Q.  Okay.  Please tell me anyone on Exhibit 58

14    that represents SPARTA.

15        A.  On the introduction I'm not sure who

16    William J. Roche is.  So I can't speak to him one

17    way or the other.  Ms. Andrews appears to be

18    OneBeacon Insurance Group and Todd Mills appears

19    to, as I recall, also OneBeacon Insurance Group.

20    I'm not sure who David Dembo is.

21        Q.  Can you identify for me anyone in

22    Exhibit 58 that you say is acting on behalf of

1    SPARTA sitting here today?

2        A.  Again, with respect to those individuals I

3    just mentioned, I don't know who they are or who

4    they were acting for or on behalf of.

5        Q.  So you have no reason to dispute, sitting

6    here today, that Exhibit 58 does not include anyone

7    acting on behalf of SPARTA?

8        A.  I'm trying to answer your question.  I

9    just don't know the names and who they represent of

10   certain individuals on that document, whether or

11   not they're acting on behalf of SPARTA or not.  I

12   can just identify who Ms. Andrews is and Mr. Mills

13   is.

14       Q.  The word "SPARTA" does not appear anywhere

15   in Exhibit 58, correct?

16       A.  I don't see the word "SPARTA."  I see a

17   reference to SUA in the fourth full paragraph.  I'm

18   not sure what that reference is, but to answer your

19   question directly, the word "SPARTA" is not on the

20   document.

21       Q.  Okay.  Let's turn to Exhibit 60.

22           MR. KAPLAN:  Did you mean to skip 59,

1   Chris? Okay.

2      A. I have Exhibit 60 in front of me.

3      Q. Exhibit 60 is a -- is a printout from the

4   Internet from news.ambest.com, correct?

5      A. It's a -- I agree, it's a printout from

6   AM Best. I'm not sure of the exact source of it,

7   but it's an AM Best document.

8      Q. If you look in the top right-hand corner

9   there's an Internet address that refers to

10   ambest.com; do you see that, sir?

11      A. Yes.

12      Q. And this is a October 17th, 2012 news

13   article from AM Best, correct?

14      A. Yes.

15      Q. Okay. SPARTA did not sign Exhibit 60, did

16   it?

17      A. I do not see a signatory from SPARTA on

18   Exhibit 60.

19      Q. The word "SPARTA" indeed did not appear

20   anywhere on Exhibit 60, does it?

21      A. I do not see the word "SPARTA" on

22   Exhibit 60.

1      Q.  Let's turn to Exhibit 61.  Exhibit 61 is

2   an excerpt from the 2012 annual statement of

3   Pennsylvania Insurance Company, correct?

4      A.  Yes.

5      Q.  SPARTA did not sign Exhibit 61, correct?

6      A.  I do not see a signatory on Exhibit 61

7   from SPARTA.

8      Q.  And the word "SPARTA" appears nowhere in

9   Exhibit 61, correct?

10     A.  I do not see the word "SPARTA" on

11  Exhibit 61.

12     Q.  Let's turn to Exhibit 62.  SPARTA did not

13  sign Exhibit 62, correct?

14     A.  I do not see a signature line for SPARTA

15  on Exhibit 62.

16     Q.  And the word "SPARTA" does not appear

17  anywhere on Exhibit 62, correct?

18                      (Witness reviewing document.)

19     A.  I do not see the word "SPARTA" on

20  Exhibit 62.

21     Q.  Let's turn to Exhibit 63.  SPARTA did not

22  sign Exhibit 63, correct?

1                    (Witness reviewing document.)

2        A.  I do not see a signatory line for SPARTA

3    on Exhibit 63.

4        Q.  The word "SPARTA" does not appear anywhere

5    on Exhibit 63, correct?

6        A.  I do not see the word "SPARTA" on

7    Exhibit 63.

8        Q.  Let's turn to Exhibit 64.  SPARTA did not

9    sign Exhibit 64, correct?

10                   (Witness reviewing document.)

11       A.  I do not see a signatory line for SPARTA

12   on Exhibit 64.

13       Q.  The word "SPARTA" does not appear anywhere

14   on Exhibit 64, correct?

15       A.  I do not see the word "SPARTA" on

16   Exhibit 64.

17       Q.  Let's turn to Exhibit 65.  SPARTA did not

18   sign Exhibit 65, correct?

19       A.  Correct.

20       Q.  The word "SPARTA" does not appear anywhere

21   on Exhibit 65, correct?

22                   (Witness reviewing document.)

1     A.  I do not see the word "SPARTA" on

2  Exhibit 65.

3     Q.  Let's turn to Exhibit 66.  SPARTA did not

4  sign Exhibit 66, correct?

5     A.  I do not see a signatory line for SPARTA

6  on Exhibit 66.

7     Q.  The word "SPARTA" does not appear anywhere

8  on Exhibit 66, correct?

9                    (Witness reviewing document.)

10     A.  I do not see the word "SPARTA" on

11  Exhibit 66.

12     Q.  Let's turn to Exhibit 67.  SPARTA did not

13  sign Exhibit 67, correct?

14     A.  I do not see a signatory line for SPARTA

15  on Exhibit 67.

16     Q.  The word "SPARTA" does not appear anywhere

17  on Exhibit 67, correct?

18                    (Witness reviewing document.)

19     A.  I do not see the word "SPARTA" on

20  Exhibit 67.

21     Q.  Let's turn to Exhibit 68.  SPARTA did not

22  sign Exhibit 68, correct?

1      A.  Yes.  It's the declaration of

2   Mr. Bendig.

3      Q.  So to be clear, SPARTA did not sign

4   Exhibit 68, correct?

5      A.  That's correct.

6      Q.  Other than in the caption at the top of

7   page 68 [sic], the word "SPARTA" does not otherwise

8   appear on Exhibit 68, correct?

9                      (Witness reviewing document.)

10      A.  The reference to AEIC claims, but I don't

11   see -- do not see the word "SPARTA" on Exhibit 68

12   other than in the caption.

13      Q.  And Exhibit 68 was a document that was

14   created in connection with this lawsuit in 2023,

15   correct?

16      A.  Exhibit 68 is dated April 3rd of 2023.

17      Q.  And it was created in connection with this

18   lawsuit and has the caption of this lawsuit on the

19   top of the first page, right?

20      A.  I agree.  The caption of this lawsuit is

21   on the first page of Exhibit 68.

22      Q.  Let's turn to Exhibit 59.  Exhibit 59 is a

1    number of e-mails.  I'd like you to review them.

2    My first question to you is going to be is the

3    earliest e-mail reflected in Exhibit 59 dated

4    October 19th, 2012?  Please take a moment to review

5    the document.

6                        (Witness reviewing document.)

7         A.  It appears that the earliest e-mail is

8    dated October 19th, 2012.  I'm not sure what date

9    the OneBeacon Insurance Company AM Best document --

10   it has a rating effective date of October 19, 2012.

11   So the answer would be October 19, 2012.

12        Q.  Okay.  So the -- just so that the record

13   is clear, the date of the earliest document

14   contained in Exhibit 59 is October 19th, 2012,

15   correct?

16        A.  Yes.

17        Q.  Okay.  And October 19th, 2012 is after the

18   date of both the 2012 stock purchase agreement that

19   we marked as Exhibit 6 and the October 2012

20   transfer and assumption agreement that we marked as

21   Exhibit 5, correct?

22        A.  As I recall, it would be seven days after

1    closing.  October 12th I believe was the date of

2    closing.

3         Q.  So just to be clear, the date of the

4    earliest document in this Exhibit 59 comes after

5    both the October 2012 transfer and assumption

6    agreement and the October 25 -- 2012 stock purchase

7    agreement, correct?

8         A.  I'm only hesitating because I'm not sure

9    what date the regulatory approvals were to, but I

10   agree that the earliest reference in Exhibit 59 is

11   October 19, 2019.

12        Q.  Okay.

13             MR. KAPLAN:  You just said 2019.

14        A.  I'm sorry.  2012.

15        Q.  Let's refresh your recollection.  Let's

16   take a look at Exhibit 5 together, which is the

17   date of the 2012 transfer and assumption agreement.

18        A.  I'm sorry.  Exhibit 5 or 6?

19        Q.  We're going to look at both.  Let's

20   start --

21        A.  Which would you prefer?

22        Q.  Let's start with 5.  So Exhibit 5 is the

1    transfer and assumption agreement.  You'll see at

2    the top of the first page it's dated October 1st,

3    2012; do you see that, sir?

4         A.  I see that date.

5         Q.  Okay.  Let's take a look at Exhibit 6 now,

6    and the date of Exhibit 6, it says the closing date

7    October 1, 2012; do you see that, sir?

8         A.  Yes.

9         Q.  Okay.  So do you agree that the earliest

10   date of any document in Exhibit 59 comes after both

11   the 2012 transfer and assumption agreement in

12   Exhibit 5 and the 2012 stock purchase agreement in

13   Exhibit 6?

14        A.  Yes.

15        Q.  Okay.  Let's take a look at Exhibit 59 for

16   a moment.  Exhibit 59 --

17        A.  Hang on just one second, please.

18        Q.  Oh, of course.

19        A.  Okay.

20        Q.  Exhibit 59 does not contain any document

21   that is signed both by SPARTA and PGIC, correct?

22                      (Witness reviewing document.)

1          MR. KAPLAN:  Chris, can I clarify.  I just

2     want to make sure.  "Contain" does not mean refer

3     to in your explanation -- in your understanding,

4     correct?

5          MR. CLARK:  Yes.  I mean in the physical

6     pieces of paper that Mr. Silver has in his hand

7     marked as Exhibit 59.

8          A.  I do not see any document from PGIC in

9     Exhibit 59.

10          Q.  So Exhibit 59 does not contain any

11     document that is signed by both SPARTA and PGIC,

12     correct?

13          A.  There are documents from SPARTA, but I do

14     not see any document from PGIC in 59.

15          Q.  So Exhibit 59 does not contain any

16     document that is signed by both SPARTA and PGIC,

17     correct?

18          A.  I don't see a piece of paper in Exhibit 59

19     that has signatories for both PGIC and SPARTA.

20          Q.  Okay.  Let's take a look at the page

21     ending SPARTA-67473.

22          A.  Okay.

1        Q.  And do you see here there's an e-mail from

2   Beth Terrell at SPARTA Insurance to Virginia

3   McCarthy dated October 19, 2012?

4        A.  Yes, I see that.

5        Q.  Okay.  And that e-mail is sent after both

6   the transfer and assumption agreement in 2012 and

7   the stock purchase agreement in 2012, correct?

8        A.  Yes.

9        Q.  Okay.  Does PGIC claim that this

10  communication reflects a modification to the 2005

11  or 2007 agreements?

12        MR. KAPLAN:  We're using "modification" in

13  the broad sense that we agreed to earlier?

14        MR. CLARK:  Yes.

15        MR. KAPLAN:  Objection to the form.

16        A.  Our position is that this document,

17  SPARTA-00067473, is one document that supports our

18  position.  There are other documents previously

19  referenced as well as our answers to

20  interrogatories.  So this is just one part of the

21  documents that we rely on.

22        Q.  Okay.  Thank you.  That's not quite my

1    modification of the 2005 and 2007 agreements?

2            MR. KAPLAN:  Objection to the form and, I

3    know we're going to disagree on this, but I believe

4    asked and answered.

5            MR. CLARK:  It has been asked.  It

6    certainly has not been answered.  Sir, please

7    answer.

8            MR. KAPLAN:  I disagree.

9        A.  My answer would be the same and I'm trying

10   to answer your focused question that as PGIC's

11   30(b)(6) representative this letter cannot be

12   looked at in isolation but must be looked at in

13   connection with other documents, other positions,

14   and things that have occurred since the date of the

15   transaction represented by Exhibits 5 and 6.

16       Q.  Let's read the e-mail together, sir.

17   Could you please read the e-mail into the record.

18       A.  Do you want me to read the whole e-mail?

19   I'm happy to do so if that's what you want me to

20   do.

21       Q.  That's what I'd like you to do.

22       A.  Sure.

1        "Hi Jenny.  I hope all is well with you.

2    I haven't been to another AICP meeting, but would

3    like to go and hopefully we can catch up at one of

4    the next ones."

5        "I read that OneBeacon is selling off some

6    business.  Can you please advise if this includes

7    the old business that was in American Employers'

8    Insurance Company (which is now known as SPARTA

9    Insurance Company)?  We have ongoing cash transfers

10   related to AEIC due to guarantee fund refunds/

11   assessments on the old years and forward claims

12   information and litigation as a result of the old

13   business to OneBeacon."

14       "Any information you can provide would be

15   helpful.  Thanks, Beth."

16       Q.  Please tell me what provision of the 2005

17   transfer and assumption agreement you believe the

18   e-mail you just read modifies?

19       MR. KAPLAN:  Objection -- Objection to the

20   form, misstates the testimony.

21       MR. CLARK:  You can answer it.

22       A.  As I indicated previously, this document

1  which I just read in its entirety, not in and of

2  itself but in connection with other documents

3  supports our position in this case.  Those

4  documents have been previously identified and our

5  position is further indicated in our answers to

6  interrogatories.

7      Q.  Sir, my question was what provision of the

8  2005 transfer and assumption agreement do you

9  believe this e-mail modifies?  Perhaps you could

10  point to in Exhibit 1 the provision.

11      MR. KAPLAN:  Objection to the form, asked

12  and answered.

13      A.  I will reiterate my answer previously

14  given that this document and e-mail which I just

15  read in addition to other documents that we have

16  provided and in addition to answers to

17  interrogatories provide our basis for our position

18  in this case.  And I would note for you that

19  apparently claims information and litigation as

20  referenced in this e-mail were being sent to

21  OneBeacon subsequent to the date of closing of the

22  stock purchase agreement and transfer and

1   assumption agreement in 2012 and continue to do so

2   up to and including 2021.

3       Q.  I move to strike as nonresponsive.

4           Mr. Silver, your counsel can ask you any

5   questions at the end of the deposition he wants,

6   but I'm going to ask you to please answer mine.  So

7   I'd like you to pull out Exhibit 1 in the exhibit

8   binder, which is the 2005 transfer and assumption

9   agreement.  Do you have Exhibit 1 in front of you?

10      A.  I do.

11      Q.  And you see that Exhibit 1 has these

12  paragraph numbers for each of the provisions in

13  Exhibit 1; do you see that, sir?

14      A.  I see the various paragraphs in Exhibit 1.

15      Q.  Okay.  Could you tell me the paragraph

16  number of Exhibit 1 that PGIC claims is modified by

17  the e-mail in Exhibit 59 you just read?

18          MR. KAPLAN:  Objection to the form, asked

19  and answered.

20      A.  The entirety of Exhibit 1, the transfer

21  and assumption agreement, dated June 15, 2005, was

22  modified using the phrase that we have agreed to

1    previously by documents including but not limited

2    to the paragraph or e-mail that I previously read,

3    other documents that we provided, and our answers

4    to interrogatories as a result of the 2012 stock

5    purchase agreement and the 2012 transfer and

6    assumption agreement and associated documents and

7    regulatory approvals.

8        Q.  Sir, I'd like you to answer my question

9    about just Exhibit 59 for a moment.  Are you

10   capable of doing that?

11       MR. KAPLAN:  He has answered it several

12   times.

13       MR. CLARK:  He has not answered it.

14       MR. KAPLAN:  He absolutely has.

15       MR. CLARK:  Okay.  So, sir, let's look at

16   Exhibit 59.  Could you please highlight for me in

17   the e-mail that we're discussing and only that

18   e-mail the words of that e-mail that you claim in

19   some way modify Exhibit 1.

20       MR. KAPLAN:  Objection to the form, asked

21   and answered, and to the extent that you're

22   suggesting he has said something previously, I

1    think that misstates the testimony.

2        A.   So what I will do is I will highlight the

3    entire e-mail and indicate to you that that e-mail

4    along with the 2012 stock purchase agreement, the

5    2012 transfer and assumption agreement, the

6    associated regulatory approvals, other documents

7    that we provided to you, and answers to

8    interrogatories reflect our position.  If you want

9    me to highlight the entire e-mail, I will be happy

10   to do so at this time.  Do you want me to do that?

11       MR. CLARK:  No.  I'd like to go off the

12   record for a moment.  Sam, is that okay with you?

13       MR. KAPLAN:  Sure.

14       THE VIDEOGRAPHER:  Going off the record at

15   11:05.

16                     (Whereupon a discussion was had

17                      off the record.)

18       THE VIDEOGRAPHER:  Back on the record at

19   11:28.

20       MR. CLARK:  Counsel for PGIC and SPARTA

21   had a discussion off the record in a good faith

22   attempt to narrow or resolve a dispute concerning

1    the questioning of PGIC's 30(b)(6) witness.  We're

2    going to try another approach to the question to

3    see if we can involve -- avoid having to call the

4    Court on this.

5    BY MR. CLARK:

6         Q.  Sir, do you have Exhibit 59 in front of

7    you?

8         A.  I do.

9         Q.  Okay.  Does Exhibit 59 represent SPARTA's

10   consent to the 2012 stock purchase agreement?

11             MR. KAPLAN:  Are you finished with your

12   question?  Object to the form, calls for a legal

13   conclusion.  And is "consent" used in the broad

14   sense that we're using "modification"?

15             MR. CLARK:  Sure.

16             MR. KAPLAN:  Still objection to the form,

17   but I'm -- that's a helpful clarification.

18        A.  Exhibit 59 would be one of the documents

19   that would support our position that SPARTA

20   consented to the 2012 stock purchase agreement and

21   transfer and assumption agreement.

22        Q.  Does PGIC have any knowledge of the





Redacted



Redacted





Redacted



Redacted



Redacted



Redacted



Redacted

Redacted



Redacted

1          MR. KAPLAN:  Well, we'll see about that

2     because none of this is relevant, but --

3          MR. CLARK:  We'll see.

4     BY MR. CLARK:

5          Q.  Who approves PGIC's annual statements?

6          A.  Annual statements are approved by the

7     accounting department and Mr. Menzies and myself

8     and Mr. Stafford as part of the accounting

9     department.

10         Q.  Approximately how many hours per year does

11    Steven Menzies spend working on PGIC matters?

12         MR. KAPLAN:  Objection to form and beyond

13    the scope.

14         A.  I do not know.

15         Q.  Across all of the work that you do,

16    Mr. Silver, in 2023 how many hours have you spent

17    speaking with or communicating by e-mail with

18    Mr. Menzies?

19         MR. KAPLAN:  Objection to the form and

20    beyond the scope, but you can address in your

21    individual capacity.

22         A.  I don't know that I can quantify that in

1    terms of time.

2         Q.  More than 50 hours?

3         A.  I can't quantify it.  Sometimes I talk to

4    him often.  Sometimes I don't talk to him for some

5    time.

6         Q.  How many employees does Mr. Menzies

7    supervise?

8         A.  He is --

9              MR. KAPLAN:  I'm sorry.  Objection to the

10   form, scope.  Go ahead and answer in your

11   individual capacity.

12             THE WITNESS:  He's the ultimate

13   controlling person of North American Casualty.

14   So -- and each of the insurance companies.

15        Q.  Do you know how many direct reports

16   Mr. Menzies has at North American Casualty?

17             MR. KAPLAN:  Objection to the form and

18   scope.

19        A.  I do not know the answer to that question.

20        Q.  Who would know?

21        A.  Mr. Stafford probably would know.

22        Q.  Does Mr. Menzies have any involvement in

1   the day-to-day operation of PGIC?

2     A.  You have to explain when you say

3   "day-to-day operations."

4     Q.  What do you understand that phrase to mean

5   as someone who works in the industry?

6     A.  It could mean various things.  It could

7   mean daily involvement, weekly involvement, monthly

8   involvement.  It could mean a whole host of the

9   things.

10     Q.  Let's use all of those.  So does

11   Mr. Menzies have any daily involvement in the

12   operation of PGIC?

13     MR. KAPLAN:  Objection to the form.

14     A.  It depends on the issue involved, the

15   nature of the issue involved as to whether or not

16   he spends a certain amount of time or not.  It's

17   probably issue driven.

18     Q.  What are the types of issues that

19   Mr. Menzies has been involved with with respect to

20   the business of PGIC in 2023?

21     MR. KAPLAN:  Objection to the form and

22   scope.  You can answer in your individual

1  　　　　　　C E R T I F I C A T E

2  　　　　I, TINA M. ALFARO, Registered Professional

3  Reporter, Certified Realtime Reporter, and

4  Registered Merit Reporter, the officer before whom

5  the foregoing deposition was taken, do hereby

6  certify that the foregoing transcript is a true and

7  correct record of the testimony given; that said

8  testimony was taken by me stenographically and

9  thereafter reduced to typewriting under my

10  direction; that reading and signing was requested;

11  and that I am neither counsel for, related to, nor

12  employed by any of the parties to this case and

13  have no interest, financial or otherwise, in its

14  outcome.

15  　　　　IN WITNESS WHEREOF, I have hereunto set my

16  hand on this 2nd day of November,

17  2023.

18

19

20

21  _____

22  Tina M. Alfaro, RPR, CRR, RMR

<u>ERRATA SHEET</u>

NAME OF CASE: SPARTA Insurance Company v. Pennsylvania General Insurance Company

DATE OF DEPOSITION: 10-25-23 and 10-26-23

NAME OF WITNESS: JEFFREY SILVER

| Page/Line | Corrected Testimony | Reason for Correction |
|---|---|---|
| Transcript Vol. 1 (10/25/2023) | | |
| 69:14 | "PGIC's employer ID number of 23-147144 [sic]…" should read: "PGIC's employer ID number of 23-1471444…" | Transcription Error (replace "23-147144 [sic]" with "23-1471444") |
| 134:8-11 | "…limited number of individuals. He says 'In this assumption, assumption certificates were only sent to a subset of the then in force policyholders. Policyholders who received assumption certificates…" should read: "…limited number of individuals. He says 'In this assumption, Assumption Certificates were only sent to a subset of the then in-force policyholders. Policyholders who received Assumption Certificates…" | Transcription Error ("assumption certificate" should be capitalized and "in force" should be hyphenated) |
| 149:13 | "The 2000 [sic] stock purchase agreement…" should read: "The 2012 stock purchase agreement…" | Transcription Error (replace "2000 [sic]" with "2012") |
| 172:13 | "… involve no enforced policies." should read "… involve no inforce policies." | Transcription Error (replace "enforced" with "inforce") |
| 176:18-20 | "… transfers all assets and liabilities excluding retained assets of American Employers General Insurance Company." should read "… of American Employers' to Pennsylvania General Insurance Company." | Omits apostrophe and words in exhibit (add apostrophe and the words "to Pennsylvania") |

| 200:21 | "… of enforced premium …" should read "… of in-force premium …" | Transcription Error (replace "enforced premium" with "in-force premium") |
|---|---|---|
| 221:7 | "…but the 25 [sic] agreement…" should read: "…but the 2005 agreement…" | Transcription Error (replace "25 [sic]" with "2005") |
| 229:3 | "I don't like being proven wrong." should read "I don't mind being proven wrong." | Transcription error: (replace "like" with "mind") |
| **Transcript Vol. 2 (10/26/2023)** | | |
| 326:7 | "…page 68 [sic]…" should read: "…page 1…" | Transcription Error (replace "68 [sic]" with "1") |
| 353:21 | "…counsel's construction [sic]." should read: "…counsel's instruction." | Transcription Error (replace "construction [sic]" with "instruction") |
| 379:3-4 | "…the third [sic] is AEIC…" should read: "…the second is AEIC…" | Transcription Error (replace "third [sic]" with "second") |
| 387:8 | "…related to the 26 [sic] transfer" should read: "…related to the 2006 transfer…" | Transcription Error (replace "26 [sic]" with "2006") |
| 405:9 | "For every year from 2021 [sic] to 2023…" should read: "For every year from 2011 to 2023…" | Transcription Error (replace "2021 [sic]" with "2011") |

I declare under penalty of perjury under the laws of the United States of American that the forgoing is true and correct.

2

Executed on December 1, 2023

_____

JEFFERY SILVER

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

------------------------------------ )

SPARTA INSURANCE COMPANY (as        )

successor in interest to Sparta     )

Insurance Holdings, Inc.),          )

            Plaintiff,          )Case No.

      vs.                          )21-11205-FDS

PENNSYLVANIA GENERAL INSURANCE      )

COMPANY (now know as Pennsylvania   )

Insurance Company),                 )

            Defendant.          )

------------------------------------ )


DEPOSITION OF JEFFREY SILVER

VOLUME III

WASHINGTON, D.C.

DECEMBER 5, 2023


REPORTED BY:  Tina Alfaro, RPR, CRR, RMR

1    loss reports, correct?

2        A.   That's what it says.

3        Q.   To record and maintain records of

4    claims-related information, correct?

5        A.   That's what it says.

6        Q.   Further down the page it discusses

7    providing data extracts and bordereau to enable

8    PGIC to prepare quarterly and annual statutory

9    statements; do you see that?

10       A.   That's what it says.

11       Q.   And it talks about providing reports

12   detailing paid and case activity for tracking the

13   collateral balance; do you see that?

14       A.   That's what it says.

15       Q.   Has PGIC been satisfied with AGRM's

16   services provided pursuant to this Exhibit 96?

17            MR. KAPLAN:  Objection to the form.

18       A.   I would say yes.

19       Q.   Has PGIC ever invoked a dispute resolution

20   provisions of PGIC's contract with AGRM reflected

21   in Exhibit 96?

22       A.   No.

1        Q.  Okay.  Why did PGIC select AGRM to provide

2    the services reflected in Exhibit 96?

3        A.  AGRM was the TPA that had been handling

4    Pennsylvania Insurance Company claims prior to

5    Bedivere's liquidation.  So we thought it would be

6    appropriate to continue that process.

7        Q.  Any other reasons why PGIC selected AGRM?

8        A.  No, not that I can recall.

9        Q.  You referred a moment ago to a TPA.  What

10   is a TPA?

11       A.  Third-party administrator.

12       Q.  And is AGRM a TPA?

13       A.  I would consider them a TPA.

14       Q.  And why would PGIC hire a TPA?

15       A.  To adjust claims.

16           THE REPORTER:  Address claims?

17           THE WITNESS:  Adjust claims.  Sorry.

18           THE REPORTER:  That's okay.

19       Q.  You can put this aside for the moment.

20   We'll come back to this a couple of times.

21           MR. CLARK:  97?

22           THE REPORTER:  Yes.

1                    (PGIC Exhibit 97 was marked

2                         for identification.)

3    BY MR. CLARK:

4        Q.   I've marked as Exhibit 97 a document

5    bearing the Bates label BEDIVERE-109.  It is a

6    services agreement dated as of December 23rd, 2014

7    by and between OneBeacon Insurance Company and

8    others and Armour Risk Services [sic] Management.

9             Sir, have you seen this document before

10   today?

11       A.   No.

12       Q.   You understand that AGRM has adjusted

13   claims made in respect of the historical AEIC

14   policies for a number of years, correct?

15       A.   I don't know that I have that

16   understanding.  I mean, I see the document, but

17   I've never seen it before.

18       Q.   Irrespective of the document, part of the

19   reason why PGIC decided to hire AGRM to adjust

20   claims is because AGRM had historic involvement

21   with claims that were administered on behalf of

22   certain OneBeacon companies, correct?

1            MR. KAPLAN:  Objection to the form.

2        A.   Primarily Pennsylvania Insurance Company.

3        Q.   If you turn to page 5 of the contract, do

4    you see there's a paragraph here on "Claims

5    Processing" at the top of the page?

6        A.   I do.

7        Q.   Okay.  And then if you turn to the -- all

8    the way to the end, there's a two-page schedule at

9    the end of this contract that identifies certain

10   claims services and accounting and financial and

11   other services; do you see that?

12       A.   I see that.

13       Q.   And the claims services listed here on

14   this Exhibit 97 are similar in many respects with

15   the claims services that were reflected on

16   Exhibit 96, which is the contract between PGIC and

17   AGRM, correct?

18            MR. KAPLAN:  Objection -- I'm sorry.

19   Objection to the form.

20       A.   Pretty standard language in a claims

21   services agreement.

22       Q.   You can put that aside, sir.

1                    (PGIC Exhibit 98 was marked

2                         for identification.)

3    BY MR. CLARK:

4        Q.   If you take a look at Exhibit 70, which we

5    previously marked, you may recall, sir, that at

6    your last deposition I asked you some questions

7    about this Exhibit No. 70, which was some

8    communications between Keith Kaplan, the Bedivere

9    liquidation officer, and Robert Stafford.  I'll

10   represent to you that you testified at page 366

11   that you learned about Exhibit 70 because

12   Mr. Stafford would have forwarded it to you.

13            I'm now marking as Exhibit 97 --

14            THE REPORTER:  98.

15            MR. CLARK:  98.  I'm now marking as

16   Exhibit 98 a document from Mr. Stafford to you, and

17   my question, for the record, is simply is this the

18   e-mail communication you had in mind when you

19   testified previously?

20       A.   I --

21            MR. KAPLAN:  Objection to the form.

22       A.   I believe so.

1   Armour today.  He said all the right things.  He

2   asked for a complete claim listing, a draft

3   contract for Armour to serve as TPA, and how

4   funding would work."  Did I read that correctly?

5        A.  You did.

6        Q.  The e-mail continues "While that sounds

7   positive, we will proceed with preparations to send

8   notices to Claimants and policyholders, including

9   CC to WC board for WC claims, as well as getting

10  SPARTA, former AEIC, and Markel, former ACIC, ready

11  to fund claims."  Did I read that correctly?

12       A.  You did.

13       Q.  Do you have a memory today of the call you

14  had with Armour referenced in Exhibit 106?

15       A.  I do not, although I appreciate Mr. Kaplan

16  indicating that I said all the right things.

17       Q.  Mr. Kaplan's e-mail said that you asked

18  for a complete claim listing; do you see that?

19       A.  I see that.

20       Q.  Did you ask AGRM for a complete claim

21  listing?

22       A.  I know that's what it says.  I don't have



Redacted



1          MR. CLARK:  It's right here.  Lot of

2     paper.

3     BY MR. CLARK:

4          Q.  Mr. Silver, in Exhibit 144 if you look at

5     the last page of the attached letter from

6     Mr. Weiner to you, Mr. Weiner writes "Please

7     contact me if you need additional information or

8     believe any of this is incorrect"; do you see that?

9          A.  Yes.

10         Q.  Did you respond to Mr. Weiner in September

11    of 2023 in response to Exhibit 144 and request any

12    additional information?

13         A.  As I sit here, I don't recall whether our

14    counsel responded to him.

15         Q.  Did you respond to Mr. Weiner?

16         MR. KAPLAN:  Objection to the form.

17         MR. CLARK:  Yeah.  Let me withdraw it.

18         Mr. Silver, did you personally respond to

19    Mr. Weiner in response to Exhibit 144?

20         A.  I don't recall doing that.

21         MR. CLARK:  Sam, for efficiency purposes,

22    I do have the subsequent responses between counsel

1   for the parties.  Safe to say that you would

2   instruct the witness, if I were to ask him any

3   questions about the content of your letters, that

4   that would be privileged and you would instruct him

5   not to provide additional gloss beyond the words in

6   your letters?

7          MR. KAPLAN:  Well, for efficiency, I --

8   can you show me which letters you're talking about?

9          I can't say, Chris, that I -- that I would

10  instruct him not to answer categorically because

11  this is, you know, our response under the contract.

12  So it depends.  Or at least one of them is our

13  response under the contract.

14  BY MR. CLARK:

15     Q.  Mr. Silver, I'm going to ask you some

16  questions about a letter in a moment.  At no point

17  do I want the substance of communications between

18  you and your counsel.

19                      (PGIC Exhibit 146 was marked

20                       for identification.)

21  BY MR. CLARK:

22     Q.  I'm marking as Exhibit 146 a letter dated

1    November 10, 2023 from your counsel, Samuel Kaplan,

2    to me.  Have you seen Exhibit 146 before today?

3         A.  Yes.

4         Q.  Did you see Exhibit 146 before it was

5    finalized and transmitted on or about

6    November 10th?

7         A.  Yes.

8         Q.  At the bottom of page 1 -- at the bottom

9    of page 1 of Exhibit 146, PGIC writes that

10   "Section 8.3 expressly requires SPARTA to apprise

11   PIC of the amount of any claim for which it seeks

12   reimbursement and provides that the notice shall

13   include in reasonable detail information explaining

14   calculations of the amount of such claim"; do you

15   see that?

16        A.  I do.

17        Q.  Okay.  Please tell me what you mean by

18   "reasonable detail."

19        A.  That would require me to relay

20   attorney-client privileged information.

21             MR. CLARK:  I'm assuming, then,

22   Mr. Kaplan, you're going to tell Mr. Silver not to

1    answer that question?

2            MR. KAPLAN:  Given what he just said,

3    yeah.

4                    (PGIC Exhibit 147 was marked

5                        for identification.)

6    BY MR. CLARK:

7        Q.  I'm marking as Exhibit 147 a December 3rd

8    letter from your counsel, Samuel Kaplan, to me.

9    Have you seen Exhibit 147 before?

10       A.  Yes.

11       Q.  And did you see Exhibit 147 before it was

12   transmitted on or about December 3rd, 2023?

13       A.  Yes.

14       Q.  Are you aware that the 2007 SPA requires

15   PGIC to participate in good faith negotiations

16   within a certain number of days after delivering a

17   dispute notice?

18           MR. KAPLAN:  Objection to the form.

19       A.  I guess my answer would be the

20   December 3rd, 2023 correspondence speaks for

21   itself.  Any further discussion would involve

22   conversations I had with counsel.

1    Q.  On page 1 of 147, the last paragraph, four

2  lines from the bottom, the PGIC letter states in

3  part "SPARTA failed to send the letter and

4  spreadsheet to outside counsel or even put the

5  letter on letterhead"; do you see that?

6    A.  I see that.

7    Q.  Is there a provision of the 2007 SPA that

8  requires notices to be printed on letterhead?

9    MR. KAPLAN:  Objection to the form.

10    A.  To answer that question I would have to

11  invoke attorney-client conversations.

12    Q.  Is it PGIC's position in this case that

13  there's a letterhead defense to contract

14  enforceability?

15    A.  I think this letter speaks for itself in

16  terms of what PGIC's position is along with all my

17  prior testimony from the prior two days and the

18  hours leading up to where we are right now.

19    Q.  If I were to ask you any other questions

20  about this Exhibit 147, would your testimony be the

21  same?

22    A.  Yes.

1   some of those letters.  Sorry.

2           MR. KAPLAN:  I'll just state for the

3   record I do not believe we have yet responded to

4   that letter.

5           MR. CLARK:  That's even easier.

6           MR. KAPLAN:  Yeah.

7                   (PGIC Exhibit 150 was marked

8                    for identification.)

9   BY MR. CLARK:

10      Q.  Mr. Silver, I'm marking as Exhibit 150 a

11  letter dated October 20, 2023 from your counsel

12  Mr. Kaplan to me.  Have you seen Exhibit 140

13  before?

14      A.  150.

15      Q.  Have you seen Exhibit 150 before?

16      A.  Yes.

17      Q.  Exhibit 150 refers to SPARTA's request

18  that PGIC state definitively whether it's asserting

19  any affirmative defenses or challenges to the

20  payment of individual claims in respect of

21  historical American Employers' Insurance Company

22  policies; do you see that?

1       A.   Yes, I see that in the document.

2       Q.   Okay.  And this letter was sent in

3  response and sets forth in its contents PGIC's

4  position with respect to raising or perhaps more

5  accurately not raising certain claim-by-claim

6  defenses; do you see that?

7       A.   I see that reference in the document.

8       Q.   Does Exhibit 150 remain PGIC's position in

9  this litigation as of today?

10          MR. KAPLAN:  Objection to the form.

11          MR. CLARK:  Let me withdraw that because I

12  want a clean question that's not objected to.

13          Does the position set forth in Exhibit 150

14  constitute PGIC's position with respect to

15  claim-by-claim defenses?

16       A.   I guess I would answer that the letter

17  speaks for itself.  Additional inquiry would

18  require me to divulge attorney-client privilege.

19       Q.   And I don't want the substance of

20  attorney-client privileges, but you, Mr. Silver, as

21  PGIC's corporate representative agree to be bound

22  by the contents of the letter that is Exhibit 150,

1    correct?

2          MR. KAPLAN:  As to claim-specific

3    defenses.

4          MR. CLARK:  I'll withdraw it and ask it

5    again because I want it to be clean.

6          As PGIC's corporate representative, you

7    agree on behalf of PGIC to be bound by the contents

8    of Exhibit 150 as to claim-by-claim defenses?

9    A.  Yes.

10          MR. CLARK:  Let's take a break.

11          THE VIDEOGRAPHER:  Off the record at 5:03.

12                (A break was had.)

13          THE VIDEOGRAPHER:  Back on the record at

14    5:14.

15                (PGIC Exhibit 151 was marked

16                   for identification.)

17    BY MR. CLARK:

18    Q.  Off the record there was a discussion

19    between and among counsel about the Defendant's

20    answer and affirmative defenses to SPARTA's second

21    amended complaint.  You recall we marked that

22    previously as Exhibit No. 12.  I understand that

1    there's a factual basis for certain affirmative

2    defenses that PGIC's representative would like to

3    enter into the record.  So we've marked as

4    Exhibit 151 an annotated excerpt of PGIC's

5    affirmative defenses.  It's page 19 of Docket

6    No. 91 filed in this litigation.

7            Mr. Silver, will you please tell me the

8    factual basis for PGIC's affirmative defenses 16 to

9    19 --

10    A.  Yes.

11    Q.  -- incorporating, of course, your prior

12   testimony during the deposition, the discovery

13   responses that PGIC has served and the written

14   correspondence between counsel.

15            MR. KAPLAN:  Yes.  And I would add to that

16   at least for some of the affirmative defenses our

17   motion to -- our motion to dismiss.

18    A.  Okay.  With that preface, with respect to

19   affirmative defenses 16 through 19, it would

20   include the absence of any contact from SPARTA for

21   years -- most years -- or many years from the date

22   of PGIC's acquisition in October of 2012 through

1                  C E R T I F I C A T E

2          I, TINA M. ALFARO, Registered Professional

3   Reporter, Certified Realtime Reporter, and

4   Registered Merit Reporter, the officer before whom

5   the foregoing deposition was taken, do hereby

6   certify that the foregoing transcript is a true and

7   correct record of the testimony given; that said

8   testimony was taken by me stenographically and

9   thereafter reduced to typewriting under my

10  direction; that reading and signing was requested;

11  and that I am neither counsel for, related to, nor

12  employed by any of the parties to this case and

13  have no interest, financial or otherwise, in its

14  outcome.

15          IN WITNESS WHEREOF, I have hereunto set my

16  hand on this 12th day of December,

17  2023.

18

19

20

21  _____

22  Tina M. Alfaro, RPR, CRR, RMR

## ERRATA SHEET

I, JEFFREY SILVER, have reviewed the transcript of my deposition taken on December 5, 2023 (Vol. III). The following changes are necessary to correct my testimony:

| Page/Line | Corrected Testimony | Reason for Correction |
|---|---|---|
| 503:16 | "…operated since…" should read "….operated was, since…" | Transcription Error |
| 519:2 | "I don't have specific recollection…" should read "I don't have a specific recollection…" | Transcription Error |
| 520:19 | "…Insurance disagrees with…" should read "…Insurance disagreed with…" | Transcription Error |
| 539:16 | "…one of my previous questions…" should read "…one of my previous answers…" | Transcription Error |
| 561:19 | "…Underwriters, Inc. would result in increased…" should read "…Underwriters, Inc., it would result in increased…" | Transcription Error |
| 577:19 | "…view that the questions you've been asking is…" should read "…view the questions you've been asking as…" | Transcription Error |
| 600:8 | "…Armour Risk Services [sic] Management." should read: "…Armour Risk Management, Inc." | Transcription Error |
| 616:21; 617:3; 617:5 | "…on-line…" should read "…online…" | Transcription Error |
| 621:8-9; 654:1-2; 657:21; 658:13-14; | "…American Employers' Group…" should read "…American Employers'…" | Clarification |

| 716:12-13; 731:21-22 | | |
|---|---|---|
| 636:10 | "…respect to ACIC…" should read "…respect to AEIC…" | Transcription Error |
| 637:3 | "…or ACIC policies…" should read "…or AEIC policies…" | Transcription Error |
| 637:16 | "…AG…" should read "…AGRM…" | Transcription Error |
| 646:22 | "…Article 5th…" should read "…Article 5…" | Transcription Error |
| 650:16 | "…I don't have knowledge what…" should read "…I don't have knowledge of what…" | Transcription Error |
| 675:3-5 | "I don't know what documents that were attached…" should read "I don't know what documents were attached…" | Transcription Error |
| 730:15 | "…ACIC…" should read "…AEIC…" | Transcription Error |
| 741:18-19 | "I don't recall we answered…" should read "I don't recall, we answered…" | Transcription Error |
| 749:10-11 | "As I recall, the Armanino audit that we went was as of December -- as of 2022, as I recall." should read "As I recall, the Armanino audit that we went over was as of December -- as of 2022, as I recall." | Transcription Error |
| 750:12 | "…regulatory company level." should read "…regulatory company action level." | Transcription Error |
| 776:6-7 | "…clean shell, no liabilities…" should read "…clean shell, with no liabilities…" | Transcription Error |
| 779:19 | "…PGIC SPARTA…" should read "…PGIC, SPARTA…" | Transcription Error |

| | | |
|---|---|---|
| 783:5 | "…policyholders of in force premium…"<br>Should read<br>"…policyholders with in force premiums…" | Transcription Error |
| 785:7;<br>785:19 | "…PGI…" should read "…PGIC…" | Transcription Error |
| 785:9-10 | "…from his e-mail section 7…"<br>should read<br>"…from his e-mail about section 7…" | Transcription Error |
| 785:21 | "…correct, section 2.4…"<br>should read<br>"…correct, about section 2.4…" | Transcription Error |
| 787:18 | "…all American's…" should read "…all of American's…" | Transcription Error |
| 789:13-16 | "Did you mean that answer to exclude whatever was stated in the financial statements of PGIC and AEIC the intercompany pooling agreements in paragraph 4 itself?"<br>should read<br>"Did you mean that answer to exclude whatever was stated in the financial statements of PGIC and AEIC, or the intercompany pooling agreements, or in paragraph 4 itself?" | Transcription Error |
| 793:5 | "Does PGI…" should read "Does PGIC…" | Transcription Error |
| 796:10 | "…set forth on section…" should read "…set forth in section…" | Transcription Error |
| 797:6-7 | "…in addition to documents…"<br>should read<br>"…in addition, documents…" | Transcription Error |
| 799:4 | "And it would…" should read "And would…" | Transcription Error |
| 799:15 | "I object to…" should read "I objected to…" | Transcription Error |
| 801:18 | "…in respect of policies…" | Transcription Error |

3

| | | should read<br>"…in respect to policies…" | |
|---|---|---|---|
| 808:14 | "…have been simultaneously been in force…"<br>should read<br>"…have simultaneously been in force…" | Transcription Error |
| 809:11 | "…is that the AEIC's…" should read "…is that AEIC's…" | Transcription Error |
| 809:16 | "…to second restated…"<br>should read<br>"…to the second restated…" | Transcription Error |

I declare under penalty of perjury under the laws of the United States of America that the forgoing is true and correct.

Executed on January 11, 2024

JEFFREY SILVER