*Exhibit 16*

*Excerpts from the Transcript
of SPARTA's Rule 30(b)(6)
Deposition, dated November 15-16, 2023*

1           UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF MASSACHUSETTS

3

4

5    *********************************

6    SPARTA INSURANCE COMPANY,

7                    Plaintiff

8    vs.                        CA NO. 21-11205-FDS

9    PENNSYLVANIA GENERAL INSURANCE

     COMPANY,

10

                     Defendant

11

     *********************************

12

13           VIDEOTAPED DEPOSITION OF:

14        30(b)(6) SPARTA - RONALD P. HARRELL

15      SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

16              500 Boylston Street

17              Boston, Massachusetts

18         November 15, 2023      9:46 a.m.

19

20

21

22             Darlene M. Coppola

23           Registered Merit Reporter

24           Certified Realtime Reporter

1          A.    I don't think so.

2                    MS. SCORDATO:   Beginning at

3     page 12.

4     BY MR. KAPLAN:

5          Q.    Beginning at page 12, yes, or rather,

6     Bates number PGIC 4097.

7

8                    (Exhibit No. 4 marked for

9     identification.)

10

11    BY MR. KAPLAN:

12         Q.    And your counsel has probably already

13    told you this, Mr. Harrell, but you should

14    feel free at any point in the deposition, if

15    you need to refer to a document to refresh

16    your recollection, just to tell us.  And it

17    can be a document that's already been marked,

18    or if there's some other document that you

19    need to refresh your recollection, that's fine

20    too.  We would just mark it for the record.

21         A.    Okay.

22         Q.    Do you recognize this document,

23    Mr. Harrell?

24         A.    I --

1        Q.    Go ahead.

2        A.    Yes, I do.

3        Q.    You recognize it to be a stock

4    purchase agreement entered into as of

5    March 12, 2007 by and between Pennsylvania

6    General Insurance Company, OneBeacon Insurance

7    Company, and SPARTA Insurance Holdings, Inc.?

8        A.    Yes, I recognize that as the parties

9    to the -- to this agreement.

10        Q.    Great.  And I'm looking right now at

11    page 4169, the signature page.  It was

12    executed on behalf of Pennsylvania General

13    Insurance Company by T. Michael Miller, chief

14    executive officer?

15        A.    Yes.

16        Q.    And executed on behalf of OneBeacon

17    Insurance Company by T. Michael Miller, also

18    chief executive officer?

19        A.    Yes.

20        Q.    And it was executed by SPARTA

21    Insurance Holdings, Inc., on behalf of

22    George L. Estes, III.  I see CEO there -- oh,

23    I think it says chair and CEO; is that

24    correct?

1       A.   Yes.

2       Q.   Have you ever spoken with Mr. Estes?

3       A.   I have not.

4       Q.   And just so my question is clear -- I

5   think it was -- but you've never spoken to him

6   for any purpose?

7       A.   No, I do not know Mr. Estes.

8       Q.   And you never communicated with him in

9   writing or anything like that?

10      A.   No.

11      Q.   And just to close the loop, you've

12   never had any communications from Mr. Estes

13   relayed to you in connection with anything, at

14   least to your knowledge?

15             MR. CLARK:  Object to form.

16   What do you mean "relayed"?

17   BY MR. KAPLAN:

18      Q.   Meaning no one's ever told you

19   Mr. Estes said something about something.

20      A.   No, I don't believe that I've seen

21   anything like that.

22      Q.   All right.  The first subtopic for

23   this -- just, by the way, to give you a road

24   map, Mr. Harrell, at least for a lot of the

1   deposition, the topics in the notice will be

2   providing and organizing principle, but if we

3   spend a lot of time today on the first few

4   topics, you know, you needn't despair that,

5   oh, we've got 57 more things that are exactly

6   going to be this length.

7           We will -- there will be doing some

8   jumping around probably, but we'll also --

9   some topics will move quite quickly, or they

10  overlap.

11          So, first, the decision to enter into

12  the stock purchase agreement, I'll just ask

13  you why did SPARTA Insurance Holdings purchase

14  AEIC?

15      A.   SPARTA Insurance Holdings was

16  established to start up an insurance

17  operation, selling insurance through program

18  brokerages.  And the most efficient way to

19  start up an insurance company is to locate and

20  purchase a clean shell, a shell of an

21  insurance company that already possesses the

22  licenses; hence, at the time, the OneBeacon

23  group was clearing out a number of companies,

24  and they approached them.

1       that they acquired -- "they," being Sparta

2       Insurance Holdings, acquired American

3       Employers Insurance Company in 2007.  They --

4       American Employers Insurance Company was a

5       Massachusetts-domiciled insurance company.

6             Sparta Insurance Holdings then

7       requested permission of the State of

8       Massachusetts and the State of Connecticut to

9       redomesticate it to the state of Connecticut,

10      which was approved.  And so American Employers

11      Insurance Company became a Connecticut

12      domestic insurance company.

13            At some point in that process -- and I

14      believe it was immediately after domesticating

15      it into Connecticut -- they also asked for

16      approval of all the states in which they were

17      licensed, which I believe there were 52

18      licenses that came with American Employers, to

19      rename the company SPARTA Insurance Company.

20            That was approved, although it did

21      take an appeal with the State of California

22      because the State of California thought there

23      was another entity that might have a name too

24      close.  But SPARTA appealed that and got

1      permission to change the name to SPARTA

2      Insurance Company.

3             In 2014, when SPARTA Holdings and

4      SPARTA Insurance Company were acquired by

5      Catalina Holdings, Catalina wanted the

6      insurance entities and the holding company

7      merged together.  So they merged.  There was

8      another company -- I believe it was SPARTA

9      Specialty Insurance Company at the time -- but

10     they -- they basically merged them all

11     together into SPARTA Insurance Company.

12            At some point they established -- and

13     I'm not sure when, but at some point they

14     established Catalina U.S. Insurance Services

15     as a wholly owned subsidiary of SPARTA

16     Insurance Company.  And at least up to the

17     point of the liquidation of Bedivere, that's

18     the essential structure that existed for

19     SPARTA.  It owned Catalina U.S. Insurance

20     Services and was, in turn, owned by a series

21     of companies effectively by Catalina Holdings

22     Bermuda.

23         Q.   Okay.  Thank you for that.

24         Very helpful.

1          You say that Catalina wanted SPARTA

2     Insurance Company and SPARTA Insurance

3     Holdings merged together?  Did I get that

4     right?

5          A.   Yes.

6          Q.   Do you know why they wanted them

7     merged together?

8          A.   I don't know the specific reason.

9          Q.   Do you know a general reason?

10         A.   Catalina already had a holding

11    company.  They didn't need another holding

12    company in the tower.

13         Q.   In the what?

14         A.   In the tower of companies.

15         Q.   Got it.

16              Any other reason that you know?

17         A.   No.

18         Q.   You said at some point they

19    established Catalina Insurance Services.  Am I

20    correct that took place after -- am I correct

21    that establishing Catalina Insurance Services

22    took place after SPARTA Insurance Company and

23    SPARTA Insurance Holdings were merged

24    together?

1        A.   I'm not specific on the time as to

2    when they did that.  But at some point after

3    the Catalina acquisition, that was formed.

4        Q.   Now, you said at one point that

5    SPARTA -- correct me if I'm wrong -- SPARTA

6    Insurance Company has no employees?

7                    MR. CLARK:  Object to form.

8        A.   That's correct right now.

9    BY MR. KAPLAN:

10       Q.   And how long has that been true?

11       A.   Upon the formation of Catalina

12   U.S. Insurance Services, all employees were

13   transferred to that entity.

14       Q.   And how does SPARTA Insurance Company

15   operate with no employees?

16       A.   SPARTA Insurance Company is a party to

17   an agreement with Catalina -- with Catalina

18   U.S. Insurance Services -- "CUSIS," we call

19   them -- and through those agreements, they

20   have administrative services agreements,

21   various claim-handling agreements, et cetera.

22

23                   Redacted

24



Redacted

1    policyholders of AEIC in the first instance.

2    However, due to the transfer and assumption

3    with PGIC, we are currently looking to PIC to

4    take on administrative and economic

5    responsibility for the AEIC claims.  Having

6    said that, we reserve our rights to send these

7    to your firm as it is the insurance company

8    whose policies cover the claim.  Moreover,

9    claimants, policyholders, and even regulators

10   may reach out to you concerning your

11   responsibility for these claims.  However, in

12   the event SPARTA finds itself bearing the

13   administrative and economic responsibility for

14   any of all of these claims, SPARTA would have

15   a reinsurance claim against PIC pursuant to

16   the transfer and assumption agreement, and

17   PIC, in turn, would have a reinsurance claim

18   against Bedivere.  For your benefit, I have

19   attached a list of open AEIC claims as of

20   4/14/2021."

21           SPARTA obviously agrees -- correct me

22   if I'm wrong -- with the sentence "SPARTA

23   would have a reinsurance claim against PIC

24   pursuant to the transfer and assumption

1    agreement."

2                    MR. CLARK:  Object to form.

3              I'm just going to say you can testify

4    as to the facts.

5              Whether the legal theories are

6    identical or not, I'm assuming you're not

7    asking him for the legal interpretation.

8                    MR. KAPLAN:  No.  This is a

9    setup for the next question.

10                   MR. CLARK:  Beware of the

11   setup.

12                   MR. KAPLAN:  It's just for

13   context.

14   BY MR. KAPLAN:

15       Q.   My question is is this the first time

16   that anyone suggested that SPARTA would have a

17   reinsurance claim against PIC?

18                   MR. CLARK:  Object to form.

19       A.   I believe this is the first time that

20   we were aware of the 2012 transfer and

21   assumption agreement and also the first time

22   that those of us who had been -- well, it

23   would be Mr. Eisenmann's first look at the

24   2005 transfer and assumption agreement which

1    would form the basis for that claim against

2    PGIC or PIC, its successor company, yes.

3    BY MR. KAPLAN:

4        Q.   So I think you answered the question,

5    but let me just make sure.  Is it accurate to

6    say that people who were involved in

7    investigating how to deal with the AEIC

8    claims, it's the first time that anyone

9    suggested that SPARTA might have a reinsurance

10   claim against PIC for the AEIC claims?

11                   MR. CLARK:   Object to form.

12       A.   Yes.

13   BY MR. KAPLAN:

14       Q.   I'm going to skip Exhibit -- or

15   rather, Topic 29 for now, Mr. Harrell, and

16   move to "Any and all analyses of estimated

17   future liabilities, whether produced in

18   discovery or not, from AEIC claims that SPARTA

19   undertook after it learned of the Bedivere

20   liquidation and the bases for any estimates

21   therein, including all individuals involved in

22   producing them and all documents and

23   information relied on in generating them."

24                   Let me start here, Mr. Harrell, by

1  CERTIFICATION

2  I, DARLENE M. COPPOLA, a Notary Public, do hereby

3  certify that RONALD P. HARRELL, after having

4  satisfactorily identifying himself, came before me on

5  the 15th day of November, 2023, in Boston,

6  Massachusetts, and was by me duly sworn to testify to

7  the truth and nothing but the truth as to his

8  knowledge touching and concerning the matters in

9  controversy in this cause; that he was thereupon

10  examined upon his oath and said examination reduced to

11  writing by me; and that the statement is a true record

12  of the testimony given by the witness, to the best of

13  my knowledge and ability.

14  I further certify that I am not a relative or

15  employee of counsel/attorney for any of the parties,

16  nor a relative or employee of such parties, nor am I

17  financially interested in the outcome of the action.

18  WITNESS MY HAND THIS 28th day of November, 2023.

19

20  *Darlene M. Coppola*

21  DARLENE M. COPPOLA          My commission expires:

22  NOTARY PUBLIC              November 2, 2029

23  REGISTERED MERIT REPORTER

24  CERTIFIED REALTIME REPORTER

1            UNITED STATES DISTRICT COURT
2        FOR THE DISTRICT OF MASSACHUSETTS
3

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

4

SPARTA INSURANCE COMPANY,

5

            Plaintiff

6

vs.                CA NO. 21-11205-FDS

7

PENNSYLVANIA GENERAL INSURANCE

8 COMPANY,
9            Defendant
10    \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
11
12

        VIDEOTAPED DEPOSITION OF:

13

     30(b)(6) SPARTA - RONALD P. HARRELL

14

   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

15

         500 Boylston Street

16

       Boston, Massachusetts

17

     November 16, 2023    9:28 a.m.

18

           Volume II

19
20
21
22         Darlene M. Coppola
23       Registered Merit Reporter
24      Certified Realtime Reporter

1        BY MR. KAPLAN:

2            Q.    Paragraph 3 says -- well, let me

3        just -- so the record's clear, Interrogatory

4        No. 25 says, "For each denial you have made in

5        response to Defendant's requests for

6        admission, describe the basis for such

7        denial."

8                    On the one we're talking about, SPARTA

9        says, "With respect to Request for Admission

10       No. 16, SPARTA states the following:  Between

11       2007 and 2012, SPARTA tendered claims relating

12       to American Employers Insurance Company

13       policies to OneBeacon, PGIC's parent company

14       and the guarantor of PGIC's obligations under

15       the SPA, or other third parties as directed by

16       OneBeacon or its agents."

17                    My question is does SPARTA continue to

18       believe that PGIC's parent company and the

19       guarantor of PGIC's obligations under the SPA

20       were the same entity?

21                        MR. CLARK:  Object to form.

22           A.    They are not the same entity, no.

23       BY MR. KAPLAN:

24           Q.    And how -- and just so the record's

1    clear, how are they different?

2        A.   OneBeacon Insurance Company is an

3    entity.   Pennsylvania General Insurance

4    Company is another entity that I believe was

5    owned by OneBeacon Insurance Company.

6    However, OneBeacon Insurance Company was

7    administering all of the claims for all of the

8    companies.

9        Q.   So is it fair to say that SPARTA

10   tendered claims to OneBeacon Insurance Group

11   or OneBeacon Insurance Company during that

12   period?

13                   MR. CLARK:   Object to form.

14       A.   SPARTA tendered the claims in

15   accordance with the stock purchase agreement.

16   The direction in that, as requested by

17   OneBeacon, was that all notices go to

18   OneBeacon Insurance Company under the

19   agreement.   And as they subsequently directed

20   other places to send those claim notices,

21   SPARTA did that.

22   BY MR. KAPLAN:

23       Q.   And just so we're precise here, you

24   say, "The direction in that, as requested by

1      OneBeacon, was that all notices go to

2      OneBeacon Insurance Company."

3              Who is the OneBeacon that you're

4      referring to when you say "requested by

5      OneBeacon"?

6          A.   The parties to the stock purchase

7      agreement were Pennsylvania General Insurance

8      Company, OneBeacon Insurance Company, and

9      SPARTA Insurance Holdings.  And in the stock

10     purchase agreement, both the seller and the

11     guarantor requested that documents be sent to

12     the same address with a different attention

13     line.

14         Q.   Sometimes you -- am I correct that

15     from 2008 forward, in tendering claims to --

16     pursuant to the stock purchase agreement, they

17     were often sent by e-mail?

18         A.   Yes.

19         Q.   They weren't always sent to the

20     address in the stock purchase agreement,

21     correct?

22         A.   That's correct.

23         Q.   And when they were sent by e-mail,

24     they were sent to a OneBeacon e-mail

1            Q.   At any point in time, did SPARTA treat
2       PGIC as a reinsurer with respect to the AEIC
3       liabilities?
4                      MR. KAPLAN:   Objection to form.
5            A.   No.
6                      MR. KAPLAN:   Go ahead.   You can
7       answer.
8            A.   No.
9       BY MR. CLARK:
10           Q.   At any point in time, did SPARTA treat
11      any of the OneBeacon Group companies as
12      reinsurers with respect to the AEIC
13      liabilities?
14                     MR. KAPLAN:   Objection to form.
15                     Go ahead.
16           A.   No.
17      BY MR. CLARK:
18           Q.   Okay.   Let's turn back to the 2007
19      stock purchase agreement that was marked as
20      Exhibit 4.
21           A.   Okay.
22           Q.   On the first page of the stock
23      purchase agreement, the page that bears the
24      Bates-label PGIC 4097, do you see the top

1        paragraph just below the heading "Stock

2        Purchase Agreement"?

3            A.   Yes.

4            Q.   In the 2007 SPA, what is the defined

5        term assigned to PGIC?

6            A.   Seller.

7            Q.   And what is the defined term assigned

8        to SPARTA?

9            A.   Purchaser.

10           Q.   What is the defined term assigned to

11       OneBeacon Insurance Company?

12           A.   Guarantor.

13           Q.   At any point in time, have there ever

14       been any oral modifications to the 2007 SPA?

15                     MR. KAPLAN:  Object to form.

16       And calls for a legal conclusion.

17                     But go ahead and answer.

18           A.   At any point in time?

19       BY MR. CLARK:

20           Q.   Let me ask the question again.

21                     At any point in time, have there ever

22       been any oral discussions modifying the 2007

23       SPA?

24                     MR. KAPLAN:  Objection to form.

1          Calls for a legal conclusion.

2                         Go ahead and answer.

3               A.    No.

4          BY MR. CLARK:

5               Q.    Does SPARTA have any reason to believe

6          today that the 2007 SPA is no longer in

7          force?

8                         MR. KAPLAN:   Same objections.

9                         Go ahead.

10              A.    No.

11         BY MR. CLARK:

12              Q.    In 2007, what was the purchase price

13         paid for AEIC pursuant to the 2007 SPA?

14              A.    $12 million plus the assets that were

15         remaining in AEIC at the time.

16              Q.    Would SPARTA have paid millions of

17         dollars to receive a company with hundreds of

18         millions of dollars in liabilities?

19                         MR. KAPLAN:   Objection to the

20         form.

21                         But go ahead and answer.

22              A.    No.

23         BY MR. CLARK:

24              Q.    Did SPARTA ever enter into any written

1      agreement with PGIC to amend the 2007 SPA

2      after 2010?

3           A.   No.

4           Q.   Did SPARTA enter into any written

5      agreement with any OneBeacon company to amend

6      the 2007 SPA after 2010?

7           A.   No.

8           Q.   Did SPARTA enter into any written

9      agreement with anyone at any time to amend the

10     2007 SPA after 2010?

11          A.   No.

12          Q.   Did SPARTA provide PGIC with written

13     consent to assign the 2007 SPA to any other

14     party?

15          A.   No.

16                    MR. KAPLAN:  I'm going to just

17     object to the form.

18                    But go ahead.

19          A.   No.

20     BY MR. CLARK:

21          Q.   Did SPARTA provide anyone at any time

22     with written consent to assign the 2007 SPA to

23     any other party?

24                    MR. KAPLAN:  Same objection.

1          And it calls for a legal conclusion.

2                    But go ahead.

3          A.   No.

4     BY MR. CLARK:

5          Q.   I want to turn your attention, sir, to

6     the 2012 stock purchase agreement by and

7     between North American Casualty Company and

8     OneBeacon Insurance Group, which has been

9     marked as Exhibit 16.

10

11               (Stenographer clarification.)

12

13    BY MR. CLARK:

14         Q.   If you turn to the first page of the

15    contract, which is marked PGIC 16035, do you

16    see at the top there's a heading titled "Stock

17    Purchase Agreement"?

18         A.   Yes.

19         Q.   Can you please identify the parties

20    identified in the first paragraph of the 2012

21    stock purchase agreement marked as Exhibit 16?

22         A.   OneBeacon Insurance Group LLC is the

23    seller.  North American Casualty Company is

24    the buyer.  There are no other parties.

1          Q.   Is SPARTA a party to the 2012 SPA

2     marked as Exhibit 16?

3          A.   No.

4          Q.   Is AEIC a party to the 2012 SPA marked

5     as Exhibit 16?

6          A.   No.

7          Q.   I'd like to turn your attention, sir,

8     to Exhibit No. 13, which is a 2012 instrument

9     of transfer and assumption by and between

10    OneBeacon Insurance Company and PGIC bearing

11    the Bates-label PGIC 5137.

12               Do you have that document in front of

13    you, sir?

14         A.   Yes.

15         Q.   Okay.  Do you see on the first page of

16    the 2012 transfer and assumption agreement

17    there is a paragraph at the top that

18    identifies the parties?

19         A.   Yes.

20         Q.   Who are the parties to the 2012

21    transfer and assumption agreement marked as

22    Exhibit 13?

23         A.   OneBeacon Insurance Company and

24    Pennsylvania General Insurance Company.

1          Q.    Is SPARTA a party to the 2012 transfer
2     and assumption agreement marked as Exhibit 13?
3          A.    No.
4          Q.    Is AEIC a party to the 2012 transfer
5     and assumption agreement marked as Exhibit 13?
6          A.    No.
7          Q.    Did SPARTA sign any documents in
8     connection with the 2012 sale of PGIC?
9          A.    No.
10         Q.    Did SPARTA consent in writing to the
11    2012 SPA marked as Exhibit 13 at any time?
12         A.    The transfer and assumption marked as
13    Exhibit 13?
14         Q.    Thank you.  I misspoke.  Withdraw the
15    question.
16               Did SPARTA consent in writing to the
17    2012 SPA marked as Exhibit 16 at any time?
18                    MR. KAPLAN:  Objection to the
19    form.  And calls for a legal conclusion.
20                    Go ahead and answer.
21         A.    No.
22    BY MR. CLARK:
23         Q.    Did SPARTA sign any writing consenting
24    to the 2012 SPA marked as Exhibit 16?

1          MR. KAPLAN:  Same objection.

2          Go ahead.

3      A.   No.

4  BY MR. CLARK:

5      Q.   Did SPARTA verbally consent to the

6  2012 SPA marked as Exhibit 16 at any time?

7      A.   No.

8      Q.   Did SPARTA consent in writing to the

9  2012 transfer and assumption agreement marked

10  as Exhibit 13 at any time?

11          MR. KAPLAN:  Same objection as

12  before.

13          Go ahead.

14      A.   No.

15  BY MR. CLARK:

16      Q.   Did SPARTA consent verbally to the

17  2012 transfer and assumption agreement marked

18  as Exhibit 13 at any point in time?

19      A.   No.

20      Q.   In 2012, did SPARTA sign any documents

21  that purported to amend the 2007 SPA?

22          MR. KAPLAN:  Objection to form.

23  Calls for a legal conclusion.

24          Go ahead.

1   A. No.

2 BY MR. CLARK:

3   Q. After 2012, did SPARTA sign any

4 documents that purported to amend the 2007

5 SPA?

6       MR. KAPLAN: Same objection.

7       Go ahead.

8   A. No.

9 BY MR. CLARK:

10   Q. Did PGIC notify SPARTA of the 2012 SPA

11 marked as Exhibit 16 before the 2012 SPA was

12 executed?

13       MR. KAPLAN: Objection.

14 Foundation. And objection to the form.

15       MR. CLARK: What's wrong with

16 the form?

17       MR. KAPLAN: "Notify."

18 BY MR. CLARK:

19   Q. Did SPARTA receive any communication

20 from PGIC about the 2012 SPA marked as

21 Exhibit 16 before Exhibit 16 was executed?

22       MR. KAPLAN: Just -- this time,

23 just foundation.

24   A. No.

1      BY MR. CLARK:

2         Q.  Did SPARTA receive any communication

3      from NAC about the 2012 SPA marked as

4      Exhibit 16 before Exhibit 16 was executed?

5         A.  No.

6         Q.  Did SPARTA receive any communication

7      from anyone about the 2012 SPA marked as

8      Exhibit 16 before Exhibit 16 was executed?

9               MR. KAPLAN:  The same foundation

10     objection.

11        A.  No.

12     BY MR. CLARK:

13        Q.  Did SPARTA receive any communication

14     from PGIC about the 2012 transfer and

15     assumption agreement marked as Exhibit 13

16     before Exhibit 13 was executed?

17              MR. KAPLAN:  Same objection on

18     foundation.

19        A.  No.

20     BY MR. CLARK:

21        Q.  Did SPARTA receive any communication

22     from any OneBeacon company about the 2012

23     transfer and assumption agreement marked as

24     Exhibit 13 before Exhibit 13 was executed?

1          MR. KAPLAN:  Same objection on

2   foundation.

3          A.   No.

4   BY MR. CLARK:

5          Q.   Prior to the Bedivere liquidation, did

6   PGIC provide SPARTA with a copy of the 2012

7   SPA?

8          A.   No.

9          MR. KAPLAN:  Same objection on

10  foundation.

11         A.   No.

12  BY MR. CLARK:

13         Q.   Prior to the Bedivere liquidation, did

14  PGIC provide SPARTA with a copy of the 2012

15  transfer and assumption agreement?

16         MR. KAPLAN:  Same objection.

17         A.   No.

18  BY MR. CLARK:

19         Q.   Prior to the Bedivere liquidation, did

20  NAC provide SPARTA with a copy of the 2012

21  SPA?

22         MR. KAPLAN:  Same objection.

23         A.   No.

24  BY MR. CLARK:

1          Q.   Prior to the Bedivere liquidation, did

2     NAC provide SPARTA with a copy of the 2012

3     transfer and assumption agreement?

4                    MR. KAPLAN:  Same objection.

5          A.   No.

6     BY MR. CLARK:

7          Q.   Prior to the Bedivere liquidation, did

8     any OneBeacon company provide SPARTA with a

9     copy of the 2012 SPA?

10                    MR. KAPLAN:  Same objection.

11         A.   No.

12     BY MR. CLARK:

13         Q.   Prior to the Bedivere liquidation, did

14     any OneBeacon company provide SPARTA with a

15     copy of the 2012 transfer and assumption

16     agreement?

17                    MR. KAPLAN:  Same objection.

18         A.   No.

19     BY MR. CLARK:

20         Q.   Did SPARTA receive a copy of the 2012

21     transfer and assumption agreement marked as

22     Exhibit 13 from anyone prior to Exhibit 13

23     being executed?

24                    MR. KAPLAN:  Same objection.

1      A.    No.

2      BY MR. CLARK:

3           Q.    Did SPARTA receive any communication

4      from anyone about the 2012 transfer and

5      assumption agreement marked as Exhibit 13

6      before it was executed?

7                     MR. KAPLAN:   Same objection.

8           A.    No.

9                     MR. CLARK:   I'm marking as

10     Exhibit 158 a document bearing the Bates-label

11     SPARTA-91855.

12

13                    (Exhibit No. 158 marked for

14     identification.)

15

16                    MR. CLARK:   It's an agreement

17     and plan of merger entered into as of

18     October 9, 2015 by and between SPARTA

19     Insurance Company and SPARTA Insurance

20     Holdings Inc.

21     BY MR. CLARK:

22          Q.    Do you have that document, sir?

23          A.    I do.

24          Q.    In October 2015, did SPARTA Insurance

1    Holdings Inc. merge into SPARTA Insurance

2    Company?

3        A.    Yes.

4        Q.    Please turn to the second page of

5    Exhibit 158.  In the middle of the page,

6    there's a section titled "Article 2, Surviving

7    Corporation."

8             Do you see that?

9        A.    I do, yes.

10       Q.    Pursuant to the October 2015 merger

11   agreement marked as Exhibit 158, was SPARTA

12   Insurance Company the surviving corporation?

13             MR. KAPLAN:  Objection to the

14   form.  Calls for a legal conclusion.

15             But go ahead and answer.

16       A.    Yes, SPARTA Insurance Company was the

17   surviving organization.

18   BY MR. CLARK:

19       Q.    Exhibit 158 includes a section titled

20   "Article 2," correct?

21       A.    Yes.

22       Q.    Could you read for the record the

23   words that come directly after "Article 2."

24       A.    "Surviving corporation."

1          Q.   After those words, there's one

2     sentence.

3               Do you see that, sir?

4          A.   I do.

5          Q.   Could you please read that one

6     sentence in Exhibit 158 into the record,

7     please.

8          A.   "SIC's," which is previously defined

9     as SPARTA Insurance Company, "articles of

10     incorporation, bylaws, officers, and directors

11     as of the effective time shall remain

12     unaffected and unchanged by the merger."

13

14               (Exhibit No. 159 marked for

15     identification.)

16

17     BY MR. CLARK:

18          Q.   I'm handing you a document I've marked

19     as Exhibit 159.  It's a document bearing the

20     Bates-label SPARTA-59862.   It's an e-mail

21     exchange from 2009.

22               Please take a moment to review that

23     document.

24          A.   (Witness reviews document.)

1                        CERTIFICATION

2          I, DARLENE M. COPPOLA, a Notary Public, do hereby

3    certify that RONALD P. HARRELL, after having

4    satisfactorily identifying himself, came before me on

5    the 16th day of November, 2023, in Boston,

6    Massachusetts, and was by me duly sworn to testify to

7    the truth and nothing but the truth as to his

8    knowledge touching and concerning the matters in

9    controversy in this cause; that he was thereupon

10   examined upon his oath and said examination reduced to

11   writing by me; and that the statement is a true record

12   of the testimony given by the witness, to the best of

13   my knowledge and ability.

14          I further certify that I am not a relative or

15   employee of counsel/attorney for any of the parties,

16   nor a relative or employee of such parties, nor am I

17   financially interested in the outcome of the action.

18          WITNESS MY HAND THIS 28th day of November, 2023.

19

20   *Darlene M. Coppola*

21   DARLENE M. COPPOLA            My commission expires:

22   NOTARY PUBLIC                 November 2, 2029

23   REGISTERED MERIT REPORTER

24   CERTIFIED REALTIME REPORTER